# EXHIBIT A

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF TEXAS
 2                            MARSHALL DIVISION

 3   VARTA MICROBATTERY, GMBH,      (  CAUSE NO. 2:21-CV-400-JRG
                                    )
 4           Plaintiff,             (
                                    )
 5   vs.                            (
                                    )
 6   EVE ENERGY, CO., LTD.,         (
     et al.,                        )  MARSHALL, TEXAS
 7                                  (  AUGUST 7, 2023
             Defendants.            )  9:00 A.M.
 8   _____

 9

10
     _____
11
                        PRETRIAL CONFERENCE
12
                 BEFORE THE HONORABLE ROY S. PAYNE
13               UNITED STATES MAGISTRATE JUDGE

14   _____

15

16

17

18

19

20

21

22               SHAWN McROBERTS, RMR, CRR
                     100 E. HOUSTON STREET
23                MARSHALL, TEXAS  75670
                        (903) 923-8546
24            shawn_mcroberts@txed.uscourts.gov

25
```

```
 1                          A P P E A R A N C E S

 2          FOR THE PLAINTIFFS:    LEYDIG VOIT & MAYER - CHICAGO
                                   TWO PRUDENTIAL PLAZA
 3                                 180 NORTH STETSON, SUITE 4900
                                   CHICAGO, ILLINOIS  60601-6780
 4                                 (312) 616-5600
                                   BY: MR. H. MICHAEL HARTMANN
 5                                     MR. PAUL FILBIN
                                       MR. ROBERT WITTMANN
 6                                     MR. WESLEY MUELLER

 7                                 RAMEY & FLOCK, PC
                                   100 E. FERGUSON ST., SUITE 500
 8                                 TYLER, TEXAS  75702
                                   (903) 597-3301
 9                                 BY:  MR. ANDREW STINSON

10          FOR THE DEFENDANTS:    MAYER BROWN, LLP - DC
                                   1999 K STREET, NW
11                                 WASHINGTON, DC 20006-1101
                                   (202) 263-3040
12                                 BY:  MR. GARY HNATH

13                                 ARCH & LAKE, LLP
                                   203 N. LaSALLE ST., SUITE 2100
14                                 CHICAGO, ILLINOIS  60601
                                   (312) 558-1368
15                                 BY:  MR. PETER CURTIN
                                       MR. SHEN WANG
16
                                   Patton Tidwell & Culbertson,
17                                 LLP - Texarkana
                                   2800 Texas Boulevard
18                                 Texarkana, TX 75503
                                   (903) 792-7080
19                                 BY:  MR. GEOFFREY CULBERTSON

20          OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                   100 E. HOUSTON STREET
21                                 MARSHALL, TEXAS  75670
                                   (903) 923-7464
22

23

24

25
```

```
 1                THE COURT:  Good morning.  Please be seated.

 2         For the record, we're here for the pretrial conference

 3    in VARTA Microbattery versus EVE Energy, which is under lead

 4    Case No. 2:21-400 on our docket.

 5         Would counsel state their appearances for the record?

 6                MR. STINSON:  Good morning, Your Honor.  Andy

 7    Stinson here for VARTA.  Here with me are Mike Hartmann.

 8                MR. HARTMANN:  Good morning, Your Honor.

 9                THE COURT:  Good morning.

10                MR. STINSON:  Wes Mueller.

11                MR. MUELLER:  Good morning, Your Honor.

12                THE COURT:  Good morning.

13                MR. STINSON:  Bob Wittmann.

14                MR. WITTMAN:  Good morning, Your Honor.

15                THE COURT:  Good morning.

16                MR. STINSON:  And Paul Filbin.

17                MR. FILBIN:  Good morning, Your Honor.

18                THE COURT:  Good morning.

19                MR. STINSON:  And Your Honor, We're ready to

20    proceed.  Thank you.

21                THE COURT:  Thank you, Mr. Stinson.

22                MR. CULBERTSON:  Good morning, Your Honor.  Geoff

23    Culbertson for EVE Energy.  Today from Mayer Brown I have Gary

24    Hnath with me.

25                MR. HNATH:  Good morning, Your Honor.
```

```
 1              THE COURT:  Good morning.

 2              MR. CULBERTSON:  And from the Arch & Lake law firm,

 3   I have Shen Wang.

 4              MR. WANG:  Good morning, Your Honor.

 5              THE COURT:  Good morning.

 6              MR. CULBERTSON:  And Peter Curtin.

 7              MR. CURTIN:  Good morning, Your Honor.

 8          `   THE COURT:  Good morning.

 9              MR. CULBERTSON:  And EVE is ready to proceed.

10              THE COURT:  Thank you, Mr. Culbertson.

11              MR. CULBERTSON:  Thank you.

12              THE COURT:  As counsel are aware, this case is set

13   for jury selection before Judge Gilstrap on September the

14   11th.  I know that Judge Gilstrap has recently been moving a

15   lot of the jury selections to the Friday before to allow more

16   time during the trial week.  I am not aware of that having

17   been done on this case, but I'll seek to find out whether that

18   is going to be done and let you know right away if it is.

19         There are currently three other cases also, three other

20   patent cases on this September 11 docket.  I know that some of

21   them are in active settlement negotiation.  I'll learn more

22   about that.  And there has not been a decision made by Judge

23   Gilstrap's chambers yet about the order of trials for this

24   docket, but I expect that to be coming soon, and I'll make

25   sure you're advised where you stand on it as soon as I know.
```

1        I wanted to ask a question of counsel for Defendants.  I

2   saw a reference in one of the recent notices to a decision to

3   withdraw the invalidity defense.  And tell me what the timing

4   on that is.

5        MR. HNATH:  Yes, Your Honor.

6        I believe that we have decided to withdraw the defense.

7   We've notified VARTA of that.  We can file whatever is

8   necessary formally with the Court, but I think we've also

9   indicated that in our papers as well.  So...

10        THE COURT:  All right.  So I can consider that that

11   is done at this time?

12        MR. HNATH:  Yes, Your Honor, you can.

13        THE COURT:  All right.  Thank you, then, Mr. Hnath.

14        We'll -- I know that will have some effect on some of the

15   other motions, and we can talk about that as we go through.

16        It seems to me, based on looking at the issues and the

17   witnesses, that 11 hours per side should be sufficient for the

18   evidence.  That, of course, does not include the time for jury

19   selection, openings, and closings; that's just the time during

20   which each side is presenting evidence to the jury.  If either

21   side wants to argue that that is not sufficient, I'm happy to

22   hear the argument, but I see none at this point.

23        MR. HARTMANN:  I think Plaintiff is fine with the 11

24   hours, Your Honor.

25        THE COURT:  All right.  Thank you, Mr. Hartmann.

1          Then there will also be 30 minutes per side for the voir

2     dire, 30 minutes for openings, and you can expect 40 minutes

3     for closings.  Obviously you'll have a chance to talk to Judge

4     Gilstrap about that well before closing, but that's his

5     ordinary practice.

6          Does either side have any questions about what the voir

7     dire practice is?  I'm happy to answer them, but I know that

8     both sides have local counsel with experience in that regard

9     and you may not need it.  But if there are any questions about

10    what Judge Gilstrap's current practices are, I'm happy to take

11    that up.

12             MR. MUELLER:  Your Honor, this is Wes Mueller on

13    behalf of VARTA.

14         One of the questions that we had asked and didn't know

15    the precise answer was in the voir dire reference to foreign

16    nationals.  It's a German Plaintiff and a Chinese Defendant,

17    and we understand that the Court is very sensitive about

18    reference in that regard, but it seems to us it's a legitimate

19    question that --

20             THE COURT:  You're talking about the standing order

21    on motions in limine?

22             MR. MUELLER:  Yes.

23             THE COURT:  All right.  And I do think that you're

24    exactly right, that the -- what Judge Gilstrap is concerned

25    about is attempts at disparagement based on the nationality,

1    and certainly he is not intending to exclude factual

2    references that are relevant to the case.  I'm trying to see

3    if I can find the precise language of that standing MIL.

4              MR. CULBERTSON:  I believe it's No. 2, Your Honor.

5              THE COURT:  Which number, Mr. Culbertson?

6              MR. CULBERTSON:  No. 2, I believe.

7              THE COURT:  Okay.  Right.  Certainly, Mr. Mueller,

8    you can be assured that a relevant reference to the

9    nationality of a party will not violate that MIL, but I do

10   think that if there was repeated use of that Chinese company

11   does this and that Chinese company does that, that that might

12   be deemed to cross the line there, but a reference that each

13   party is wherever it is is not going to be a problem.

14             MR. MUELLER:  Understood, Your Honor.  Thank you.

15             MR. HNATH:  And Your Honor, could I just ask one

16   point of clarification?

17             THE COURT:  Yes, Mr. Hnath.

18             MR. HNATH:  My understanding is that part of the

19   purpose of the voir dire process is to determine whether any

20   members of the potential jury may have biases or prejudices

21   against, for example, Chinese companies, and that is something

22   that we would intend to develop during the voir dire process.

23             THE COURT:  And I think that's certainly proper and

24   appropriate, and especially if it's coming from the party that

25   would be the subject of that animus, if there was any.  And --

1    in other words, if we had a case against a Chinese defendant

2    and the plaintiff kept asking if the jury had problems with

3    the Chinese doing this or the Chinese doing that, that might

4    be found to be disingenuous, but certainly if your side is

5    concerned about a certain animus, there is nothing

6    inappropriate about reviewing that.

7         And I'll note in the order on MILs that this issue was

8    raised by the parties and that the Court instructed that under

9    the circumstances of this case, appropriate references by both

10   sides to the nationality of their client would not be a

11   violation of this MIL.

12             MR. HNATH:  Understood, and thank you, Your Honor.

13             THE COURT:  All right.  So the -- basically the

14   bottom line is that after the Court has done its standard voir

15   dire and the parties have each used their 30 minutes, or as

16   much of it as they want, then the Court will take up

17   challenges for cause.  And then Judge Gilstrap does the

18   peremptory strikes, and I think four per side, on a

19   simultaneous written basis so that each side provides the

20   Court with the four strikes at the same time that -- you will

21   not know the other side's peremptories at the time you do

22   yours and the like, but -- and then the eight jurors first

23   remaining will be the trial jury.

24        Obviously, as you know, there are no alternates in

25   federal civil trials, so all eight will deliberate, but the

1    reason there are eight is that the Court has to have six in

2    order to go to a verdict without consent of both sides and,

3    therefore, eight is chosen so that if unexpectedly one becomes

4    unavailable, or even two, that a case can still proceed to

5    verdict with the remainder.

6        I believe that the deadline for jury questionnaires is

7    August the 14th in this DCO, so if the parties can agree on

8    and believe that a questionnaire would be helpful, we need to

9    have you provide that to our Deputy-In-Charge, Ms. Clendening,

10   by no later than August the 14th.  It would probably be

11   prudent, if you can get it done before then, to do it in case

12   there's some problem with what you submit, there will still be

13   time to fix it and get it out.  If you do, then that jury

14   questionnaire will be made available to you I believe the

15   Thursday before the jury selection, which I think is September

16   the 7th.  But Ms. Clendening can give you details about that

17   if you have any questions.

18       Judge Gilstrap has a standing order on the use of that

19   jury information, so you can consult it if you have detailed

20   questions, but basically the bottom line is that we provide

21   that to counsel with the understanding that counsel will not

22   disseminate it, will not use it beyond the jury selection

23   process; that after that time it will be either returned or

24   destroyed.  And we do that as part of our promise to our

25   jurors to keep their information confidential.

1          On that same day, the Thursday before when you can pick

2     up the jury information, we want you to drop off jury

3     notebooks.  We do require that there be a set of 12 jury

4     notebooks delivered to the Court by that noon on Thursday.

5     That gives the Court enough time to make sure that they're in

6     proper shape before jury selection.

7          The jury notebook is to have in it the patents, the

8     asserted patents, and if there -- obviously if there are some

9     that are dropped between now and then, then obviously it's

10    only the patents that you'll be -- the Plaintiff will be

11    asserting at trial.  But copies of those patents.  And we're

12    talking single-sided copies in a three-ring jury notebook with

13    tabs separating the patents and identifying them.

14         The claim construction should also be in there, and as I

15    think counsel understand, the intent of that is not the claim

16    construction order but just a table showing simply the term

17    construed and the Court's construction of it on a side-by-side

18    basis.

19         I noticed in the pretrial order you have some fairly

20    extensive stipulations.  Any of those stipulations that are

21    intended for the jury should be in the jury notebook so that

22    the jurors can look at them that way as opposed to the Court

23    reading them the stipulations.  To the extent that your

24    stipulations are for purposes of appeal or post-trial, those

25    don't need to be in there, but any stipulation that the

1    parties want the jury to consider should be in the jury

2    notebooks.

3         And then the last section of the jury notebooks is to be

4    a set of pages that have a head-and-shoulders shot of the

5    witness, and under the picture the name of the witness.  The

6    intent of those is to allow the jury to see the witness during

7    their deliberations when they're trying to evaluate the

8    testimony.  Many of them will be taking notes about the

9    witnesses that will be on the same page as that picture, and

10   the jurors always tell us that that's a real aid to their

11   recollection of the particular testimony of those witnesses.

12   So that's something that we routinely order.

13        I think that we'll be able to get you some written

14   details about the jury notebook and -- but if you have any

15   questions about what that requires, I'll be happy to take them

16   up now.

17        Mr. Stinson or Mr. Culbertson, is there anything that

18   you-all have encountered that you want clarification on?

19             MR. STINSON:  No, Your Honor, for Plaintiff.  Thank

20   you.

21             MR. CULBERTSON:  Thank you, Your Honor.  It's clear.

22   Thank you.

23             THE COURT:  All right.  Great.  Thank you.

24        I understand from the pretrial order that there was

25   an issue about when the Defendant was going to be able to

1    identify which of its witnesses would be brought to trial.

2    Is that something that the Defendant is prepared to discuss

3    or has already provided notice of to the Plaintiff?

4          MR. HNATH:  Your Honor, we are still working

5    through travel issues for our witnesses.  We are keeping

6    VARTA up-to-date in terms of the status of that, and we will

7    continue to do so.  We hope within a week to be able to make a

8    final decision on who can actually come to trial, who will be

9    able to come to trial.

10         THE COURT:  All right.  Thank you, Mr. Hnath.

11      Is that working to the satisfaction of Plaintiff's

12   counsel at this point.

13         MR. HARTMANN:  Your Honor, it is partially, but

14   we do want to reserve the right to possibly take some trial

15   depositions should the witness -- or should any of them not

16   show up at the last moment.

17         THE COURT:  Have you indicated -- are you just

18   saying you want to have the deposition of their corporate

19   representative, or are there particular employees that you

20   are talking about?

21         MR. HARTMANN:  Both, conceivably; both.  It would

22   obviously be limited to those witnesses who will then -- who

23   will not show up.

24         THE COURT:  Well, why isn't that something that

25   would have been accomplished in discovery?

1    MR. HARTMANN:  Well, because we don't know -- during

2    discovery we didn't know who would show up and who would not

3    show up.

4    THE COURT:  Well, if they don't show up they won't

5    be showing up.

6    MR. HARTMANN:  Right.

7    THE COURT:  So why would you want their deposition?

8    MR. HARTMANN:  Well, for one reason, because the

9    case is much more focused now than it was during discovery.

10   For another reason, because the discovery depositions were

11   very, shall I say, difficult.  They were taken through

12   translators, and it was very convoluted, and some of the

13   testimony is, frankly, difficult to follow, whereas now we

14   have a very much more focused set of issues.

15   THE COURT:  All right.  Thank you, Mr. Hartmann.

16   Mr. Hnath, what is the Defendants' position on

17   depositions of its representatives?

18   MR. HNATH:  Your Honor, I'm not sure if the

19   discovery depositions are inadequate, but we are willing to

20   work with VARTA's counsel if witnesses are unable to come, as

21   long as the request is reasonable and we have agreement in

22   terms of how the depositions will be taken, what the ground

23   rules will be and so forth and so on.  So it's something that

24   if witnesses are unable to come, we are willing to work with

25   them on.

1           THE COURT:  All right.  Well, if the parties work it

2    out, then that is fine, and if you reach a dispute about it, I

3    will address it at that time.

4           MR. HARTMANN:  Thank you.

5           MR. HNATH:  Thank you, Your Honor.

6           THE COURT:  All right.  Thank you.

7        Are there any other issues about the witnesses that

8    either side intends to call, any objections to them, or

9    problems that the parties anticipate will be something that

10   will have to be resolved before trial?

11          MR. HARTMANN:  Not that I'm aware of presently.

12   Thank you.

13          MR. HNATH:  None from us, Your Honor.

14          THE COURT:  All right.  Very good.

15       I know that we have a couple of motions to argue.  I

16   would also like to take up the motions in limine and the

17   exhibit issues.

18       First I wanted to go through a couple of items in the

19   pretrial order, and I don't know which side wants to speak to

20   this, but in the stipulations related to case management on

21   page 11 of the pretrial order, it refers to disputes about

22   demonstratives and then it says, "Any objections shall be

23   discussed and presented to the Court in the manner set forth

24   in paragraph 11," but paragraph 8 is the last paragraph of

25   that section.  So if there is a manner that was to be set

1    forth in paragraph 11, it would be helpful to know.

2              MR. MUELLER:  Yes, Your Honor.  Apologies.  I --

3    this was, as you can imagine, a making of sausage, and I

4    believe that actually the Defendants proposed some fairly

5    significant changes that we couldn't consider and get into the

6    pretrial order on these very issues.  So I guess I would

7    suggest that the parties work out what those details might be

8    on exchange of demonstrative exhibits.  We had agreed with

9    Defendants' counsel that any issue that wasn't addressed would

10   be worked on in good faith in terms of case management issues.

11             THE COURT:  Well, certainly we can set a date for

12   you to meet and confer and file any additional stipulations

13   regarding case management.  The main thing I wanted to add to

14   whatever arrangement you work out is to make sure that it

15   includes a provision that at the end of the meet and confer

16   process, if there are objections that have not been resolved

17   by that process, that there needs to be notice to the Court by

18   email to the law clerk by no later than 10:00 p.m. of the

19   evening before the issue is to come up.

20        Judge Gilstrap's practice is that he'll be in chambers by

21   no later than 7:30 every morning, with the idea that if there

22   are disputes that have not been resolved, they can be taken up

23   in that hour between 7:30 and 8:30 when the jury is expecting

24   to start back up.  He wants to have information about any

25   unresolved disputes provided to chambers by 7:00 a.m.  So in

1   the case of a dispute about a demonstrative, a copy of the

2   demonstrative and a short statement by each side about what

3   the issue is would be delivered to chambers by 7:00, and then

4   he would meet with counsel starting at 7:30 to resolve those

5   issues.

6       So that is -- whatever you agree to in terms of your meet

7   and confer process is up to you, how early you want to have

8   the information provided to one side, those are things that

9   certainly we hope you will agree on, but we want to make sure

10   that the back end contains what Judge Gilstrap needs to be

11   able to decide these disputes and not slow down the trial.

12       Does that make sense, Mr. Mueller?

13          MR. MUELLER:  That makes sense to us, Your Honor.

14   Thank you.

15          THE COURT:  All right.  One other thing I wanted to

16   mention, and I think I'm reading your stipulations right, is

17   that they appear to say that any disputes about deposition

18   designations, what's to be presented to the jury, need to be

19   presented to the Court not the day before the use but the day

20   before that, so that -- so the Court can take them up the day

21   before they're to be presented to the jury.  The concern is

22   that in cases in the past there have been problems editing the

23   depositions on a timely basis.  If the dispute is not resolved

24   until the day they are to be used, sometimes that results in

25   delays, then, that affect the jury.  So the intent is that the

1    Court is -- needs to hear the dispute the day before the

2    deposition is going to be used, and that typically means that

3    the parties have to meet and confer about it the day before

4    that.  But anyway, I think that's what you've provided in your

5    stipulation.

6         All right.  Unless there are some other questions about

7    trial management issues, I'd like to turn to the motions in

8    limine now.  And I'll start with the Plaintiff's motions in

9    limine and hear from the Plaintiff about that.

10             MR. MUELLER:  Thank you, Your Honor.  Wes Mueller on

11   behalf of the Plaintiff VARTA Microbattery.

12        And I believe we're talking about the correct one in

13   the right sequence here, but there have been quite a few

14   agreements in the past day or two and we've proposed, you

15   know, ordering.  And so if I'm not on the same page as you,

16   I certainly would welcome a heads up and let me know which

17   motion you would like us to address.

18        But the first one that is on my list is VARTA's request

19   for leave to modify the Court's Motion in Limine No. 9, which

20   is reference to copying.

21             THE COURT:  I have that as your last motion in

22   limine, which would be your Motion in Limine No. 6, but I'm

23   happy to start there if -- it doesn't matter to me.  I'm

24   looking at your Document No. 177, which is entitled

25   "Plaintiff's Opposed Motions in Limine."

1          MR. MUELLER:  Okay.  Thank you, Your Honor.

2      So Plaintiff's Motion in Limine No. 1, which was

3  regarding production capacity, has been resolved, and so it

4  is being withdrawn.

5          THE COURT:  All right.

6          MR. MUELLER:  Plaintiff's Motion in Limine No. 2,

7  which is to preclude testimony and argument about EVE's own

8  patents is a motion in limine that is still in play, and I'm

9  happy to address that one first, Your Honor.

10          THE COURT:  All right.

11          MR. MUELLER:  Okay.  So for Plaintiff's Motion in

12  Limine No. 2 regarding reference to EVE's patents --

13      Bob, can we put up slide 70?

14      -- the problem with reference to EVE's patents or its

15  own patents in the abstract is we believe that it creates a

16  misimpression that EVE does not infringe because it has its

17  own patents.  And the case law indicates it's not relevant to

18  the issue of infringement and not relevant to the issue of

19  willful infringement, and I believe that that concept is not

20  in dispute with respect to the Defendants' position.

21      And so if we look at slide 73, please.

22      What EVE's position is essentially, its expert witness is

23  intending to introduce testimony that the reasonable royalty

24  would be altered because EVE has a sizable portfolio of

25  patents concerning its batteries, and so, therefore, it ought

1    to pay less in terms of a reasonable royalty.  But the problem

2    with that intended testimony is that it's only conclusory and

3    there's no evidence that any EVE patents actually cover its

4    coin cells.  And Mr. Kline at his deposition so indicated that

5    he hadn't done any infringement analysis.

6        And so, therefore, what we submit is that testimony and

7    evidence about EVE's own patents, because it's not probative

8    to the question of infringement and because it has such a

9    great threat to cause a misunderstanding and a misimpression

10   in the minds of the jury, that it ought to be excluded.

11   That's essentially the Plaintiff's position.

12           THE COURT:  Mr. Mueller, we routinely hear testimony

13   from the defendant's corporate representative that the

14   defendant is an innovator, that the defendant owns patents of

15   its own and respects the intellectual property of others.  Are

16   you seeking to exclude testimony at that high a level?

17           MR. MUELLER:  Not at that high level.  And again,

18   one of the issues in this case we propose or intend to present

19   is that EVE willfully infringed the patents, and so we

20   acknowledge that the totality of the circumstances, such as,

21   you know, testimony about we're an innovator and we have, you

22   know, our own innovations is not something that we are seeking

23   to exclude with this motion in limine; more, it's directed to

24   EVE's particular patent portfolio covers its own patents

25   because, one, there's no evidence that that is the case; and

1   two, such evidence is so problematic in terms of its

2   prejudicial nature and confusion in the minds of the jury.

3           THE COURT:  So what you're seeking to exclude would

4   be testimony or argument that EVE has patents that cover the

5   accused products?

6           MR. MUELLER:  That's correct, Your Honor.

7           THE COURT:  All right.  And let me hear the response

8   to that.

9           MR. HNATH:  Thank you.

10      And could we pull up slide 39 from --

11      So, Your Honor, we do not intend to argue that EVE does

12   not infringe because they have their own patents.  We do think

13   that it's relevant for two reasons.  First of all, under

14   *Georgia-Pacific*, the other side, Mr. Metzdorff, VARTA's

15   expert, has opined that other than claiming its superiority

16   over VARTA for certain product specifications, EVE has not

17   contributed any non-patented elements, manufacturing

18   processes, unique business risks, significant features or

19   improvements to the batteries that it's provided to customers.

20      In response, our damages expert, Mr. Kline, notes that

21   EVE's batteries have their own proprietary intellectual

22   property, that EVE has filed numerous patents covering their

23   coin cells--for example, they have approximately 97 relevant

24   patents and patent applications relating to their coin

25   cells--and, as a result, he opines that *Georgia-Pacific* factor

1    No. 13 would support a royalty rate towards the lower end of

2    the cost and income approach indicators.

3         So we believe that EVE's patents are relevant for two

4    reasons:  No. 1, as one of the *Georgia-Pacific* factors; and

5    No. 2, as I think you've indicated, that we would want to

6    argue that EVE is an innovator, that they're not simply a

7    copycat, that they do have a sizable patent portfolio of their

8    own.  We would expect that EVE's witnesses will tie together

9    those patents and their products if there's any evidentiary

10   gap there.  And so we believe the evidence is relevant and

11   that should not be excluded.

12        THE COURT:  And are you going to have any evidence

13   that EVE's patents cover the accused products?

14        MR. HNATH:  Yes.  So I think in and of itself the

15   fact that they have patents shows that they are also an

16   innovator, and so to that extent I'm not sure it's necessary

17   to show that the patents cover the accused products; but to

18   the extent that it relates to *Georgia-Pacific No.* 13, yes, our

19   witnesses will talk about the relationship between the patents

20   and EVE's products.

21        THE COURT:  And is that evidence that's been

22   disclosed?

23        MR. HNATH:  I'm not sure there's been any specific

24   request for it.  We have provided a list of the patents.

25        THE COURT:  So the -- obviously the fact that you

1    may have patents that cover some feature of the accused

2    products isn't relevant to the infringement issue, but you're

3    saying that the *Georgia-Pacific* factor 13 makes it relevant?

4          MR. HNATH:  *Georgia-Pacific* factor 13, as I read it,

5    would not necessarily require us to make a direct link between

6    the patents and the accused products because the issue is

7    whether the party to the hypothetical negotiation comes to the

8    table with their own technology, with their own patents.

9          THE COURT:  And remind me of what factor 13 is.  I

10   know 15 is the hypothetical negotiation.  I don't remember 13.

11         MR. HNATH:  Factor 13 deals with whether--and I

12   believe it's alluded to by Mr. Metzdorff--whether a party has

13   contributed non-patented elements, manufacturing processes,

14   unique business risks, significant features, or improvements.

15   I believe that's pretty close to a paraphrase of GP factor 13.

16         THE COURT:  And your argument is that the Plaintiff

17   opened the door to that by relying on factor 13 saying that

18   the Defendant had not contributed anything to the product?

19         MR. HNATH:  Well, certainly they opened the door by

20   saying that they haven't contributed anything, but even if

21   they hadn't, I think that our expert could independently

22   analyze the *Georgia-Pacific* factors and look at factor 13.

23   But certainly this is in partial response to what their expert

24   has opined.

25         THE COURT:  Well, I'm not sure whether what you've

1    described requires allowing the Defendant to discuss its

2    particular patents as opposed to the concept that the

3    Defendant has patents.  The concern is, obviously, not wanting

4    the Defendant to be able to create the impression in the

5    jury's mind that EVE cannot be infringing the Plaintiff's

6    patent because they're practicing their own patent, and that's

7    not a valid defense to infringement.

8                    MR. HNATH:  We agree.

9                    THE COURT:  And so if you are going into details

10   about particular patents, I think that is a heightened

11   concern.  If all you're going to do is talk about we have our

12   own portfolio of patents which concern coin cell batteries,

13   that's less of a concern.

14       What -- where on that spectrum does the testimony you

15   want to offer fall?

16                   MR. HNATH:  If we can talk about the number of

17   patents that they have relating to coin cells and that they

18   have patents, I think that would be adequate, Your Honor,

19   without getting into specific patents or specific patent

20   numbers.

21                   THE COURT:  And that would be the testimony that is

22   in Mr. Kline's report in paragraphs 226 through 230?  That's

23   what you have on the screen?

24                   MR. HNATH:  It is.  He says they have approximately

25   97 relevant patents and patent applications, yes.

1           THE COURT:  All right.

2      Thank you, Mr. Hnath.

3      Let me hear back from Mr. Mueller about that.

4           MR. MUELLER:  Thank you, Your Honor.

5      If we can switch so I can just show you slide 74, which

6  is from Mr. Kline's report.

7      So Mr. Hnath stated that Mr. Kline was simply saying that

8  EVE has numerous patents, but you can see he's saying that

9  there are numerous patents covering EVE's coin cells, and

10  that's the issue.  There is no nexus to him saying that

11  they're covering.

12      So if he was simply to say EVE has filed numerous patents

13  relating generally to coin cells, we wouldn't love it but we

14  could live with it, but here we submit that he's going too far

15  with -- in the absence of any evidence such as expert

16  testimony explaining what or how or what these patents, you

17  know, relate to--are they U.S. patents, are they -- you know,

18  what they even are.

19      So that, again, is the issue that we have with Mr. Kline

20  talking about patents covering the coin cells, which certainly

21  gives the impression that they're practicing their patents.

22           THE COURT:  All right.

23           MR. HNATH:  And Your Honor, we can live with that

24  compromise.  We would say 'relating but not covered'.

25           THE COURT:  All right.  So I'm going to grant

1    VARTA's MIL No. 2, but note that it does not exclude

2    Defendant's witnesses from testifying about the Defendant

3    being an innovator that owns patents, and can include that

4    the Defendant has 97 patents relating to coin cells, but the

5    Defendant will not be permitted to testify that those patents

6    cover the accused coin cells.  If that doesn't properly

7    capture it, let me know.  All right?

8              MR. MUELLER:  Thank you, Your Honor.

9         Your Honor, then just continuing down our list of

10   Plaintiff's motions in limine, we've talked about No. 2.

11        No. 3, 4 -- Nos. 3 and 4 have been agreed to and

12   withdrawn, so I believe we're now at No. 5, which is VARTA's

13   request for leave to modify Court MIL No. 6, which is

14   reference to IPR denials and final decisions.

15             THE COURT:  So the MIL No. 4, the one about the

16   Higuchi coin cell, that has been resolved?

17             MR. MUELLER:  Yes; late last night, Your Honor.

18             THE COURT:  And is -- do we need to put in the

19   record what the resolution is, or that you're just no longer

20   asserting that.

21             MR. MUELLER:  Well, I believe the resolution is

22   going to be that the Defendant can refer to a redesigned coin

23   cell, but it will not be referring to the Higuchi coin sell.

24   And --

25             THE COURT:  You know, that's exactly what I had

1    written down.

2              MR. MUELLER:  Okay.  Well --

3              THE COURT:  I'm glad to see that reasonable minds

4    are agreeing.  All right.

5              MR. MUELLER:  And counsel, I'm not sure if I'm

6    leaving something out of that agreement.

7              MR. HNATH:  Your Honor, it's part of an omnibus

8    agreement in which the parties withdrew their *Daubert* motions

9    as to the economic experts, so it's part of an overall

10   agreement.

11             THE COURT:  As long as it's in writing and both

12   sides know what it is, then I'm fine; we don't need to put it

13   on the record.

14             MR. HNATH:  That's fine with us, Your Honor.  There

15   was an extensive email exchange, and I think everybody's clear

16   as to what the agreement was.

17             THE COURT:  All right.

18             MR. HNATH:  Thank you.

19             THE COURT:  So we're on to the request to modify the

20   standard MIL 6?

21             MR. MUELLER:  Yes.  And Mr. Wittman will be

22   addressing that.

23             THE COURT:  All right.

24             MR. WITTMAN:  So, Your Honor, there are a number of

25   *inter partes* reviews that have been filed in this case by the

1    Defendant EVE, and we wanted to address the extent to which

2    those *inter partes r*eview proceedings can be introduced.

3         And -- well, let me go back.  So we sort of -- in our

4    brief did sort of a red line of what we were contemplating

5    with respect to the proposed modification, which would be to

6    keep the ongoing proceedings, meaning those proceedings which

7    are interim proceedings for which there has not been some kind

8    of a final decision, to continue to preclude evidence or

9    argument or testimony with respect to those interim IPRs while

10   allowing reference to concluded proceedings where there has

11   either been a final written decision or a denial of

12   institution at the Patent Office.  And I have sort of

13   summarized our position here on slide 31.

14        And by way of background, I think it's important to note

15   that EVE is, to our understanding, intending to rely on advice

16   of counsel in defense of VARTA's allegations of willful

17   infringement.  And there are, for example, two U.S.

18   opinions--one which I can --

19        Well, maybe before I do that, Your Honor, since we are

20   going to be going into some confidential material, I don't

21   know if it's appropriate to ask if the -- at least on the

22   record that the courtroom be closed.  I don't -- there is

23   nobody here that's not authorized under the protective order,

24   but just as a formality.

25             THE COURT:  Well, I'll note that you're right, there

1    is nobody in the courtroom, so I don't think there's a need to

2    close it, but I'll note that you requested it.

3            MR. WITTMAN:  Thank you, Your Honor.

4        So there are two U.S. opinions, and one of those opinions

5    was issued by the Rimon law firm, and that opinion is from

6    November of 2021. █████████████████████████████████████

7    ███████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████

11   █████████████████████████████████████████████████████

12   ██████████████████████████████████████████.

13       There was a second opinion that was issued by Mr. Bejin,

14   another attorney here in the U.S., and that's back from

15   September of 2018, ██████████████████████████████████████

16   █████████████████████████████████████████████

17   ███████████████████████████████████████████████

18   ██████████████████.

19       ████████████████████████████████████████████

20   ███████████████████████████████████████████████████████

21   ███████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ███████████████████████████████████████████████████████

24   ███████████████████████████████████████████████████████

25   ████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15      So we believe that the outcome of these IPR proceedings

16  is relevant to EVE's subjective belief that it was infringing

17  a valid patent.

18

19

20

21

22

23

24      So we are sensitive to the confusion that referring to an

25  entity like the Patent Trial and Appeal Board can create with

1    a jury, ████████████████████████████████████

2    ████████████████████████████████████████████

3    ████████████████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████████████████

7              THE COURT:  What were the dates upon which those

8    determinations by the PTAB became final?

9              MR. WITTMAN:  Sure.  So the first '581 final written

10   decision, which is shown here on slide 34, was August 8th of

11   2022.  The second decision for the '581 Patent, which was a

12   denial of institution, is dated March 14th of 2023.  And here

13   the denial of institution for the '905 Patent was March 14th

14   of 2023.  And I don't have the -- offhand the exact date for

15   '869, but that was right around that same March time period, I

16   believe.

17             THE COURT:  So these are well after the institution

18   of the lawsuit.  Your argument is that at that point the

19   infringement became willful?

20             MR. WITTMAN:  Well, no.  So with respect to the --

21   we allege willful infringement basically from the date of

22   issuance of the earliest patents that that willful

23   infringement is ongoing post-complaint and to this lawsuit.

24        So we certainly intend to argue that the opinions

25   themselves were -- had competency problems and that the

1    opinions do not -- are not sufficient for EVE to have formed a

2    good faith belief that it was not infringing the patents, but

3    beyond that, we believe that these final written -- the final

4    written decision and the denials of institution are further

5    evidence of the unreasonableness of EVE, and that even if --

6    even if the fact finder were to conclude that EVE's initial

7    reliance on the opinions of counsel was reasonable, that once

8    these decisions came from the Patent Office, that any reliance

9    on those opinions became unreasonable.

10        THE COURT:  If the decisions that you're seeking to

11   admit are admitted, why shouldn't other decisions that did not

12   go your way be admitted also?

13        MR. WITTMAN:  So -- well, one, I'm not sure that we

14   really agree with the characterization that any decision has

15   not gone our way at this point.  There were -- there are a

16   number of patents for which institution was granted.

17        THE COURT:  And doesn't the decision to institute

18   mean a finding that it is likely to be granted?

19        MR. WITTMAN:  Well, the institution decision is a

20   granting of the petition and is a granting of the IPR, but it

21   is an interim decision that is made under a very low standard

22   under 35 U.S.C. § 314 that simply requires a reasonable

23   likelihood that the petitioner would prevail with respect to

24   at least one claim, not necessarily all claims.

25        And in this case we would also note that the Patent

1   Office in the institution decisions specifically mention that

2   VARTA had cast doubt on EVE's theory.  But again, because

3   those decisions are interim, there has been no final decision,

4   we do not believe it is appropriate for those to be put before

5   the jury.

6          THE COURT:  Frankly, the hardest decisions about

7   admission of evidence about PTAB activities, in my mind, deals

8   with whether the defendants have a right to introduce evidence

9   even of non-final opinions when they're being charged with

10  willful infringement.  But to split it the way you're

11  suggesting and allow the admission against them of the

12  petitions that went against them, whereas not allowing

13  admission of the ones that may go their way that are still in

14  the works seems problematic to me in terms of a willfulness

15  claim.

16      If the Plaintiff is maintaining its claim of willful

17  infringement, I don't see how we can cut it the way you're

18  suggesting it should be cut here, but I'll -- I don't know

19  that I know everything I need to know about the proceedings

20  yet.  We've got some other issues about willfulness that are

21  going to come up over the course of this.  But let me go ahead

22  and hear from EVE on this issue, and I'll give you a chance to

23  respond.

24          MR. WITTMAN:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1          MR. HNATH:  Thank you, Your Honor.

2      Could we bring up slide 40?

3      So a couple of things.  First of all, in terms of VARTA's

4  need to introduce evidence of the IPRs, to the extent that

5  they want to introduce them to show that prior art was

6  considered by the Patent Office, we've withdrawn our

7  invalidity defense, so I think that ground is moot.

8          To the extent they're looking to introduce the IPRs as --

9  to say that the Patent Office eventually disagreed with the

10  statements in the opinions of counsel, we would disagree that

11  it's relevant for that purpose because, in evaluating the

12  opinions of counsel, the issue is whether the opinion was

13  thorough, whether it was well-reasoned, whether it was done

14  by competent counsel, not at the end of the day whether the

15  counsel was correct or not.  So we don't view it as relevant

16  whether the PTAB eventually disagreed with the opinions of

17  counsel; that seems to us to be an irrelevant sideshow.

18          They are relevant, however, to the issue of willfulness.

19  And VARTA has said that they are going to raise the

20  willfulness issue.  They said they are going to raise issues

21  about EVE's conduct before these patents issued.  And to that

22  extent it's very relevant for EVE to be able to say we believe

23  that these patents are invalid and the PTAB has issued a

24  decision saying there's a reasonable likelihood that the

25  petitioner would prevail.

1       So under the totality of circumstances test and

2   willfullness, we do believe that it's relevant for EVE to

3   be able to cite the granting of institution for some of

4   these patents.

5       At a minimum, if VARTA is allowed to introduce any

6   evidence of the IPRs, then any consideration should be fair

7   and equitable to both sides and permit discussion of both

8   institution and denial decisions, to the extent they're

9   relevant, and the context surrounding both.

10          THE COURT:  Mr. Hnath, I don't know that I've ever

11  seen a case maintaining an opinion of counsel defense where

12  the invalidity defense has been dropped; in other words, that

13  the opinion of counsel was invalidity, but that the client

14  party is not asserting invalidity at trial.

15          MR. HNATH:  We would -- number one, we did in the

16  -- I believe in the pretrial order make a reservation that

17  while we're not going to argue invalidity per se as a defense

18  to infringement, we do reserve the right to argue invalidity

19  based on the opinions of counsel--in other words, that counsel

20  rendered opinions that the patents are invalid.  I would

21  suggest, Your Honor, that that is relevant to willful

22  infringement even though we've withdrawn our invalidity

23  defense.

24          THE COURT:  Well, when you say 'argue invalidity',

25  what do you mean by that?

1            MR. HNATH:  What I'm saying is that we should be

2    able to say that competent counsel rendered an opinion that

3    certain patents were invalid and, therefore, EVE proceeded to

4    continue to sell their product based on reliance on that

5    opinion of counsel.  I don't think that requires you to get

6    into the merits of the invalidity case.  As I said before,

7    what's relevant is that they got an opinion from competent

8    counsel who analyzed the issue and came to that conclusion.

9            THE COURT:  Well, are you proposing to introduce the

10   opinion itself, the letter from counsel?

11           MR. HNATH:  Yes, Your Honor, we are.  It's on our

12   exhibit list.

13           THE COURT:  Okay.  That does get into the merits of

14   it, then, doesn't it?

15           MR. HNATH:  It -- again, I believe the law is that

16   -- and I think Mr. Curtin was going to discuss this further in

17   connection with the *Daubert* motion on Doctor Horn, but as I

18   understand the law, it's not whether the opinion was

19   ultimately correct or not; the issue is based on the opinion

20   itself, the four corners of the opinion, is it a competent

21   opinion of counsel.  And I think for that purpose you don't

22   need to get into the merits of whether the opinion was

23   correct; the question is did they look at the issues fairly,

24   did they reach a certain opinion, was it a well-reasoned

25   opinion, and so forth.  They can attack the competency of

1    the opinion, but in terms of whether the patents are, in fact,

2    invalid or not is really irrelevant.  The issue is whether the

3    attorneys did an adequate analysis and rendered an opinion on

4    that basis.

5              THE COURT:  I would agree that I think the law sets

6    a relatively low bar for the admission of an opinion of

7    counsel for that defense and that it's then up to the jury to

8    decide whether it was reasonable for the client to rely upon

9    that in their decision to go forward with their product, but I

10   just am saying that it -- I haven't had to deal with an issue

11   where the client was not maintaining invalidity at trial but

12   was relying on a defense of counsel about invalidity.

13             MR. HNATH:  As a defense to willful infringement.

14             THE COURT:  Yeah.  I understand.  It's just an

15   unusual situation.

16        All right.  Thank you.

17             MR. HNATH:  Thank you, Your Honor.

18             MR. WITTMAN:  Your Honor, just a couple of quick

19   points.

20        One, we do not, you know, fully agree with EVE's

21   assessment on the competency and the opinion of counsel issue.

22   We do think--and Mr. Mueller will be addressing this in more

23   detail a little bit later in the context of a motion that -- a

24   motion to exclude our technical expert Doctor Horn--but that,

25   in our view--and this has been briefed--we believe the

1    competency of the opinion is very much at issue.

2         Also, again, so -- and we believe that the Patent Office

3    decisions are relevant, again, because the Patent Office

4    disagreed with the assessment that were made by the opinion

5    counsel, and at a bare minimum, bare minimum, once those

6    decisions came in from the Patent Office they cast serious,

7    serious doubt on the opinions that had been rendered by the

8    U.S. attorneys.

9         I will just also note a point you raised, Your Honor,

10   that we are right now, frankly, grappling with the fact they

11   dropped invalidity but they are relying on opinions of counsel

12   on the issue of validity in defense of willful infringement.

13   And I don't have a -- you know, a specific answer as I stand

14   here, but it also occurs to us to be somewhat problematic in

15   how the fact finder is going to evaluate the reasonableness of

16   those opinions.  But perhaps that is an issue that can be

17   addressed through some jury instruction, which, you know,

18   we're considering.

19        Unless Your Honor has any further questions.

20            THE COURT:  Well, let me ask you, Mr. Wittman, if

21   the Court were to decide that it would not be appropriate, in

22   view of the willfulness defense, to admit the conclusion of

23   the PTAB on the matters that you're seeking to introduce

24   without also allowing evidence about the ongoing proceedings,

25   would your position be that it's better to let everything in

1    or not?

2             MR. WITTMAN:  One second, Your Honor.

3        Then it would be our preference that they both come in.

4             THE COURT:  All right.  I will consider that.  Thank

5    you.

6             MR. WITTMAN:  Thank you, Your Honor.

7             THE COURT:  Mr. Hnath, do you have an opinion on

8    that question?

9             MR. HNATH:  I thought I was going to be next on that

10   one, Your Honor.

11       If that is the choice, I think our preference would be to

12   let everything in and let the parties make their arguments to

13   the jury.

14            THE COURT:  All right.  I will consider that and

15   I'll carry this MIL at the moment, but I want to look further

16   at it.

17       That takes us to the MIL about copying, I believe.

18            MR. MUELLER:  Thank you, Your Honor.

19       This is Plaintiff's request to modify Court's MIL No. 9

20   to allow the use of the term 'copying' in the trial to -- with

21   respect to the issue of willful infringement.  And when we

22   first submitted our paper, the issue of invalidity was also on

23   the table, and so we believe that the issue of copying is

24   relevant to both.  But since invalidity is no longer at issue,

25   we submit that we -- the Plaintiff should be permitted to

1    refer to 'copying' because that is evidence that the

2    Defendant's infringement here was willful.

3                THE COURT:  Well, you know, this standing MIL comes

4    from concern that parties not use the term 'copying' when what

5    they're really talking about is just infringement, because the

6    Federal Circuit has made clear in a variety of cases that

7    copying is not just infringement; that copying requires

8    evidence that there be an effort to replicate a specific

9    product.  I think that was some of the early characterization

10   the court used, and more recently they've expanded that or

11   clarified that it can be not just replicating a product, but

12   after access to some technical non-public documents of the

13   plaintiff developing a product, building on that work, based

14   on that work.  But, in other words, it actually requires

15   evidence that there is access to the work or the products of

16   the plaintiff and then a reliance on those.

17       Is that the kind of evidence that you have?

18                MR. MUELLER:  Well, Your Honor, if we can go quickly

19   to slide 53, this comes from █████████████████████████████

20   ████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ██████████████████████████████████.  And those were allowed



1    to be used, or that entire industry was created by virtue of

2    this battery that was highly efficient yet extremely small

3    that could be inserted into the ear shell of -- you know, of

4    humans to, you know, listen to their iPods and their music

5    while -- you know, while carrying their iPhone.

6        And so if you go on to the next slide, slide 54,

23       And so when you look at the process in which they came up

24   with their design with the VARTA battery, you know, at -- on

25   the engineering workbench, we submit that there is sufficient

1   evidence and access to VARTA's product and that it -- a jury

2   could conclude from that evidence that there was intentional

3   copying on the part of EVE.

4       Now, you can see on the next slide, slide 55, where our

5   expert, Doctor Horn, considered the issue and he basically --

6   I'm summarizing this.  It's not laying out all of the

7   paragraphs that he goes into detail in looking at their

8   documents in which he also concludes that ███████████████

9   ████████████████████████████████████████████████████████████

10  ████████████████████████████████, and so they moved to a

11  design that was basically a copy of the VARTA patent.

12      And so that's in a nutshell the evidence.  We submit that

13  it is sufficient for a jury, again, to conclude that there was

14  copying and, therefore, we would request that the Court allow

15  us to refer to that in the context of demonstrating that the

16  Defendant's infringement was willful.

17      Thank you, Your Honor.

18          THE COURT:  All right.  Thank you, Mr. Mueller.

19          MR. CULBERTSON:  If we could go to slide 22, please,

20  Mr. Curtin.

21      Your Honor, Geoff Culbertson.

22      EVE opposes the request to modify the Court's standing

23  motion in limine precluding the party from characterizing the

24  other as copying.  The only basis for it, as counsel

25  acknowledged, is the allegation of willfulness, and that

1   copying is relevant to willfulness, and the Court was no doubt

2   mindful of that when it crafted this motion in limine; what

3   the law was on willfulness and what copying's relevance was to

4   that, yet it determined it was appropriate to have the

5   standing order of preclusion of a party using the term

6   'copying' or characterizing a party as that without first

7   obtaining leave.

8        And that's all we're asking for here is  just don't give

9   them a license to stand up in opening and start throwing

10  around the term 'copying'.  If at the end of the case they've

11  put on evidence from which the jury could conclude that,

12  that's one thing, but there's no case-specific reason here to

13  set aside the Court's standard procedure and standard practice

14  that it developed in its motion in limine.

15       There was a suggestion --

16           THE COURT:  Well, I guess -- Mr. Culbertson, I guess

17  they are asking for leave now.  It's true they're doing it

18  pretrial, but why shouldn't they be allowed, if they have

19  actual evidence of copying, to be -- to present that?

20           MR. CULBERTSON:  They have evidence of what they

21  characterize as copying.  EVE will present evidence that we

22  think shows significant differences in the designs and the

23  figures that you just saw that we characterize as something

24  other than copying.  And so the concern is that they can put

25  on their evidence, they can put on their case, they can show

1    those documents, they don't have to use the word 'copying',

2    they don't have to characterize them as being a copycat in

3    opening, because that term is so prejudicial, which is the

4    exact reason that I believe the Court developed the motion in

5    limine.

6             THE COURT:  I don't know that I've ever seen a

7    case where ███████████████████████████████████████████

8    ████████████████████████████████████████████████████████,

9    and I'm -- I know that the intent of this MIL was to avoid the

10   use of the term 'copying' for -- as a substitute for

11   infringement; just a conclusion drawn from the fact that the

12   Plaintiff maintained that the claims cover the accused

13   product; ███████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████, I think that the Court does not intend to

16   prevent the use of the word 'copying'.

17        Is there anything else that you believe is improper about

18   the way they're characterizing this evidence?

19            MR. CULBERTSON:  It's just the prejudicial effect of

20   it.  And, of course, EVE will have its own testimony about

21   those documents and its own evidence about what those

22   documents show, which will be that they're not copies.  And so

23   the concern is they can put on their evidence that, yes, this

24   was in their possession; yes, you see what you see here; but

25   the parties have differing views of what that is.  And when we

1    start throwing around terms like 'copying' and 'trespassing'

2    and 'stealing', we believe we get into the 403 territory that

3    that's unduly prejudicial.

4             THE COURT:  Well, I'm not going to relieve the

5    Plaintiff of any of the other terms that are covered in

6    standing MIL 9, but I am going to grant their Motion in Limine

7    No. 6 to allow them to use the term 'copying' in connection

8    with the evidence that they've described.  And I am going to

9    say that they are required to either not use that term or to

10   present the evidence they've shown.  In other words, don't use

11   the term in your openings and not put on this evidence.  But

12   with the understanding that you're going to be putting this

13   evidence on, I find that that is a basis to refer to it as

14   copying.

15            MR. CULBERTSON:  Any further questions for me, Your

16   Honor?

17            THE COURT:  No, Mr. Culbertson.  Thank you.

18            MR. CULBERTSON:  Thank you.

19            THE COURT:  All right.  I think that takes us to

20   the Defendant's motions in limine.  And this is probably a

21   good place to take the morning recess, so we'll take a

22   15-minute recess and come back.  Thank you.

23                        (Brief recess.)

24            THE COURT:  Thank you.  Please be seated.

25         And we'll move onto the Defendant's motions in limine.

1              MR. WANG:  Thank you, Your Honor.

2         This is -- really we have a motion for supplemental claim

3    construction really related to MIL No. 1.  So this is about

4    the inconsistent position VARTA took between their IPR

5    proceeding and here in this litigation.

6         I will please go to the slide No. 3 to start with.

7         Yeah.  So the -- this is about the term 'the house cup

8    and the house top held together by a force-fitting

9    connection.'  This is in the three patents-in-suit, since

10   '835 was no longer in this litigation, so just to mention

11   that, in the '581 and the '913 Patent for this term.

12        So the proposed construction we put here is 'the house

13   cup and the house top held together exclusively by a

14   force-fitting connection and excluding any other mechanism,

15   such as spring-load arrangement, adhesives, or crimping that

16   closed or held together the button cell'.  We believe this is

17   consistent with the position VARTA took in their IPR

18   proceeding.

19        No. 4, please.

20        So VARTA clearly disavowed crimping in its IPR

21   preliminary response.  It reads, quote, "The '518 Patent

22   distinguish button cell held together by crimping from those

23   held together with a force-fit."

24        Also in another -- two additional preliminary response,

25   you know, regarding '835 and '913 have the same language in

1    there, they have a provide explanation.  They said, quote,

2    "The '518 Patent describe a cell house top and a cup closed

3    with force-fitting connection, one closed by force-fit.  The

4    house top and the cup are held together by exerting radial

5    pressure on the casing area of the cup near the cup edge to

6    hold the house cup and the cup together -- housing and the cup

7    together by static-friction force."  This language, it's in

8    the three preliminary responses filed by VARTA.

9         Similarly --

10        Page 5, please.

11        Similarly, VARTA disavow the spring-load arrangement,

12   adhesive, and the beading over regarding the -- held together

13   by a force-fitting.

14        Page six, please.

15        VARTA use exclusively and only numerously to explain

16   'held together' by force-fitting connection.  For example, in

17   the -- again, their preliminary response to the IPR petition,

18   it says, '581 Patent described it is also possible to

19   manufacture button cells in which the cell cup and the cell

20   top are held together in axial direction exclusively by

21   force-fitting connection.  This language show up in all three

22   preliminary responses.

23        Also it mentioned, quote, "This ensures that the cup and

24   the top are held together in a preferred manner, essentially

25   only by static-friction force."   The same language show up in

1    all three preliminary responses.

2        Page 7, please.

3        VARTA showed how the cup and the top are held together by

4    a force-fitting connection in a produced -- reproduced figure

5    5.  It's explained, "To achieve sufficient friction for a

6    force-fit, the external and internal radii of the cup and the

7    top should be matched to one another to the thickness of the

8    film seal."  It also show in blue in the picture.

9        All those explanations and arguments make the PTAB

10   conclude 'held together by a force-fitting connection' is held

11   together by a particular condition must be a battery casing

12   whose half paths would no longer be held together if the

13   condition were not present.

14       So basically, according to the PTAB decision, a

15   force-fitting connection is a particular condition held

16   together by a force-fitting connection, it's basically saying

17   held together by a particular condition and then no longer be

18   held together if a particular condition is gone.

19       Page 9, please.

20       Further, the PTAB also said, "whatever a force fitting

21   connection is, a battery made in accordance with the teaching

22   of the prior art is not a battery that is held together by a

23   force-fitting connection, unless the battery would seize to be

24   held together in the absence of the force-fitting connection."

25   So again, the 'held together by force-fitting connection'

1    equal to cease to be held together absent a force-fitting

2    connection.

3         This is the position our expert took in his rebuttal

4    report dated May 22nd.  We -- you know, we start to sense

5    VARTA going to switch their position in the deposition for our

6    expert -- technical expert Marc Juzkow.  And later on we met

7    and conferred with VARTA counsel and we find out they're going

8    to take a different position at the trial.  That's why we --

9    rather than let the jury to figure out what is actually this

10   'held together by force-fitting connection' means, we ask the

11   Court to clarify.

12         THE COURT:  Can you show me something, Mr. Wang,

13   where VARTA told the PTAB that the relevant claims of these

14   patents require that the battery only or exclusively use a

15   force-fitting connection?

16         MR. WANG:  The held together -- I mean,

17   consistently, you know, 'held together by a force-fitting

18   connection', it's a patent term in the -- in those, you know,

19   relevant patents.  And I believe the Federal Circuit saying

20   the relevant argument and the claim amendment can be, you

21   know, disavowed, used to disavow this term.  And that there's

22   no -- I mean, through all the preliminary responses VARTA

23   filed, they consistently took a position this 'held together

24   by force-fitting' is not a crimping, not -- I should say

25   spring-load arrangement, not adhesive, and explained several

1    times this is a exclusive -- let me get the specific language

2    there.  It's saying it is exclusive -- it's in the aerial

3    direction exclusively by force-fitting connection and

4    essentially only by static-friction force.

5         THE COURT:  And are those sentences describing

6    the asserted claims or are they just talking about various

7    embodiments in the specification?

8         MR. WANG:  This -- the 'held together by

9    force-fitting' is a claim term.  When they explain what is

10   held together by a force-fitting connection, it's essentially

11   explaining the claim term.  And this is also make -- the PTAB

12   reached a decision and that the PTAB decision consistent with

13   their explanation.  They say it's a particular condition that

14   held two part together.

15        THE COURT:  All right.  Thank you, Mr. Wang.

16        MR. WANG:  You're welcome.

17        MR. WITTMAN:  So just a few preliminary points.

18   VARTA has not taken an inconsistent position.  VARTA has

19   taken the very same position throughout the litigation and the

20   IPRs in the Patent Office that it is the claim language that

21   controls, and the claim language says that the cup and top are

22   held together by a force-fitting connection.

23   It was actually EVE that took inconsistent positions.

24   During the IPRs in the Patent Office, EVE took the position

25   that a crimp inherently resulted in a force-fitting

1    connection.  In the litigation they're taking the exact

2    opposite position that any type of a band or a crimp prohibits

3    a force-fitting connection.

4         The other point I wanted to make is that our position has

5    not changed since we filed our infringement contentions back

6    in March of 2022.  There has been no recent change in the

7    position that has been taken by VARTA.  VARTA has stayed true

8    to its infringement contentions that it served early on in

9    this case.

10        And if -- to just turn to our opposition for a moment, we

11   do believe that this issue can be resolved in the context of a

12   waiver because of the fact that this issue is not a new issue,

13   this is an issue that could have been raised by EVE during the

14   claim construction process had it elected to do so.

15        And then, briefly, I'll also just talk about the merits

16   that even if the Court were to consider what happened during

17   the IPR proceedings, the construction that's proposed by EVE

18   would not be appropriate.

19        So this is just a little bit of a simplified timeline

20   with the district court proceeding events on the top and the

21   events in the IPR proceedings on the bottom.  And the two

22   events that are highlighted in yellow are basically what are

23   relevant for purposes of waiver.  The statements that VARTA

24   made in its preliminary response, which, you know, VARTA

25   believes do not result in any waiver at all, but to the extent

1    that EVE argues those statements constitute any kind of a

2    disclaimer or disavowal of claim scope happened in December of

3    2022, and specifically on December 15th, which was before any

4    of the claim construction briefing had even taken place in

5    this case.  Varta filed its opening brief in January, January

6    24th, and EVE didn't file its claim construction brief until

7    February 7th.  So if EVE was going to raise this issue, this

8    issue should have been raised by -- at -- during claim

9    construction.

10       The issue was raised for the first time in their motion

11   in limine, which was filed on July 17th after all of the

12   expert reports had been filed, after the expert depositions

13   had been taken, after *Daubert* and summary judgment motions.

14       And so the bottom line is, we simply think this is not

15   being timely presented, and we would ask that it be deemed a

16   waiver.

17       And I did just want to -- turning, you know, more

18   towards their proposed construction itself, I put up an

19   exemplary claim from one of the patents that was the subject

20   of the IPRs, and the claim language is pretty straight

21   forward--'the housing cup and the housing top are held

22   together by a force-fitting connection'.  What is below this

23   is EVE's construction.  And basically all of the text in the

24   light Brown is the text that EVE wants to read into the claim,

25   which not -- for it to be exclusively a force-fitting, and

1    then excluding any mechanism such as a spring-loaded

2    arrangement, adhesives, or crimping that closes or holds

3    together the button cells.

4        None of that latter text is even in the specification.

5    The closest the specification comes is talking about beading

6    over a cell, which is a way of closing it versus

7    force-fitting, but even then the specification never says that

8    those two are mutually exclusive or exclusive for one another,

9    meaning you can have a force-fit, and you could have a cell

10   that is closed by beading over.  So there is no support in the

11   specification for any of this latter text.

12       Exclusively -- in preferred examples the specification

13   does talk about 'exclusively held together by a force-fit'.

14   VARTA did not rely on those preferred examples in the IPRs.

15   VARTA did have portions of its IPR responses where we

16   summarized the patents and part of that summary talked about

17   the various embodiments, including, you know, 'exclusively by

18   a force-fitting connection', but that language was also

19   proceeded by, you know, words like 'preferably', and again,

20   was only in the context of a summary of the patent, not the

21   claims and not in any argument that was used to distinguish

22   over the prior art.

23           THE COURT:  Did the PTAB go on to say at some point

24   that 'held together' meant that in the absence of the

25   force-fitting connection the cup and the top would come apart?

1          MR. WITTMAN:  Well, they didn't -- they -- no.  So

2     if I go to the -- what the PTAB actually said, they said a

3     couple of things.  First, they said, We don't need to construe

4     this term.  They're talking about the term 'force-fitting

5     connection'.  And this is an example from one of the -- from

6     the '581 Patent decision denying institution.  They went out

7     of their way to say that they did not need to construe the

8     term to basically decide whether or not to institute a trial

9     at the PTAB.

10          THE COURT:  And that's the full term--'held together

11     by a force-fitting connection'?

12          MR. WITTMAN:  The cup -- yeah, the cup and top held

13     together by a force-fitting connection, yes.  That is the

14     term.  And that's shown here on the bottom in the sentence

15     just above -- yeah, the sentence above where the red underline

16     is in the text.

17          THE COURT:  And what was the context in which they

18     went on to say that if something is held together by a

19     particular connection, that means that in the absence of that

20     connection it would not stay together?

21          MR. WITTMAN:  Sure.  So this is a statement by the

22     PTAB, which I have on this page, and this, again, is from the

23     '581, but there's a similar statement in the '913 decision not

24     to institute.  And what the Patent Office said is, "Without

25     some evidence to the contrary, a battery casing whose half

1    parts are held together by a particular condition must be a

2    battery casing whose half parts would no longer be held

3    together if the condition were not present."

4         The key there is where they said without some evidence to

5    the contrary'.  And the reason that the Patent Office is

6    making that statement is EVE presented prior art.  One was a

7    Kobayashi reference; a second reference was a Brown reference.

8    Both of those showed a cell that was crimped over.  There is a

9    third reference construction that describes closing a cell

10   with a spring-loaded mechanism or an adhesive, and those are

11   the closure methods that are expressly described and shown in

12   those references.

13        Eve, however, was relying on inherency, contending that

14   even though those references did not explicitly describe a

15   force-fitting connection; they inherently resulted in a

16   force-fitting connection.  And the problem with EVE's

17   petitions, they didn't provide any evidence that inherency

18   was met, other than attorney argument.  There was no evidence

19   presented that those references also had a force-fitting

20   connection.

21        And that is the portion of the Patent Office's decision

22   over to the right where they say that "The petitioner"--EVE--

23   "offers only attorney argument for the proposition that such a

24   process creates a battery casing that is held together by a

25   force-fitting connection."

1          VARTA never argued and the Patent Office never found that

2    because those references had some other closure mechanism,

3    like a beading over, they could not have a force-fitting

4    connection.  That was never argued and that was never found,

5    and so there is no disclaimer to the effect that would support

6    the construction that has been offered by EVE.

7          THE COURT:  All right.

8          MR. WITTMAN:  Yeah.  And again, I do just want to

9    reiterate -- and essentially on the merits EVE is taking the

10   position that VARTA contended that a force-fit and any other

11   closure mechanism were mutually exclusive.  That is not a

12   position that was ever argued.  That was not a position that

13   was ever found by the PTAB.

14         And again, we did -- just one final point, Your Honor.

15   At the end, and we've cited the authority, the *Shire*

16   *Development v. Watson Pharma* case, that disclaimer only

17   applies to unambiguous disavowals, and we would submit

18   that there is no disavowal at all, certainly no unambiguous

19   disavowal that would support EVE's proposed construction.

20         That's all I have, Your Honor.

21         THE COURT:  Thank you, Mr. Wittman.

22   Go ahead, Mr. Wang.

23         MR. WANG:  Thank you, Your Honor.

24   Just I want to make a couple of clarification.

25         Claim estoppel really, you know, means whatever VARTA

1    explained, you know, this term to the word is what it meant,

2    should be held, you know, to the later proceeding, meaning

3    whatever they explained in the PTAB proceeding, including the

4    preliminary response, is a official document; it's not a claim

5    amendment.  Whatever they explained what the term means is how

6    to be -- you know, it can be considered, you know, disavowed.

7        In the preliminary response, VARTA never gave a second

8    meaning about this 'held together by a force-fitting

9    connection'.  The only thing they talk about is, you know,

10   static-friction on the side direction, horizontal direction.

11   So -- and the PTAB -- you know, according to that, the PTAB,

12   you know, explained what it should mean, 'held together by a

13   force-fitting connection', and we rely on that meaning in our

14   expert --

15            THE COURT:  But that meaning cannot be a disclaimer

16   or a disavowal by the Plaintiff.

17            MR. WANG:  The -- you know, the meaning, they

18   explained that, what that meaning is--'held together by a

19   force-fitting connection'.

20            THE COURT:  The PTAB may have said what it said,

21   but you're proceeding here on an argument that VARTA has

22   disclaimed scope, and I don't see you citing any statement by

23   VARTA that disclaims it.

24            MR. WANG:  Uh-huh.  The VARTA saying this is

25   distinguished from a crimping, both of the patents, from those

1    held together with force-fit, so they clearly disavow the

2    crimping.  And also they explain what is held together by a

3    force-fitting connection, they consistently saying this is a

4    -- describe a cell top and cup closed with a force-fit

5    connection -- one closed by a force-fit, house top and a cup

6    held together by exerting radial pressure on the casing area

7    of the cup, near the cup edge, to hold a house cup and -- a

8    housing and a cup together by a static force.  They

9    consistently explained that way.  So, you know,

10   that -- because of that, the PTAB denied institution of those

11   three patents, so they should be held to that explanation to

12   the word.

13        Alternatively, alternatively, even, you know, from a

14   plain and ordinary meaning sense, the PTAB, you know,

15   considered the explanation that way.  So we believe even plain

16   and ordinary meaning should construe to be the way we present

17   it, meaning it just -- a particular condition, you know, and

18   held two pieces together when the condition's not present,

19   those two pieces are not held together.  And that condition

20   exclude the crimping and spring-load arrangement, adhesive

21   connection.  And we do not ask the Court here to construe the

22   'force-fitting connection'; we just ask Court to construe the

23   'held together by a force-fitting connection'.

24            THE COURT:  You are trying to argue, as I understand

25   it, that this phrase 'held together by a force-fitting

1    connection' should be construed to mean 'held together

2    exclusively by a force-fitting connection'?

3              MR. WANG:  I mean, we believe this is -- this

4    language is consistent with the PTAB's explanation, it's held

5    together by a particular condition; it's not more than one,

6    it's just a particular condition, and when this condition is

7    not present, those two pieces are no longer held together, and

8    at -- this particular condition certainly does not include a

9    crimping and spring-load arrangement and adhesive connection.

10             THE COURT:  You know, these are comprising

11   complains, are they not?

12             MR. WANG:  The -- this particular term actually is

13   -- it's embedded in the, you know, certain claim language of

14   the particular claims of the three patents, or now actually

15   two patents are relevant in this case.  And, you know, yeah,

16   our position is they, you know, explained this to one way;

17   they never -- I mean, VARTA never gave a different

18   explanation.  They should be held to the explanation they

19   provide in the PTAB proceeding.

20             THE COURT:  And what is your response to the

21   argument that you should have presented this during claim

22   construction?

23             MR. WANG:  We never figured VARTA would construe

24   this term inconsistent with their IPR proceeding.  Their IPR

25   proceeding -- you know, from the proceeding from the PTAB's

1  explanation, it can be construed the way we construe it.

2          THE COURT:  The PTAB expressly said they were not

3  construing it.

4          MR. WANG:  Right.  But not construed the

5  'force-fitting connection'.  The PTAB explained what is

6  held together by force-fitting connection.

7          THE COURT:  No.  The PTAB said, We, are not

8  construing, quote, 'held together by a force-fitting

9  connection' close quote.  So they were refusing to construe

10  the 'held together' part also, weren't they?

11          MR. WANG:  We -- but they're clearly saying it won't

12  be held together if that condition does not present twice,

13  number one.  Number two, they -- you know, VARTA disclaimed

14  the crimping, it's claimed a spring-load arrangement, it's

15  claimed adhesive connection, and we take the consistent

16  position till, you know -- even our expert report filed in the

17  May 22nd in the page 49 we -- the expert quoted the PTAB's

18  position and explained what this means.  So we never feel,

19  you know, this could be a (unintelligible) from the other

20  party until recently.

21          THE COURT:  All right.  Well, since there is a

22  separate motion on this, which is your motion for supplemental

23  claim construction, I'll take this up and issue a written

24  order on that -- both your MIL No. 1 and your motion for

25  supplemental claim construction.

```
 1              MR. WANG:  Thank you, Your Honor.

 2              THE COURT:  Thank you.

 3         Which takes us to Defendant's MIL No. 2.  As I

 4    understand, it has been withdrawn.

 5              MR. HNATH:  That's correct, Your Honor.

 6              THE COURT:  And so we're at MIL No. 3.

 7              MR. HNATH:  MIL No. 3 has been withdrawn based on

 8    agreements reached between the parties.

 9              THE COURT:  All right.

10              MR. HNATH:  And MIL No. 4 is a live MIL which

11    Mr. Culbertson will address.

12              THE COURT:  All right.

13              MR. CULBERTSON:  Your Honor, EVE's MIL No. 4 seeks

14    to exclude evidence of an alleged Chinese industry meeting

15    designed to take down VARTA's patents.  And as an initial

16    matter, this evidence comes from an exhibit that may be talked

17    about later, but I can talk about it now, Plaintiff's Exhibit

18    27, which is inadmissible hearsay.  It's an article written by

19    -- or a press release, it's unclear, written by an

20    organization called Sunrise Big Data.  There's no connection

21    between Sunrise Big Data and EVE, and there's no connection

22    between EVE and the alleged industry meeting that's discussed.

23    And we think that if the jury is allowed to hear evidence

24    about an entire national industry meeting that was organized

25    to take down VARTA's patents and there's no association with
```

1   EVE, that there's a tremendous risk of confusion and undue

2   prejudice against EVE.  So we have a 403 objection for that

3   reason.

4        It's unclear how this evidence would come in, given the

5   hearsay objection.  I'm not sure who a sponsoring witness

6   would be.  I know that EVE--excuse me--VARTA intends to have

7   Mr. Miehlich--and I apologize if that's an incorrect

8   pronunciation--testify to the horrors of this, that he's never

9   seen anything like it in his 40- or 45-year career, but he has

10  no specific way of tying it to EVE or any -- and there's no

11  evidence that EVE attended or was associated with the meeting,

12  if it ever intended--excuse me--if it ever occurred.

13       The evidence doesn't show industry knowledge of VARTA's

14  patent portfolio by EVE.  And even if it did, it would be

15  irrelevant, because if this is, as I understand the

16  contention, relevant to willfulness, they'd have to show

17  knowledge by EVE of the specific patents at issue.  This

18  doesn't speak to that issue at all.  And neither the Samsung

19  case that was settled nor EVE's IPRs are any evidence,

20  circumstantial or otherwise, that EVE attended this alleged

21  meeting.

22       So we ask that that evidence be excluded, Your Honor.

23            THE COURT:  All right.  Thank you, Mr. Culbertson.

24            MR. CULBERTSON:  Thank you.

25            MR. MUELLER:  Thank you, Your Honor.

1         If we could switch over.

2         I think before I address the merits, we need to take just

3    a quick step back to understand what is going to be tried at

4    this trial, and that is that EVE contends that it has no idea

5    where its products end up, and it has no knowledge that its

6    batteries end up in TWS products that come into the United

7    States.

8         So in the way in which this industry works, the battery

9    manufacturers sell their products to a contract manufacturer

10   or an OEM or ODM in China.  Products that -- the earbuds are

11   made in China, then they're typically sold to another class,

12   the brand -- a brand customer who then sells its products, you

13   know, worldwide.  But as we know, 35, 40 percent of these

14   products end up in the United States.

15        And so what we're talking about here is an industry

16   association meeting where Mr. Miehlich got an invitation to

17   the meeting.  It was disseminated to all the industry

18   participants, it was indiscriminately sent, and we submit

19   that it's implausible that EVE didn't get the invitation.

20   It wasn't produced to us in discovery for sure.  But if

21   Mr. Miehlich got it and he was -- and VARTA were the target of

22   this meeting, we submit that, at least inferentially, EVE

23   would have gotten it as well.  And we would also submit that

24   it shows that EVE had knowledge where its products were going.

25        If we can go quickly to slide 58.

1        Here's the invitation itself that identifies EVE as -- it

2    was part of the TWS button cell patent proceedings and, you

3    know, initiated as to EVE and other manufacturers known as the

4    first war.  You can see from the bottom it's talking about

5    activities targeting patents that were U.S.-based.  It's

6    talking about patent wars on button cells.  Well, you know,

7    that was VARTA's lawsuit against EVE's largest customer,

8    Samsung, in 2020 brought here as well as another manufacturer

9    of button cells myPower.

10        So to suggest that EVE, and if we go to the next slide as

11    well, this is not an item of evidence but this was a

12    photograph taken at the meeting, you can see EVE is one of the

13    foundational members on the bottom of the pyramid, and VARTA

14    and other manufacturers are there as well.  So the argument

15    that EVE was not fully aware of this meeting and the intention

16    to take out the VARTA patent portfolio, and again to show that

17    EVE was specifically targeting its products to be -- to

18    ultimately end up through the regular commercial channels into

19    the U.S., we think certainly it should be admitted and the

20    jury can accept it if they so choose.

21            THE COURT:  Why is it not hearsay?

22            MR. MUELLER:  Well, it's not -- its truth is not

23    what's important here.  The importance is on the impact that

24    it would have; that if EVE was being invited to a meeting in

25    which the VARTA patents were to be taken down, then that would

1   tend to show -- then whether it was true or not is not at

2   issue; the question would be whether EVE was fully

3   knowledgeable about where its batteries were going to end up.

4        And as to Mr. Miehlich, again, if we can go to the final

5   slide, he does indicate that, you know, this was something

6   that he has never seen an invitation to an industry-wide

7   conference for the purpose of destroying VARTA's U.S. patent

8   portfolio.  And, you know, certainly for the issue of whether

9   EVE was knowledgeable as to where its products were going and

10  to how it was participating in this commercial -- in the

11  commercial channels of TWS products ending up into the United

12  States, we think certainly at least there is circumstantial

13  evidence that it -- that EVE had such knowledge.

14        THE COURT:  You know, obviously you would agree that

15  this is a very prejudicial document, and it strikes me as

16  difficult to admit it based on an assumption that EVE received

17  it.

18        MR. MUELLER:  Well, Your Honor, I would ask, if Your

19  Honor is inclined to exclude it, to at least reserve ruling

20  until we get to depose all of EVE's witnesses in the event

21  that there is someone who had knowledge of this meeting and

22  participated.

23        THE COURT:  All right.  Obviously you can seek to

24  revisit the ruling if you develop evidence that supports

25  reconsidering it, but I don't think at this stage of the case

 1   I can say that it's not ripe for decision.  And I -- unless

 2   you have something stronger than I've heard to indicate that

 3   EVE participated in this, I just don't see any way that it's

 4   admissible.

 5              MR. MUELLER:  Understood, Your Honor.

 6              THE COURT:  All right.  Well, I'm going to grant the

 7   Defendant's Motion in Limine No. 4.

 8              MR. MUELLER:  Thank you.

 9              THE COURT:  Thank you, Mr. Mueller.

10       That takes us to the Defendant's MIL No. 5.

11              MR. HNATH:  Yes, Your Honor.  And MIL No. 5 is also

12   withdrawn based on agreements between counsel.

13              THE COURT:  All right.

14              MR. HNATH:  Would you like to address the *Daubert*

15   motions next?

16              THE COURT:  You know, I would rather see if we can

17   get through the exhibit issues first.  I am happy to hear

18   argument on the *Daubert* motion if there's time, but I want to

19   make sure we've addressed the exhibits.

20              MR. HNATH:  We're at your pleasure.  Thank you, Your

21   Honor.

22              THE COURT:  All right.  Let's take up the

23   Defendant's objections to the Plaintiff's exhibits.

24       And I have an email that was sent by Mr. Stinson last

25   night, I guess, that has buckets for those.  So we can start

1  with the first one.  I guess we hear first from counsel for

2  Defendant on PTX 02.

3          MR. HNATH:  Yes, Your Honor.

4      And we have copies of the exhibits.  Could we hand those

5  up to you so you can refer to the exhibits as we go through

6  the argument?

7          THE COURT:  That's very helpful.  Thank you.

8          MR. STINSON:  May I approach?

9          THE COURT:  Sure.  Thank you, Mr. Stinson.

10          MR. HNATH:  So the first objection is to PTX 2.

11  PTX 2 is a declaratory judgment complaint that was filed in

12  the Northern District of Illinois on behalf of Audio

13  Partnership and EVE Energy Company, Limited.  Audio

14  Partnership has since been dismissed from the case.  Our

15  objections are based, number one, on standing MIL No. 13.

16          THE COURT:  Well, Mr. Hnath, let me interrupt you.

17  You're ahead on points on this one.  Let me hear from the

18  other side, and I'll give you a chance to respond.

19          MR. HNATH:  Okay.  Thank you, Your Honor.

20          MR. MUELLER:  Your Honor, we do not intend to refer

21  to litigation or satellite litigation.  This is only for the

22  allegation that is made by EVE in paragraph 54 particularly

23  where, again, the issue that we're trying to the jury is

24  whether EVE has knowledge that its products are being sold in

25  the United States, and here it alleges that EVE continues to

1    offer for sale and sell EVE products, including EVE products

2    at issue, to ODM customers overseas that on information and

3    belief sell their products incorporating EVE products to

4    customers that sell the underlying products in the United

5    States.

6        So this is exactly what we say EVE had knowledge of and

7    is, therefore, inducing the infringement of an infringement

8    that is occurring in the United States.  So this goes to the

9    heart of what facts are in dispute in the litigation.

10       So they told us -- they informed us last night that they

11   didn't consider this to be a judicial admission because it was

12   pled on information and belief, but this goes to the very crux

13   of what gave rise to the declaratory judgment jurisdiction

14   that they were seeking in the Northern District of Illinois.

15       And so we are not intending to argue or present evidence

16   of what happened in the Northern District of Illinois or that

17   the Northern District of Illinois case was dismissed; that's

18   not the purpose of this document; it's simply to show that EVE

19   has admitted that its products are coming into the United

20   States and, indeed, it made that allegation in this document,

21   which is -- we propose as Plaintiff's Exhibit 2.

22            THE COURT:  All right.  So you are only seeking

23   admission of the statement in paragraph 54?

24            MR. MUELLER:  That's correct, Your Honor.

25            THE COURT:  All right.  Thank you, then.

1          Let me hear the response to that.

2          MR. HNATH:  Yes, Your Honor.

3          So we believe that the law of judicial admissions does

4    not apply to this case, and we did bring some legal

5    authorities to VARTA's attention yesterday, so we gave them

6    a full heads up on that.

7          So judicial admissions require a formal concession, and

8    for that we would cite *Martinez versus Bally's LA*, 244 F.3d

9    474.  That's a Fifth Circuit case, 2001.  It's also

10   established that judicial admissions need to be deliberate,

11   clear, and unequivocal.  That's *Shallow Water Equipment v.*

12   *Pontchartrain Partners*, which is 620 F.Supp.3d 495.  That's

13   out of the Eastern District of Louisiana.

14          THE COURT:  What about this is not unequivocal?

15          MR. MUELLER:  So on information and belief.  And

16   there are cases, including in this district, which says that

17   statements that are made on information and belief are not

18   judicial admissions; do not qualify as binding judicial

19   admissions.

20          THE COURT:  Why isn't this just a regular admission?

21          MR. HNATH:  It's made in a court.  If it was made in

22   this case, we would argue it's not a binding judicial

23   admission.  This is even further removed from a statement made

24   in this case; it's made in another case involving parties in

25   addition to EVE, so the information can be on behalf of not

1    only EVE but also Audio Partnership.  It's a complaint that

2    was soon withdrawn after Audio Partnership settled from the

3    case.

4        So if it wouldn't be a judicial admission in this case,

5    it certainly shouldn't be deemed to be a judicial admission

6    from another case.  For all the reasons and statements of --

7    on information and belief would not be judicial admissions if

8    made in the current case, we think even more so they should

9    not be deemed to be judicial admissions in another complaint.

10            THE COURT:  Why isn't it just an admission under

11    Rule of Evidence 801(d)(2)?

12            MR. HNATH:  Because the same would apply to any

13    judicial admission.  If that were true, then any statement by

14    a party made would qualify under 801, but the law as to

15    statements made in pleadings are very well-set forth in terms

16    of judicial admissions.

17            THE COURT:  All right.  And what is your best case

18    on that?

19            MR. HNATH:  We would like to cite three, Your Honor.

20    One would be *Corinth Investors v. Evanston*, which is 214 U.S.

21    District Lexus 118008.

22            THE COURT:  Are any of them appellate decisions?

23            MR. HNATH:  No, Your Honor.  The first one is

24    Eastern District of Texas 2014 in which the Court stated, "A

25    statement made on information and belief in a pleading does

1    not constitute a binding judicial admission."

2         THE COURT:  Well, you know, the effect of a judicial

3    admission is that you cannot contradict it, whereas an

4    ordinary admission is simply admissible but it's not binding.

5    The law that you're citing to me seems to me to be saying that

6    this doesn't qualify as a binding admission, meaning you can't

7    oppose it.  But I -- do you have any law that says that

8    801(d)(2) doesn't apply in the context of statements made in

9    pleadings?

10        MR. HNATH:  No, we have not found such a case, Your

11   Honor, but we would argue that where a statement is made on

12   information and belief where the information and belief can be

13   a non-party to this case--in other words, part of that

14   information and belief could be supplied by Audio

15   Partnership--that that should not be imputed to EVE, and that

16   to do so would be prejudicial.  This is not a statement that

17   was made by EVE alone; it's based on information from Audio

18   Partnership.  And Audio Partnership was a company that was,

19   indeed, purchasing products from the OEMs and the ODMs and the

20   contract manufacturers that Mr. Mueller had referenced.  So

21   they have knowledge that EVE would not.

22        So it would be prejudicial to impute their knowledge in

23   part, which was stated -- made in a statement on information

24   and belief in another judicial proceeding to EVE in this case.

25        THE COURT:  You know, 801(d)(2)(C) says that the

1    statement was made by a person whom the party authorized to

2    make a statement on the subject.  EVE authorized its counsel

3    to make the statement that they're seeking to admit, did it

4    not?

5              MR. HNATH:  The statement was authorized by EVE and

6    Audio Partnership.

7              THE COURT:  Uh-huh.

8              MR. HNATH:  And we will be in a position where we

9    need to explain to the jury that there were multiple

10   defendants -- multiple parties in the case, where the

11   information came from, and so forth and so on.  I think that's

12   going to lead us to, you know, inquiries that are unnecessary,

13   and I do think it's prejudicial and we would state -- stand on

14   our opinion -- on our objection.

15             THE COURT:  All right.  I'm going to allow you to

16   redact this document down to just paragraph 54, but I believe

17   based on what I have before me that it is non-hearsay based on

18   801(d)(2)(C), and I'll overrule the objection to it on that

19   basis.  I am not finding that it's a judicial admission and,

20   therefore, I'm not saying that EVE can't take a contrary

21   position, but I think it is admissible.

22             MR. HNATH:  Thank you, Your Honor.

23             THE COURT:  All right.  Thank you.

24             MR. HNATH:  Next is I think we resolved the issue as

25   to the duplicate sales summary.  We have agreed that VARTA can

1    introduce its sales summary as its position on EVE sales.  EVE

2    will produce its sales summary based on its position on EVE

3    sales, and on that basis with that clarification and

4    adjustment to the document, we would not -- we would withdraw

5    our objection to PTX 3.

6            THE COURT:  All right.  So I'll note the objection

7    is withdrawn in that fashion.

8            MR. HNATH:  Next is a group of documents, PTX 4,

9    PTX 5, PTX 7, PTX 8, and PTX 11.  Our objection to these is

10   that the documents are not linked to the accused infringement

11   at issue.  We believe, therefore, they are irrelevant; that

12   their introduction would be prejudicial.

13       Let me take PTX 4, for example.  And I think this will

14   get into confidential information, Your Honor, so I would

15   request that this portion of the discussion be deemed

16   confidential.

17           THE COURT:  All right.  We'll note your request and

18   you can seek particular relief afterwards if, in fact, there

19   is anything that needs to be protected.

20           MR. HNATH:  Thank you.

21   ███████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

1   ████████████████

2       Varta has not made an offer for sale infringement

3   contention.  We asked them during the meet and confers if they

4   ever made such a contention.  They failed to point to one.

5   And so that would be the basis for excluding PTX 5 and -- 4

6   and 5, which I understand are related documents.

7       PTX 7 are actually three different agreements between EVE

8   and its contract manufacturers.  There is no particular tie to

9   the infringement issues in this case and, therefore, we would

10  object to those documents as irrelevant.

11          THE COURT:  And that's 7?

12          MR. HNATH:  That's 7, yes.  It appears what VARTA

13  has done is put three different agreements with contract

14  manufacturers into one exhibit, which is PTX 7.

15          THE COURT:  All right.

16          MR. HNATH:  So we would challenge the relevance of

17  that.

18      PTX 8 similarly is an agreement between EVE and a

19  purchaser of its batteries.  We don't see the relevance of

20  that document, so we would also object on relevance and 403

21  grounds.

22      ████████████████████████████████████████████

23  ████████████████████████████████████  There is no

24  evidence that EVE, the Defendant in this case, was in any way

25  involved in that offer for sale.  An offer for sale by EVE's

1    subsidiary would not give rise to damages as to EVE.  And,

2    Your Honor, we would cite a case that was cited in our MIL

3    No. 3 actually, *Confectionary Arts v. CKP Products*, 2019 U.S.

4    District Lexus, 34735 at page 14.  That's out of the District

5    of Connecticut, 2018.  "In order for CI to be liable for sales

6    made by CKP, its subsidiary, plaintiff must pierce the

7    corporate veil for CI."

8        So that stands for the general proposition that EVE in

9    China is not liable for sales made by EVE North America simply

10   because EVE North America is a subsidiary of EVE China.

11   There's been no allegation, no pleading that the Court should

12   pierce the corporate veil or find EVE North America to be an

13   alter ego of EVE China.

14           THE COURT:  Is this evidence that the Plaintiff is

15   offering in order to show knowledge that EVE has that its

16   batteries are ending up in the United States?

17           MR. HNATH:  I would let VARTA speak to that.  I

18   think they're interested mostly in the price information.

19           THE COURT:  Oh.

20           MR. HNATH:  ██████████████████████████████████

21   ████████████████████  But this is an offer made by EVE North

22   America.  I'm unaware of anything tying EVE China to this

23   offer for sale.

24           THE COURT:  All right.  And you're saying it's

25   otherwise irrelevant what the price is if it's not tied to EVE

 1    China?

 2              MR. HNATH:  Correct.  The price that EVE -- what's

 3    relevant is what EVE China is offering its products for, not

 4    what EVE North America is offering its products for.  So if

 5    that's the reason they're wanting to use it, it's irrelevant.

 6    If they want to use it to show that EVE China was making an

 7    offer for sale, they haven't tied it sufficiently to EVE

 8    China.

 9              THE COURT:  All right.  Thank you.

10              MR. HNATH:  That's what I have for Group No. 3, Your

11    Honor.  Thank you.

12              THE COURT:  All right.  Thank you.

13              MR. FILBIN:  Thank you, Your Honor.  Paul Filbin for

14    VARTA.

15         So the -- although we have a bucket, the bucket has --

16    it's almost like a couple of little buckets in one big bucket.

17    So there are several themes to these four exhibits, but Your

18    Honor just asked a question of Mr. Hnath that I think is on

19    point, is that the -- if there is a theme to this bucket, it

20    is inducement; it's EVE China's activities in America to

21    induce the infringement of others, including their -- the

22    Chinese contract manufacturers in China and also brands that

23    bring those batteries into the United States one way or the

24    other.

25              THE COURT:  Well, let's start with PTX 4 and tell me

1    about your position on the relevance of it.

2             MR. FILBIN:  So by way of background, EVE China

3    holds out EVE USA as EVE China's U.S. sales office.  There's

4    other exhibits.  ████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████  So they are working hand-in-glove

7    to promote and sell the accused button cell batteries, and in

8    this case particularly in the United States, but everywhere.

9             And the document you're looking at at PTX 4 is what I

10   would refer to as like a lead sheet.  It's drumming up

11   business to sell the accused button cells products

12   particularly in the United States.

13             THE COURT:  And were all of the documents in this

14   bucket documents that were produced in discovery by the

15   Defendant?

16             MR. FILBIN:  Yes, Your Honor.

17             THE COURT:  All right.  So the fact that PTX 4

18   and PTX 5 are just offers, you're just saying that they are

19   relevant to show efforts to sell in the U.S.?

20             MR. FILBIN:  Yes, Your Honor.  It's part of the

21   active encouragement of infringement in the United States to a

22   class of people, category, i.e., contract manufacturers and/or

23   brand users.

24             THE COURT:  And does your damages expert rely upon

25   any of the documents in this bucket to show the damages



1    base--in other words, the number of units sold?

2          MR. FILBIN:  No, Your Honor.  Mr. Metzdorff uses

3    the exhibit we just discussed a moment ago, PTX 3.  That is

4    the sales information that EVE produced in several different

5    exhibits that he compiled into a summary.  So he uses that

6    global sales data to compute the base -- you know, the total

7    number of units sold.

8          THE COURT:  All right.  Let's go to the PTX 7

9    documents, then.

10          MR. FILBIN:  So -- yes, Your Honor.  PTX 7 was

11    produced in the manner you see it by EVE to us, so we

12    maintained it in that format.  It is a series of several --

13    ████████████████████████████████████████████████████████

14    ██████████████████████████████████████████

15    ██████████████████████████████████████████████

16    ██████████████████████████████████████

17          THE COURT:  All right.

18          MR. FILBIN:  ████████████████████████████████████

19    ██████████████████████████████████████████████████████

20    ██████████████████████████████████████████████

21    ████████████████████████████████████████████████████████

22    ██████████████████████████████████████████████

23    ████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████

25    ██████████████████████████████████████████

1 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

2      Again, we think this is completely probative and relevant

3 to the issue of whether EVE China is inducing the infringement

4 in the United States of VARTA's patents.

5           THE COURT:  All right.  Is there other relevance

6 you're relying on, or is Article 1 it?

7           MR. FILBIN:  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

8 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

9 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

11 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

13 ▇▇▇▇▇▇▇▇▇▇

14           THE COURT:  All right.  And is that representative

15 of the relevance of the other two contracts in this exhibit?

16           MR. FILBIN:  Yes.  The others refer to -- are a

17 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

18 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇,

19 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

20 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

21 ▇▇▇▇▇▇▇▇▇▇▇

22           THE COURT:  All right.  What about Exhibit 8?

23           MR. FILBIN:  No. 8 is more of the same as in PTX 7,

24 Your Honor.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

25 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

1 ████████████████████████████████  ███████████

2 ████████████████████████

3          THE COURT:  All right.  And Exhibit 11?

4          MR. FILBIN:  Exhibit 11 is another, you know,

5 typical business record.  It's a price quotation.

6 Mr. Metzdorff uses it in particular as evidence of prices

7 that were quoted to the outside world as opposed to internal

8 accounting records from EVE that he found to be, in his words,

9 nonsensical.  He found this to be -- he preferenced this type

10 of evidence as far as determining actual price offerings for

11 EVE's accused button cell battery.

12          THE COURT:  And what do you say to the argument that

13 this is from EVE North America, not EVE China?

14          MR. FILBIN:  I'll point Your Honor to page 2 of

15 PTX 11 and note that ████████████████████████████████

16 ██████████████     So again, it belies the notion that the

17 two are -- that EVE China and EVE U.S. are somehow separate

18 corporate entities.  They're working together to promote and

19 sell the accused button cell batteries.

20          THE COURT:  All right.  Thank you, Mr. Filbin.

21          MR. FILBIN:  Thank you, Your Honor.

22          MR. HNATH:  Your Honor, just a few comments, if I

23 may.

24          THE COURT:  All right.

25          MR. HNATH:  First of all, PTX 4 and 5 are not in the

1  damages base, and I think Mr. Filbin acknowledged that.

2  Therefore, our position is that it's simply not relevant to

3  any damages theory that VARTA has set forth or infringement

4  theory that they've set forth in this case.

5  ████████████████████████████████████████████

6  ██████████████████████████████████████████████████

7  ████████████████████████████████████████████

8  ██████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ███████████████████████████████████████████

11 ████████████████████   We don't believe that they've sufficiently

12 tied these agreements to anything in the United States.

13     On Exhibit 8, ████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████   This one seems to really be irrelevant.

16 And again, I apologize if I didn't find it.  I looked through

17 it and I couldn't find it.

18     And as to No. 11, this is -- you had asked whether these

19 were documents produced by EVE China.  No. 11 is not a

20 document that was produced by EVE China.  As you can see from

21 the Bates number on the bottom right, it was produced by EVE

22 North America.  ████████████████████████████████

23 ████████████████████████████, that doesn't mean that EVE

24 China was in any way involved in creating or sponsoring this

25 offer for sale.

1          That's all I have, unless you have any questions.

2               THE COURT:  All right.  Thank you.

3          I think that the Plaintiff has shown adequate relevance

4     for these documents and that the objections raised by the

5     Defendant go to their weight, not their admissibility.  I'll

6     overrule the objections to PTX 4, 5, 7, 8, and 11.

7          Which takes us back to PTX 27.  That's, I take it, the

8     exhibit that I was shown previously.

9               MR. HNATH:  It is, Your Honor, so I believe that's

10    been resolved through our discussion of the MIL.

11              THE COURT:  All right.  Then the objection to PTX 27

12    is sustained.

13         And that takes us to the Plaintiff's objections.

14              MR. MUELLER:  Thank you, Your Honor.

15         I think, first, we would like to talk about what we've

16    called Bucket 1, and I know that some of these were possibly

17    subject to discussion and agreement, but our Bucket 1 relates

18    to prior art that Defendants seek to introduce as evidence now

19    that they have withdrawn their invalidity defense, so that

20    would include Defense Exhibit 4, the Higuchi reference;

21    Defendant's Exhibit 3, which is Pytlik; there is a U.S. patent

22    in Brenner, that's Defendant's Exhibit 9; and then there are

23    two items relating to what's known as a zinc-air battery,

24    Defendant's Exhibit No. 24.  And Defendant's Exhibit 26.

25         We believe that now that the invalidity defense has been

1    withdrawn, there need be no discussion at trial about items of

2    prior art; that they will only serve to confuse the jury and

3    they are not relevant to any issue.

4            THE COURT:  Now, the bucket itself just lists 9, 24,

5    and 26.  You mentioned a couple of other exhibits at the

6    outset.

7            MR. MUELLER:  I did, but again -- I apologize, Your

8    Honor.  It's unclear to me if those have been withdrawn by

9    Defendants or not.  But the bucket relates to items of prior

10   art.

11           THE COURT:  Okay.  And just repeat for me, again,

12   what the other exhibit numbers were that you listed.

13           MR. MUELLER:  Okay.  I apologize, Your Honor.  So

14   Defendant's Exhibit 1, which is Higuchi; Defendant's Exhibit

15   3, which is Pytlik; Defendant's Exhibit 9, which is Brenner;

16   Defendant's Exhibit 24, which is a zinc-air drawing; and

17   Defendant's Exhibit 26, which is another zinc-air drawing.

18           THE COURT:  All right.  And let me hear the response

19   to those, and I'll give you a chance to respond.

20           MR. HNATH:  Just for clarification, Your Honor, so

21   Exhibit 1 has been withdrawn.  Exhibit 3 also has been

22   withdrawn based on VARTA's representation that they will be

23   withdrawing any patent claims relating to the beading over

24   claim term.  As you may have seen from some of the

25   correspondence, we've agreed that VARTA will be reducing the

1    number of patent claims being asserted to 15 claims by this

2    Thursday, and based on their representation that those claims

3    will not include any claims with beading over, we have agreed

4    to withdraw our Exhibit 3.  So that leaves in this bucket 4,

5    24, and 26.

6                THE COURT:  Is it 9, 24, and 26?

7                MR. HNATH:  Yes.  I'm sorry--9, 24, and 26.

8                THE COURT:  All right.  And what is the relevance of

9    those prior art documents now?

10               MR. HNATH:  So the relevance of -- let's take first

11   DTX 9.  This is a patent to a Mr. Brenner and which he

12   describes the force-fitting connection that we talked about

13   earlier today, and basically says this is his invention.  If

14   VARTA makes a -- presents testimony that their inventors came

15   up with the idea of a force-fitting connection as part of the

16   invention, then we believe that this would be fair rebuttal to

17   show that, no, that wasn't their idea at all; this was an idea

18   that came from an unnamed inventor named Mr. Brenner.

19        So I don't know if they're going to make -- put on that

20   kind of testimony.  I'm not sure that kind of testimony would

21   even be relevant at this point given that validity's not an

22   issue.  But if they present an invention story, which

23   plaintiffs often do, about how they came up with this idea,

24   that idea, that idea, and put it all together into a button

25   cell, I think it's fair game for us to say, Well, no, you

1   didn't come up with this particular idea; someone else did;

2   you got this idea from somewhere else.

3            THE COURT:  All right.

4            MR. HNATH:  That's the relevance to No. 9.

5        The relevance to 24 and 26 is similar.  These two

6   documents, which were produced late by VARTA, show a prior art

7   zinc-air button cell.  And this zinc-air button cell had two

8   housings, just like the button cells that -- in VARTA's

9   patents.  It had a gasket between the two housings, just as in

10  VARTA's patents.  And if they put on evidence that, you know,

11  they came up with this idea of two housings, you know, with a

12  seal in between, then I think we should be entitled to say,

13  No, you got that idea from, you know, this zinc-air button

14  cell that was being sold by VARTA already, and these documents

15  show that zinc-air button cell.

16           THE COURT:  Well, I think that the documents are not

17  admissible absent the kind of predicate you are laying which

18  would make them, in effect, impeachment documents.  But I'm

19  going to sustain the objection to those, and you can approach

20  -- if you think the door has been opened by the Plaintiffs

21  improperly claiming to have originated that idea, then you can

22  approach and seek leave to use them.  But I'm not going to

23  pre-admit them.

24           MR. HNATH:  That's fine with us, Your Honor.  And we

25  would reserve the right to at that time not only use them for

1  impeachment, but enter them into evidence.  But we understand

2  your ruling.

3            THE COURT:  All right.

4            MR. HNATH:  Thank you.

5            THE COURT:  And I guess I should go ahead and take

6  this occasion to ask Mr. Mueller, is it fair to say that you

7  do not intend to elicit testimony that your clients originated

8  the idea that the Defendant contends is displayed in these

9  exhibits?

10           MR. MUELLER:  We are going to tell how our button

11 cell was invented, but we are not going to say that we

12 invented each individual component; we invented a combination

13 of components.

14           THE COURT:  All right.

15           MR. MUELLER:  And, you know, arranged in a

16 particular way.  So we see this as, you know, an attempt to

17 backdoor an invalidity case, which would be entirely improper.

18           THE COURT:  Well, hopefully your side will not

19 approach that door so there won't be a cause to argue whether

20 it's been opened, but --

21           MR. MUELLER:  Understood, Your Honor.

22           THE COURT:  All right.

23           MR. MUELLER:  Your Honor, I believe I have

24 responsibility for Bucket 2 as well, which is Defendant's

25 Exhibit 2, and that is a drawing.  And we disparage it, in

1    quotes, as -- it's a cartoon-type of drawing that --

2              MR. HNATH:  I think he's mistaken in terms of what

3    -- may we confer one second, Your Honor?

4              THE COURT:  Sure.

5              MR. HNATH:  I don't want him to go too far.

6              MR. MUELLER:  You withdrew it?  Thank you.  Again, I

7    should have stayed up later last night, I guess.

8         So I think EVE's patent list is the next item in the

9    list, and we talked about that earlier today where I think

10   the resolution of the motion in limine resolves this issue as

11   well.

12             THE COURT:  I think that DTX 6 is either withdrawn

13   or the objection is sustained.  I'm not sure which -- do I

14   need to sustain that objection or is that exhibit withdrawn?

15             MR. HNATH:  It's withdrawn, Your Honor, based on the

16   discussion about the MIL earlier.

17             THE COURT:  All right.

18             MR. MUELLER:  Thank you, Your Honor.

19        Mr. Filbin will be addressing the next bucket.

20             THE COURT:  If this -- let me interrupt a minute to

21   say we've only got three exhibits left, so we can go a little

22   long and go through those, but are there other motions that

23   the parties want to orally argue, in which case we can break

24   for lunch and come back?

25             MR. HNATH:  May we confer, Your Honor, just one

1    second?

2              THE COURT:  Sure.

3                        (Pause in proceedings.)

4              MR. HNATH:  Your Honor, may I?

5              THE COURT:  Yes.

6              MR. HNATH:  Okay.  So other than the remaining

7    exhibit issues, there is VARTA's motion to exclude certain

8    opinions of Mr. Juzkow and EVE's motion to exclude certain

9    opinions of Doctor Horn.  We would prefer, since we're all

10   here together, to go ahead and argue those motions even if we

11   have to come back after lunch, with your indulgence.  That

12   would be our preference.

13             THE COURT:  All right.  And I assume that's

14   acceptable to the Plaintiff as well.

15             MR. HARTMANN:  Yes, we would agree.

16             THE COURT:  All right.  Well, then we'll go ahead

17   and recess now until 1:15.  Thank you.

18                        (Lunch recess.)

19             THE COURT:  Good afternoon.  Please be seated.

20        We are ready to resume with the objections to Defendant's

21   exhibit in Bucket 3, I believe.

22             MR. MUELLER:  Thank you, Your Honor.  Wes Mueller on

23   behalf of the Plaintiff VARTA.

24        The Plaintiff, in the interest of expediency, is

25   withdrawing its objections to Bucket 3, which I believe is

1    Defendant's Exhibit 16-C, as well as Bucket 4, which are

2    Defendant's Exhibits 25-C and 27-C.

3              THE COURT:  All right.

4              MR. MUELLER:  Which I believe takes us to the end of

5    Defendant's exhibits, with Bucket 5 being the IPR decisions,

6    which presumably will rise and fall with Your Honor's decision

7    regarding the MIL.

8              THE COURT:  All right.  I understand that and I'll

9    get something written on that.

10       Then whichever is the first of the motions that counsel

11   want to argue, we can hear from the movant.

12             MR. WITTMAN:  Good afternoon, Your Honor.

13       The next motion is VARTA's motion to strike and exclude

14   the opinions of Marc Juzkow, or certain parts of his opinion.

15       Just as an initial matter, we had originally briefed

16   several issues in our motion to strike and exclude Mr. Juzkow,

17   and we have dropped most of the issues except for one.  So

18   we've dropped what was Section 3(b) in our brief which related

19   to an Ultralife cell that's no longer at issue, and also

20   section 3(c)(1) which related to Mr. Juzkow's analysis of an

21   insulator.

22       What remains at issue is what we contend to be

23   Mr. Juzkow's improper claim construction of the term 'spot

24   welded connections and/or linear welded connections' in his

25   report, and that is specifically at paragraphs 277 through 292

1    of Mr. Juzkow's rebuttal expert report on the infringement

2    issue.  And the precise issue is we believe that it is clear

3    from Mr. Juzkow's expert report as well as his testimony that

4    he is taking a term which the parties agree was subject to

5    plain and ordinary meaning and he is reading in a preferred

6    embodiment from the patent specification.  And specifically he

7    is reading in a limitation that the weld must be made with

8    laser welding, and also that the weld bead pass through the

9    housing.

10        And if I could just start, I've put up the claim at

11   issue, which is claim 1 from the '904 Patent, and I've put up

12   the claim language and underlined the particular claim term

13   that is at issue, which, again, is the 'one or more

14   spot-welded connections and/or linear welded connections'.

15   And there is no mention in claim 1 of the '904 Patent of laser

16   welding or a weld bead passing through the housing.

17        As some background, and we initially believe that there

18   is a waiver and what we believe to be an attempt through EVE's

19   expert to construe a term that EVE agreed was subject to plain

20   and ordinary meaning.  And I've just summarized here EVE did

21   initially identify the term for a construction, and EVE's

22   original proposed constructions indicated that the term was

23   limited to a laser weld.

24        After VARTA submitted its claim construction brief, EVE

25   withdrew its request to construe the term, as reflected in the

1    graphic on the bottom shows an excerpt from an email that was

2    provided from counsel for EVE to counsel for VARTA indicating

3    that they were withdrawing their request to construe the term,

4    and, further, that they agreed to VARTA's proposal of plain

5    and ordinary meaning.

6        If I could turn first to Mr. Juzkow's testimony during

7    the deposition, he acknowledged multiple instances in his

8    deposition that a person of skill in the art would understand

9    that a type of welding called 'resistance welding' or

10   'resistive welding' is a well-known spot welding process.

11   And following his deposition--or, excuse me--in his expert

12   report, if we look at his analysis, for example, in the

13   paragraph shown on slide 23, it is clear that he is relying on

14   examples from the specification to narrow the term beyond its

15   plain and ordinary meaning.

16       And, for example, in paragraph 280, he discusses

17   preferred examples from the patent specification.  In

18   paragraph 281, he indicates that a POSITA would understand

19   the term 'by one or more spot-welded connections and/or linear

20   welded connections' in claim 1 to mean that there are weld

21   beads and/or weld spots that pass through the housing.

22       In paragraph 285, in his analysis of the EVE cell, he

23   concludes that the claim limitation relating to weld spots is

24   not met because it is not of the type that is formed from

25   laser irradiation.  And I'm looking specifically at paragraph

285 where he is concluding that the EVE cell is resistance welding, which he acknowledged during his deposition is a form of spot welding, and concluding that it does not meet the claim language, again, because it is not laser welding.

And we know that he is importing limitations from the patent specification first because he tells us he is during his deposition.  He was asked if he's limiting the claim to an example from the patent specification, and he acknowledges that he is.

Further, if we actually look at the specification from the patent, we see on the left some excerpts that just talk about spot-like and/or linear welded connections without imposing any further limitation on those types of weld, like, you know, a laser or weld beads passing through the housing. They are just discussed generically on the left.

On the right we see the part that Mr. Juzkow is relying on, which is the part of the specification that talks about the, you know, 'preferably done by the schematically represented laser 114'.  And again, that's on the graphic on the right, the first highlighted part.

And then the second part from that same paragraph where it talks about weld beads which pass fully through the housing of the button cell, that is also a limitation that he is importing into the claim even though there is no support for it in the claim language itself.

1       And we believe that this clearly crosses the line of an

2    expert merely applying the plain and ordinary meaning to the

3    patent claim language and imports the limitations into the

4    claim which we believe is an improper claim construction by

5    the expert.  We believe that it would violate the Court MIL

6    No. 18 which precludes the parties from doing exactly what

7    Mr. Juzkow does for purposes of infringement or

8    non-infringement that is comparing the accused product to

9    preferred embodiments in the patent specification.

10       And in their response, the Defendants appear to take the

11   position that this is not -- he's not construing the claim,

12   but it is clear from his analysis that that is exactly what

13   Mr. Juzkow is doing; he is importing the preferred

14   embodiments.

15       And unless Your Honor has any questions, that's all I

16   have.

17           THE COURT:  All right.  Thank you, Mr. Wittman.

18           MR. WITTMAN:  Thank you.

19           MR. CURTIN:  Can you go to slide 10, please, Geoff?

20       Good afternoon, Your Honor.  You know, I'll start by

21   saying I think it's -- to understand and rule on this motion,

22   it's important to actually give a close read to Mr. Juzkow's

23   report.  The sections that VARTA seeks to exclude is

24   paragraphs 277 to 292 and 301 to 306.

25       We argue the Court should deny VARTA's motion and permit

1    Mr. Juzkow's testimony because the -- we believe VARTA is

2    mischaracterizing the dispute here and what this is really

3    about.

4        The infringement dispute -- and Mr. Juzkow's

5    non-infringement opinion is not about the definition of weld

6    or connections; it's not about what spot welding is or what

7    linear welding is.  EVE's not seeking a new claim

8    construction, obviously, and we don't believe the testimony

9    contradicts the Court's prior claim construction or violates

10   MIL 18; rather, Mr. Juzkow's non-infringement argument is

11   based on the meaning of 'directly connected' in light of the

12   intrinsic evidence.  That's another part of that claim

13   limitation that hasn't been so highlighted.

14       Next slide, please.

15       If you look -- it's element D of claim 1 of the '904

16   Patent, also carries through to a couple of other claims,

17   "wherein a first of the current collectors provided in the

18   form of the metal foiler mesh includes an uncoated section

19   that is not coated with active electrode material."  Now, this

20   -- "the uncoated section being directly connected by one or

21   more spot-welded connections and/or linear welded connections

22   to a first of the housing components."  You know, this -- I

23   mean, we highlighted a different portion of this limitation

24   than VARTA did on their slide, but we think that is the key.

25               THE COURT:  Well, does Mr. Juzkow contend that it

1    must be a laser weld?

2          MR. CURTIN:  I don't believe so, Your Honor.  We

3    don't read it that way.

4          THE COURT:  All right.

5          MR. CURTIN:  I can't speak to everything he said in

6    his deposition, but --

7          THE COURT:  Well, the -- what I heard from the

8    Plaintiff was that they're objecting to his conclusion that

9    the claim requires that it be a laser weld and that the weld

10   be through the housing wall.

11         MR. CURTIN:  Well, Your Honor, I think it is fair

12   to say that Mr. Juzkow does conclude that the weld must go

13   through the housing in order to directly connect the current

14   collector to the housing component, or must go through, but I

15   don't believe there's anywhere in his report he says that that

16   must be done by lasers.  He talks about -- he certainly talks

17   about an embodiment in the specification that talk about what

18   this would mean to a person of ordinary skill in the art in

19   terms of how you make a direct connection, and I can't dispute

20   the language from his report --

21         THE COURT:  Well, look at --

22         MR. CURTIN:  -- that VARTA put up there.

23         THE COURT:  I'm sorry.  Look at paragraphs 285 and

24   287.  Those are the paragraphs that the Plaintiff contends

25   contain his opinion that it has to be by laser.

1          MR. CURTIN:  Okay.  And Your Honor, but I think when

2     I saw that up there, my conclusion was -- my initial -- my

3     immediate reaction was that that's not where his

4     non-infringement conclusion is.  His non-infringement

5     conclusion is in paragraph 283, we argue, where -- which

6     says --

7          Next slide, Geoff, please.

8          283, he starts by present extending entire limitation.

9          Then next slide, please.

10         "Therefore, the EVE accused products do not have weld

11    beads and/or weld spots that pass through the

12    housing"--clearly says it has to pass through the

13    housing--"which means the uncoated section in the EVE accused

14    products does not connect to the housing by one or more spot

15    welded connections and/or linear welded connections."  It's

16    about connection; it's about the direct connection, we

17    believe.  And in order for the weld to be what is connecting

18    it, what's directly connecting it, it does have to pass

19    through the housing.

20         Now, let's -- now, in -- with regard to 283 and 285, Your

21    Honor, it's important to note -- well, on 285 and 287, Your

22    Honor, I apologize for not having this in the presentation for

23    you, but Mr. Juzkow, that's the part of his report where he's

24    critiquing the evidence presented by Doctor Horn to argue that

25    this infringement has -- that this limitation has been met.

1    There's an image directly above 285, and he says -- does say

2    that's not a weld spot because that's the stamp created by the

3    welding head, you know, on the output conductor.

4         287, I'll just say he talks about how VARTA's doing it.

5    He doesn't say -- nothing in 287 says in order to infringe

6    this claim you have to do it with a laser, that you have to

7    laser weld.

8              THE COURT:  All right.  Well, I'll just have to look

9    at the report and the briefing.  I think I know how to

10   recognize whether the expert is engaging in claim

11   construction, and I understand that you would contend he's not

12   and they contend he is, and until I have a chance to, as you

13   recommend, review the report, at least that section of the

14   report in its entirety, I won't know.

15             MR. CURTIN:  Thank you, Your Honor.

16             THE COURT:  Thank you, Mr. Curtin.

17        Anything else on this argument, Mr. Wittman?

18             MR. WITTMAN:  Yes, just very briefly.

19        There was a portion of the claim that Mr. Curtin

20   highlighted that indicated that the expert was analyzing.

21   I would simply note that that term was not asked to be

22   construed, and I think even if that were the case--and I don't

23   believe that's what Mr. Juzkow's report reflects--would not

24   support the analysis that he is undertaking.

25        We also disagree that a weld bead or a spot has to pass

1    all the way through the housing to make a direct connection.

2    If two pieces of metal are welded together, they have a direct

3    connection.

4         So then if we could just maybe have the presentation back

5    really quick.

6         I think, again, paragraphs 281, he is specifically

7    talking about the term 'by one or more spot-welded connections

8    and/or linear welded connections'; he is not talking about a

9    different claim term when he is talking about the weld beads

10   or weld spots passing through the housing.  And again, in

11   paragraph 285, he is -- the first sentence he talks about the

12   alleged welded spot.  So he is, again, talking about the

13   claimed weld spots when he is introducing the concept of

14   requiring laser irradiation.  And that's in paragraph 285.

15        That's all I have, Your Honor.

16             THE COURT:  All right.  And Mr. Wittman, just so

17   I'll understand, you agree that the only live part of your

18   motion is part 3(c)(2)?

19             MR. WITTMAN:  That's correct, Your Honor.

20             THE COURT:  All right.  I will confine myself to

21   that part and take it up.  Thank you.

22             MR. WITTMAN:  Thank you.

23             THE COURT:  And so the last motion is the

24   Defendant's motion to exclude certain opinions of Doctor Horn.

25             MR. CURTIN:  Slide 15, please, Geoff.

1    Your Honor, in this motion EVE moves to exclude a portion

2    of Doctor Horn's report that addresses or offers his opinions

3    on whether or not EVE reasonably relied on its -- on the

4    opinions of counsel it received.  Part of its advice of

5    counsel defense to willfulness.  And he opines that the

6    reliance was unreasonable, and the section is paragraphs 617

7    through 634.  We maintain those opinions are inadmissible

8    under Federal Rule 702, 704, and 403 and should be excluded

9    for the following reasons really.

10    First of all, the question of reasonableness is a legal

11    concept, and reasonable reliance on opinions of counsel, in

12    particular, is a legal concept.  And Doctor Horn, you know,

13    admitted at his deposition--I don't think anyone

14    disputes--that he's not a lawyer and has no particular legal

15    expertise; therefore, we believe he's lacking the specialized

16    knowledge required to assist the trier of fact as required by

17    702(a).

18    Also using unreliable principles and methods applied to

19    this analysis because he's focusing on his technical

20    critiques, his technical analysis, his technical disagreements

21    with the opinions of counsel on various bases, and that's the

22    wrong standard for judging the competence of an opinion of

23    counsel.

24    As the Court's likely aware, and as Mr. Hnath mentioned

25    earlier in another context, opinions of counsel are judged

1    primarily on thoroughness, not completeness, whether or not a

2    business person who doesn't have to be a lawyer or a technical

3    expert would be justified in relying on them.

4        And Doctor Horn expresses legal conclusions and it would

5    be -- and the 403 argument is that it would be inappropriate

6    to allow his, you know, Ph.D. technical credentials to bolster

7    VARTA's legal positions when it's not -- those aren't areas on

8    which he should be opining.

9        Next slide, please.

10       In its briefing -- in its opposition, Your Honor, we

11   think it's telling that VARTA cites no cases in which a court

12   allowed a technical expert to opine on reasonable reliance,

13   and we believe this should not be the first.  As I mentioned

14   before, business decision-makers need not be technical

15   experts, and reasonableness is a legal concept.  We do have

16   two district court cases here, *Briley* and *Heatherly,* in which

17   -- well, the first of which excluded an engineer's testimony

18   about reasonableness, whether or not the defendant took

19   reasonable step, and I think that was in a retail store

20   safety-type of case; it wasn't about advice of counsel.  And

21   in the *Heatherly* case they excluded the engineer's legal

22   conclusions.

23       And next slide, please.

24       And Doctor Horn engaged -- made a number of improper

25   legal conclusions.  At paragraph 617, you know, he was given

1    the task of reviewing the opinions of counsel produced by EVE

2    and offer his opinion as to whether a business person would

3    have reasonably relied on them.  And he expresses the opinion

4    it would have been unreasonable for EVE to rely on those

5    opinions that the VARTA patents were invalid or not infringed.

6         Then going on to paragraph 628, "The above technical

7    deficiencies aside"--it's after he critiques the -- he offers

8    some technical critiques and he talks about the -- some IPR

9    denials--"the decisions from the Patent Office would have

10   caused any battery manufacturer to seriously question the

11   reasonableness of relying on the previous opinions of

12   unpatentability.  A reasonable battery manufacturer would have

13   obtained further opinions in light of those decisions."  And I

14   believe there's no evidence of record and we maintain that

15   Doctor Horn's not only not qualified to talk -- you know,

16   express legal conclusions, but he's not a battery manufacturer

17   and we don't believe he has the experience to talk about what

18   a reasonable battery manufacturer would have done.  There's a

19   legal aspect to that as well.

20        And next slide, Geoff.

21        Again, we have three statements--the Rimon opinion would

22   not have been reasonably relied upon by a manufacturer, ███

23   ████████████████████████████████████, and in my

24   opinion, a battery manufacturer would not reasonably rely on

25   opinions and analysis provided by a Chinese law firm with

1    respect to infringement and validity of U.S. patents.  Again,

2    those are flat out legal conclusions.

3        And while rule 704(a) -- they do eliminate the ultimate

4    opinion rule, it's still clear, including from the advisory

5    committee notes, that that change in the rule is not intended

6    to allow experts to offer legal conclusions.

7        Now, and aside from his legal conclusions, if you look at

8    the rest of the section we're talking about, there are --

9    since everyone's used the term 'buckets' today, there are

10   essentially three buckets of opinions that Doctor Horn

11   provides, all of which -- well, all of which really VARTA

12   could develop from other sources.  He offers technical

13   critiques that are only tangentially relevant to the core

14   issue of the competence of the opinion of counsel and factual

15   evidence that VARTA can develop through cross examination of

16   EVE witnesses.

17       He offers testimony about the contents of the opinion

18   letters, what's in them--contents, format, things of that

19   nature.  And that's the first line.  He talks about some PTAB

20   denials, the institution denials which were discussed earlier

21   today.  And he says that those decisions by the Patent Trial

22   and Appeal Board made -- makes EVE's continued reliance on

23   those opinions unreasonable.

24       That's a perfectly fine argument for counsel to make, but

25   Doctor Horn has no business making that argument.  Counsel

1    can -- I mean, if the Court decides that the IPRs can -- we

2    can have testimony on those, you know, after you rule on the

3    MIL, you know, the Court could take judicial notice of the --

4    for example.  That would be another way and counsel can argue

5    about them.  Counsel can cross examine an EVE fact witness who

6    will be testifying about reliance on advice of counsel to draw

7    out those issues and present those issues to the jury.  And

8    Doctor Horn also presents technical critiques based on his own

9    analysis.

10        Next slide, Geoff.

11        Okay.  And just to go quickly over a point we've already

12   discussed, Doctor Horn's technical critiques are tangential to

13   the core issue.  Legal competence of an opinion of counsel is

14   not the same as technical correctness.  And this goes back to

15   some earlier cases, but it's still -- the rule's still the

16   same.  Thoroughness, not correctness, is the proper focus,

17   because the question only arises where counsel was wrong, and

18   the Federal Circuit decision by *Ortho Pharmaceuticals versus*

19   *Smith* is one of the key early decisions there.

20        And because of this -- and the *Simmons* case is worth

21   citing.  You know, it's not exactly on point, but the point

22   is that the business decision-maker is suspected to be a

23   layperson.  They are not expected to be a technical expert,

24   and they are not expected to be able to go behind and check

25   the legal competence of their opinion of counsel.

1       And the point is that, you know, in evaluating whether

2   EVE reasonably relied on the opinions of counsel, you have to

3   look at that from the perspective of the business

4   decision-maker.  And when you're judging whether or not the

5   opinion of counsel was competent so that the decision-maker

6   could reasonably rely on it, that issue is determined

7   basically by looking at the opinion on its face--thoroughness,

8   the type of analysis, things of that nature.  It's not based

9   on whether it says a particular piece of prior art has a

10  beaded-over cover or something like that.

11      Finally last slide, Geoff.

12          THE COURT:  I take it, Mr. Curtin, that the

13  Defendant does not intend to call any of the counsel.

14          MR. CURTIN:  That's true, Your Honor, yes.

15          THE COURT:  Who would be the business decision-maker

16  that you're going to present?

17          MR. CURTIN:  Gary?

18      In terms of trial witnesses, Your Honor, I'm not

19  positive, but that's -- there's still some travel issues,

20  as Mr. Hnath mentioned, that --

21          THE COURT:  But you are going to present a witness

22  to testify about reliance upon the opinion of counsel?

23          MR. CURTIN:  Your Honor, I believe that is our

24  intention.  In order to assert the defense that EVE acted in

25  reliance of counsel, we have to have some testimony of a

1       representative of the company to say it.

2                 THE COURT:  I would expect that.

3           All right.  Do you know whether the Plaintiff has

4       obtained a deposition -- I notice that they have the counsel

5       listed on their witness list as may call live or by

6       deposition.  Have the counsel been deposed?

7                 MR. CURTIN:  I believe two of the counsel have

8       been deposed.  Mr. Jason Xu of the Rimon law firm and --

9                 THE COURT:  Thomas Bejin.

10                MR. CURTIN:  -- Mr. Bejin.  They were both deposed.

11                THE COURT:  So these things that are in Doctor

12      Horn's report on this section, they were -- counsel were asked

13      about those?

14                MR. CURTIN:  I would -- about the technical

15      critiques?  The issues?  I would expect so, Your Honor.  I

16      was not the one -- I was not at those depositions.

17                THE COURT:  All right.  Thank you, Mr. Curtin.

18                MR. CURTIN:  Thank you.

19                MR. MUELLER:  Thank you, Your Honor.

20          If we could have slide 48.

21          So the suggestion here is that we just take the opinion

22      at face value, and if it looks like it's workable then we just

23      accept it.  But the law, as we've shown from the *Golden Blount*

24      case, says that once the privilege has been waived, that the

25      patentee is free to introduce evidence to challenge the

1    competence of the opinion, and we submit that is what we are

2    doing here.

3         If we can go back to slide 40.

4         Doctor Horn is an imminently qualified technical expert.

5    His opinions go directly to the technical deficiencies in the

6    legal opinions.  He is -- that is well within his area of

7    expertise to consider the prior art that is being discussed.

8    And his conclusions on reasonableness, which I believe is what

9    is the real objection here, they flow directly from the

10   technical deficiencies that he finds in the opinions.

11        THE COURT:  What is his background in dealing with

12   patent claims?

13        MR. MUELLER:  Well, he has had --

14        And if we can go to slide 46.

15        He did work in the area of patent clearance at one of the

16   companies that he worked at, at Energizer Eveready Company,

17   but -- so it is not necessarily a question of patent clearance

18   here, but certainly from the standpoint of looking at whether

19   the prior art is being faithfully applied to the claims and

20   whether the opinions, therefore, from a technical standpoint

21   show that the claims are what the opinions ultimately conclude

22   is something that is well within his area of expertise.

23        And perhaps we can look at some of the examples of what

24   he's saying.

25        Slide 47.

1    You know, ████████████████████████████

2    ████████████████████████████████████████

3    ████████████████████████████████████████

4    ██████████████████████████████████, and he

5    explains why the opinions are deficient, because he's -- and

6    he's talking about very specific aspects or items in the prior

7    art references that are being discussed by the lawyers

8    rendering the advice.  He talks about -- and that's

9    what -- that's consistent with everything that is underlying

10   his conclusions that the opinions are technically deficient.

11       And so we would submit that based on his experience and

12   knowledge in the area of batteries and his understanding of

13   battery technologies, he can read the references as well as

14   the advice from the standpoint of a person skilled in the art

15   and then apply that to how a reasonable business person would

16   have reacted and whether, for example, a reasonable business

17   person would have asked questions about, you know, is this

18   opinion correct, or if there were subsequent events.  And he

19   talks about that in some detail, too.

20       We've gone over the IPR decisions, which we would submit

21   call into question and are directly at odds with the opinions

22   that were rendered by both the Rimon law firm and the Bejin

23   law firm.  And so he looks at what was said later on in the

24   IPR decisions, notes that it's contrary to the opinions that

25   were previously issued, and indicates that a reasonable

1    business person would have asked whether the opinions needed

2    to be updated or would have at least -- it would have at least

3    called into question whether the person would have gone on in

4    their activities that they were now pursuing with respect to

5    the alleged infringement of the VARTA patents.

6            THE COURT:  What is his background as a reasonable

7    business person?

8            MR. MUELLER:  Well, he has vast experience both as a

9    consultant and in the industry in various capacities.  It's

10   set forth in his report.

11           THE COURT:  Do any of those capacities involve

12   making decisions about whether patents are valid or apply to

13   certain manufacturing processes?

14           MR. MUELLER:  Well, he knows what the patent process

15   is about.  He's gotten several patents.  And again, he was

16   responsible for clearing products in one of his job capacities

17   with respect to patents that existed.  So he does have at

18   least some experience in that area.

19       And again, he is not -- to be clear, he is not looking at

20   these opinions in determining whether the law of obviousness

21   was applied correctly, whether the prior art is anticipating;

22   he is looking at them only from the standpoint of does the

23   reference teach what the attorney is advising that it teaches,

24   and when the attorney is making the supposed combination of

25   the references or modification to the references, does that

1    hold up from a technical standpoint.

2    ████████████████████████████████████████

3    ████████████████████████████████████████████

4    ████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████████████████████████

7         THE COURT:  If you look at his paragraph 624, in the

8    middle of the paragraph he states, "It is my understanding

9    that a finding of obviousness of a patent claim requires some

10   motivation or reason to combine or modify references which is

11   plainly lacking throughout this opinion, including with

12   respect to this output conductor requirement."

13      That -- where does he derive his understanding of the

14   requirements of a finding of obviousness of a patent claim?

15         MR. MUELLER:  So he derives that understanding based

16   on his work on this matter.  He does not have an independent

17   understanding of the legal aspects of what renders a claim

18   obvious.

19         THE COURT:  So why is he expressing an opinion on

20   something that he has no background or training on?

21         MR. MUELLER:  Because he can certainly understand

22   with -- armed with the legal requirements, he can certainly

23   make the legal connection as to whether the requirements are

24   satisfied.

25      Leading up to this motion, we had talked about if the

1    issue really is that Defendants object to him opining on the

2    legal consequences or the legal requirements in the opinions,

3    we would limit his testimony to talking about the technical

4    aspects of the opinions only.  We weren't able to reach

5    agreement on that, but that is one compromise that we would be

6    willing to pursue here, Your Honor.

7         THE COURT:  Well, that would certainly resolve some

8    of my concerns about it.  I agree that he appears to be

9    imminently qualified about battery technology, but this

10   opining as to whether or not it was reasonable for a business

11   person to rely upon this opinion of counsel seems to be

12   outside that area of competence.

13        Let me hear from counsel for Defendant why he shouldn't

14   be allowed to express opinions about the technology that he

15   refers to in this section.

16        MR. CURTIN:  Well, Your Honor, thank you.

17        As Your Honor noted, we're not challenging Doctor Horn's

18   technical credentials.  I mean, he certainly has the

19   qualifications to opine on the technology in this case.  But

20   if you listen -- listening to the argument counsel was making

21   and the critiques counsel was making --

22        I think it's around slide 23, Geoff.

23        -- every one of those critiques of the opinions, as I

24   said, they are arguments that counsel can make.  If Doctor

25   Horn is sitting up on the witness stand in front of the jury

110

1    and he's handed an opinion of counsel that EVE is relying on

2    as an exhibit and he goes through that opinion of counsel and

3    picks it apart on a technical basis, you know, naturally

4    that --

5         Oh, I'm sorry.  That's not it, Geoff.  No.  That's -- go

6    up one, please.  Up one.  Never mind.  Just take them down.

7         The -- you know, of course it would have a prejudicial

8    effect, but it we believe it would have an unduly prejudicial

9    effect because it would lend the weight of Doctor Horn's

10   technical expertise and credentials to support VARTA's legal

11   positions when, yes, there's a totality of the circumstances

12   analysis involved here, but the bottom line is that the

13   competence of an opinion of counsel is evaluated primarily on

14   its face.  It's not the same as technical correctness,

15   because, of course, this only becomes an issue -- I mean, the

16   advice of counsel defense to willful infringement only really

17   becomes an issue when a trier of fact is decided, more or

18   less, that the opinion is wrong, that you have a valid -- a

19   claim has been infringed and not proven valid.

20        So technical correctness isn't the standard.  And that

21   gets into the prejudice that EVE can suffer if the jury starts

22   to think that technical correctness is what it's all about.

23   And Doctor Horn is a distinguished expert and presumably the

24   jury likes him and then, you know, it just -- it's -- that's

25   the 403 part of the analysis.

1        THE COURT:  Isn't it a matter of degree?  I mean, if

2   there is no technical accuracy in the opinion of counsel, then

3   surely that's something that the Plaintiff can point out.

4        MR. CURTIN:  Surely, Your Honor; absolutely.  And I

5   think Plaintiff can point that out through cross examination,

6   but --

7        THE COURT:  How are they going to do that if you

8   don't call the counsel?

9        MR. CURTIN:  Well, if counsel -- if the counsel was

10   being deposed, they could cross examine the counsel.  They

11   could also cross examine, presumably, the EVE fact witness.

12        THE COURT:  And I expect that EVE's fact witness

13   will say, Well, that's what the lawyer said and we paid him

14   because he was an expert and this is what he told us.

15        MR. CURTIN:  Yes.

16        THE COURT:  So I don't think they should be limited

17   to cross examining your fact witness about the accuracy of the

18   opinion letter.

19        But anyway, I do understand that position, and I'll look

20   further at this, but while I do think that some of these

21   opinions go beyond Doctor Horn's area of competence, I think

22   that the Plaintiff is entitled to offer his technical opinions

23   about the correctness of the factual statements in the opinion

24   letters.  But anyway.

25        MR. CURTIN:  Thank you, Your Honor.

112

1          THE COURT:  Thank you.

2      Are there any other motions that counsel want to offer

3  oral argument on?

4          MR. HNATH:  None from EVE, Your Honor.  Thank you.

5          THE COURT:  All right.  Thank you.

6          MR. HARTMANN:  None from VARTA as well, Your Honor.

7  Thank you very much.

8          THE COURT:  Well, one thing we need to accomplish is

9  to get a final exhibit list from each side.  What I would ask

10  is that each side draw up a list of what they think is all of

11  their pre-admitted exhibits, offer it to the other side, and

12  then it can be -- after you've met and conferred, it can be

13  filed with the Court.  If there are disagreements that cannot

14  be resolved, then we need you to notify the Court.  You can do

15  that through a joint notice, and we will gather back together

16  before the appointed hour and resolve those disputes if there

17  are any.

18      So my first question would be here we are on Monday.  Can

19  you by the end of this week exchange those lists, and then by

20  the end of the following week you can file them with the Court

21  along with a joint notice on any objections?

22          MR. STINSON:  Yes, Your Honor.  Plaintiff does not

23  have a problem with that.

24          THE COURT:  All right.

25          MR. CULBERTSON:  Yes, Your Honor.

1          THE COURT:  Good.

2       Another thing is if there are any depositions that the

3    Plaintiff would intend to offer on the first day -- in other

4    words, that would be after the jury has been selected and

5    impaneled, there will be half a day typically of evidence.

6    If you have a deposition that is going to be used that day,

7    we need to make sure that either there are no objections to

8    the portions of it that are going to be offered, or if there

9    are objections, we need to gather back together and get those

10   resolved because there won't be time to take them up in the

11   ordinary course of what we've described.

12      So that's the question to Plaintiff.  At this point,

13   can you proceed your first day without depositions?  Or if

14   not, let's figure out how to address them.

15          MR. HARTMANN:  My best guess is, Your Honor, that

16   the first day we probably will not get to the depositions,

17   but I'm guessing that right now because, as Your Honor will

18   appreciate we're reshaping the presentations now taking

19   validity out of the case, so that will accelerate things.

20   So I cannot promise here today that we might not get to a

21   deposition about 5:00 or 4:00 that evening, that afternoon.

22          THE COURT:  Well, how about if we say by the Friday

23   before, which would be I guess September the 4th, if I'm --

24   no, the 11th is a Monday.  The 7th -- I guess that would be

25   August 31st maybe, or September the 1st.  I should look at a

1    calendar.  Can you have made that determination by Friday,

2    September the 1st, so that if --

3            MR. HARTMANN:  Sure.

4            THE COURT:  -- you are going to use a deposition and

5    you have not resolved the objections with the other side, you

6    can notify the Court and we'll have time in that week before

7    trial to resolve those objections?

8            MR. HARTMANN:  We'll do that.  I think the safest

9    thing is perhaps to assume that we will call some of the

10   witnesses by deposition, and so we are now already in the

11   process of preparing the video excerpts to show.  So yes,

12   we'll have those prepared and furnished to counsel for

13   Defendant to determine whether there are any issues that

14   need to be raised.

15           THE COURT:  All right.  And I should also let you

16   know that over the break I confirmed that there is at least

17   a likelihood that the jury selection will be on Friday,

18   September the 8th.  Now, I don't think a final decision has

19   been made on that, but in any event, you should plan for that

20   possibility.

21           MR. HARTMANN:  Your Honor, if I may ask the question

22   whether lead counsel -- whether I need to be present for that,

23   or if that is a local rule that is required.  I would plan to

24   have, you know, Mr. Stinson head up the jury selection effort.

25           THE COURT:  If you're not --

1        MR. HARTMANN:  My witnesses are flying in from

2   Germany.  You know, that Thursday, Friday, they are all

3   gathering in Chicago, and so there is some logistical concerns

4   I have, but...

5        THE COURT:  Well, if you determine that you are not

6   able to be there on that Friday and if, in fact, you get

7   notice the jury selection is to be scheduled then, I'd ask you

8   to get with Mr. Stinson and advise the Court.  I don't

9   anticipate a problem with that, but --

10       MR. HARTMANN:  Okay.  Thank you.

11       THE COURT:  -- we can take it up.

12       MR. HNATH:  Your Honor, may I ask, if the jury is

13  going to be selected on Friday, does that mean we would get

14  the juror questionnaires sooner than Thursday?

15       THE COURT:  I think that if the jury selection is

16  moved to Friday, we'll move the Thursday dates to Wednesday.

17  That would include when you'll get the questionnaires, but it

18  will also include when the jury notebooks would be due.

19       MR. HNATH:  Okay.  Thank you, Your Honor.

20       THE COURT:  All right.  And I will make sure you get

21  that word as soon as a decision is made on that.  But there

22  are, as I mentioned, several other cases that are on this same

23  docket and we're coordinating with those as well.

24       Let me see.  I'm sure I'll think of something else that

25  we need to take up.  If so, we'll notify you promptly.

116

1          Is there anything else that either side wants to take up

2     now?

3               MR. STINSON:  No, Your Honor.

4               THE COURT:  All right.

5               MR. HNATH:  Nothing from EVE.  Thank you for hearing

6     us today, Your Honor.

7               THE COURT:  All right.  Then thank you all.

8          And we are adjourned.

9                              (End of hearing.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              08/13/2023

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Concordance

**< Dates >**
**08/13/2023** 117:9 .
**August 31st** 113:25 .
**AUGUST 7, 2023** 1:13 .
**August 8th** 30:10 .
**December 15th** 51:3 .
**February 7th** 51:7 .
**January, January 24th** 51:5 .
**July 17th** 51:11 .
**March 14th** 30:12, 30:13 .
**May 22nd** 48:4, 59:17 .
**November 2021** 72:22 .
**September 11** 4:20 .
**$2.40** 74:21 .
**$2.55** 74:21 .
**'182** 28:17 .
**'501** 28:22 .
**'518** 45:21, 46:2 .
**'581** 29:1, 29:6, 30:11, 45:11, 46:18, 53:6, 53:23 .
**'835** 45:10, 45:25 .
**'869** 28:8, 29:12, 30:15 .
**'904** 28:8, 28:22, 89:11, 89:15, 93:15 .
**'905** 28:9, 28:23, 29:11, 30:13 .
**'913** 45:11, 45:25, 53:23 .
**'one** 89:13 .
**-based** 63:5 .
.
.
**< 0 >** .
**02** 66:2 .
.
.
**< 1 >** .
**1** 18:2, 21:4, 45:3, 59:24, 77:18, 78:6, 81:16, 81:17, 82:14, 82:21, 89:11, 89:15, 90:20, 93:15 .
**10** 92:19 .
**100** 1:44, 2:14, 2:40 .
**10:00** 15:18 .
**11** 5:17, 5:23, 14:21, 14:24, 15:1, 72:9, 73:22, 79:3, 79:4, 79:15, 80:18, 80:19, 81:6 .
**114'** 91:19 .
**118008** 69:21 .
**11th** 4:14, 113:24 .
**12** 10:3 .
**13** 21:1, 21:18, 22:3, 22:4, 22:9,

22:10, 22:11, 22:15, 22:17, 22:22, 66:15 .
**14** 74:4 .
**14th** 9:7, 9:10 .
**15** 22:10, 83:1, 97:25 .
**15-minute** 44:22 .
**16-C** 88:1 .
**177** 17:24 .
**18** 92:6, 93:10 .
**180** 2:5 .
**1889** 77:16 .
**1999** 2:20 .
**1:15** 87:17 .
**1st** 113:25, 114:2 .
.
.
**< 2 >** .
**2** 1:5, 3:4, 7:4, 7:6, 18:6, 18:12, 21:5, 25:1, 25:10, 60:3, 66:10, 66:11, 67:21, 79:14, 85:24, 85:25 .
**20006-1101** 2:21 .
**2001** 68:9 .
**2014** 69:24 .
**2016** 39:23 .
**2017** 39:23 .
**2018** 28:15, 74:5 .
**2019** 74:3 .
**202** 2:22 .
**2020** 63:8 .
**2021** 28:6 .
**2022** 30:11, 50:6, 51:3 .
**2023** 30:12, 30:14 .
**203** 2:26 .
**21-CV-400-JRG** 1:5 .
**2100** 2:26 .
**214** 69:20 .
**22** 41:19 .
**221-400** 3:4 .
**226** 23:22 .
**23** 90:13, 109:22 .
**230** 23:22 .
**24** 81:24, 82:4, 82:16, 83:5, 83:6, 83:7, 84:5 .
**244** 68:8 .
**25-C** 88:2 .
**26** 81:24, 82:5, 82:17, 83:5, 83:6, 83:7, 84:5 .
**263-3040** 2:22 .
**27** 60:18, 81:7, 81:11 .

**27-C** 88:2 .
**277** 88:25, 92:24 .
**280** 90:16 .
**2800** 2:34 .
**281** 90:18, 97:6 .
**283** 95:5, 95:8, 95:20 .
**285** 90:22, 91:1, 94:23, 95:20, 95:21, 96:1, 97:11, 97:14 .
**287** 94:24, 95:21, 96:4, 96:5 .
**292** 88:25, 92:24 .
.
.
**< 3 >** .
**3** 25:11, 45:6, 60:6, 60:7, 72:5, 74:3, 75:10, 77:3, 81:21, 82:15, 82:21, 83:4, 87:21, 87:25 .
**3(b** 88:18 .
**3(c)(1** 88:20 .
**3(c)(2** 97:18 .
**30** 6:1, 6:2, 8:15 .
**301** 92:24 .
**306** 92:24 .
**31** 27:13 .
**312** 2:7, 2:28 .
**314** 31:22 .
**34** 30:10 .
**34735** 74:4 .
**35** 31:22, 62:13 .
**39** 20:10 .
.
.
**< 4 >** .
**4** 25:11, 25:15, 45:19, 60:10, 60:13, 65:7, 72:8, 72:13, 72:21, 73:5, 75:25, 76:9, 76:17, 79:25, 81:6, 81:20, 83:4, 88:1 .
**40** 6:2, 33:2, 62:13, 105:3 .
**40-** 61:9 .
**403** 44:2, 61:2, 73:20, 98:8, 99:5, 110:25 .
**45-year** 61:9 .
**46** 105:14 .
**47** 105:25 .
**474** 68:9 .
**48** 104:20 .
**49** 59:17 .
**4900** 2:5 .
**495** 68:12 .

Concordance

**4:00** 113:21 .
**4th** 113:23 .
.
.
**< 5 >** .
**5** 25:12, 46:10, 47:5, 65:10, 65:11, 72:9, 73:5, 73:6, 76:18, 79:25, 81:6, 88:5 .
**500** 2:14 .
**53** 39:19 .
**54** 40:6, 66:22, 67:23, 71:16 .
**55** 41:4 .
**558-1368** 2:28 .
**58** 62:25 .
**581** 30:9 .
**597-3301** 2:16 .
**5:00** 113:21 .
.
.
**< 6 >** .
**6** 17:22, 25:13, 26:20, 44:7, 86:12 .
**60601** 2:27 .
**60601-6780** 2:6 .
**616-5600** 2:7 .
**617** 98:6, 99:25 .
**620** 68:12 .
**624** 108:7 .
**628** 100:6 .
**634** 98:7 .
.
.
**< 7 >** .
**7** 47:2, 72:9, 73:7, 73:11, 73:12, 73:14, 77:8, 77:10, 77:16, 78:23, 80:5, 81:6 .
**70** 18:13 .
**702** 98:8 .
**702(a** 98:17 .
**704** 98:8 .
**704(a** 101:3 .
**73** 18:21 .
**74** 24:5 .
**75503** 2:35 .
**75670** 1:45, 2:41 .
**75702** 2:15 .
**792-7080** 2:36 .
**7:00** 15:25, 16:3 .
**7:30** 15:21, 15:23, 16:4 .
**7th** 9:16, 113:24 .

.
.
**< 8 >** .
**8** 14:24, 72:9, 73:18, 78:22, 78:23, 80:13, 81:6 .
**801** 69:14 .
**801(d)(2** 69:11, 70:8 .
**801(d)(2)(c** 70:25, 71:18 .
**8:30** 15:23 .
**8th** 114:18 .
.
.
**< 9 >** .
**9** 17:19, 38:19, 44:6, 47:19, 81:22, 82:4, 82:15, 83:6, 83:11, 84:4 .
**903** 1:46, 2:16, 2:36, 2:42 .
**923-7464** 2:42 .
**923-8546** 1:46 .
**97** 20:23, 23:25, 25:4 .
**9:00** 1:14 .

———————————————
   DATE_____ 117:10 .
.
.
**< A >** .
**A.M.** 1:14, 15:25 .
**able** 11:13, 11:25, 12:7, 12:9, 16:11, 23:4, 30:1, 33:22, 34:3, 35:2, 102:24, 109:4, 115:6 .
**above** 53:15, 96:1, 100:6 .
**ABOVE-ENTITLED** 117:3 .
**absence** 24:15, 47:24, 52:24, 53:19 .
**absent** 48:1, 84:17 .
**absolutely** 111:4 .
**abstract** 18:15 .
**accelerate** 113:19 .
**accept** 63:20, 104:23 .
**acceptable** 87:14 .
**access** 39:12, 39:15, 41:1 .
**accomplish** 112:8 .
**accomplished** 12:25 .
**accordance** 47:21 .
**according** 47:14, 56:11 .
**accounting** 79:8 .
**accuracy** 111:2, 111:17 .
**accused** 20:5, 21:13, 21:17, 22:1, 22:6, 25:6, 43:12, 43:15, 72:10, 76:7, 76:11, 79:11,

79:19, 92:8, 95:10, 95:13 .
**achieve** 47:5 .
**acknowledge** 19:20 .
**acknowledged** 41:25, 80:1, 90:7, 91:2 .
**acknowledges** 91:8 .
**acted** 103:24 .
**active** 4:21, 76:21, 93:19 .
**activities** 32:7, 63:5, 75:20, 79:1, 107:4 .
**actual** 42:19, 43:13, 79:10 .
**actually** 12:8, 15:4, 19:3, 39:14, 48:9, 49:23, 53:2, 58:12, 58:14, 73:7, 74:3, 91:10, 92:22 .
**add** 15:13 .
**addition** 68:25 .
**additional** 15:12, 45:24 .
**address** 14:3, 17:17, 18:9, 27:1, 60:11, 62:2, 65:14, 113:14 .
**addressed** 15:9, 37:17, 65:19 .
**addresses** 98:2 .
**addressing** 26:22, 36:22, 86:19 .
**adequate** 23:18, 36:3, 81:3 .
**adhesive** 46:12, 48:25, 54:10, 57:20, 58:9, 59:15 .
**adhesives** 45:15, 52:2 .
**adjourned** 116:8 .
**adjustment** 72:4 .
**admissibility** 81:5 .
**admissible** 65:4, 70:4, 71:21, 84:17 .
**admission** 32:7, 32:11, 32:13, 36:6, 67:11, 67:23, 68:20, 68:23, 69:4, 69:5, 69:10, 69:13, 70:3, 70:4, 70:6, 71:19 .
**admission.** 70:1 .
**admissions** 68:3, 68:7, 68:10, 68:18, 68:19, 69:7, 69:9, 69:16 .
**admit** 31:11, 37:22, 64:16, 71:3 .
**admitted** 31:11, 31:12, 63:19, 67:19, 98:13 .
**advice** 27:15, 98:4, 99:20, 102:6, 106:8, 106:14, 110:16 .
**advise** 115:8 .
**advised** 4:25 .
**advising** 107:23 .
**advisory** 101:4 .

**Concordance**

**aerial** 49:2 .
**affect** 16:25 .
**afternoon** 87:19, 88:12, 92:20, 113:21 .
**afterwards** 72:18 .
**agencies** 77:22 .
**ago** 77:3 .
**agree** 9:7, 16:6, 16:9, 23:8, 31:14, 36:5, 36:20, 64:14, 87:15, 89:4, 97:17, 109:8 .
**agreed** 15:8, 25:11, 71:25, 82:25, 83:3, 89:19, 90:4 .
**agreeing** 26:4 .
**agreement** 13:21, 26:6, 26:8, 26:10, 26:16, 73:18, 78:24, 80:5, 80:13, 81:17, 109:5 .
**agreements** 17:14, 60:8, 65:12, 73:7, 73:13, 77:13, 78:18, 80:12 .
**ahead** 32:21, 55:22, 66:17, 85:5, 87:10, 87:16 .
**aid** 11:10 .
**al** 1:12 .
**allegation** 41:25, 66:22, 67:20, 74:11 .
**allegations** 27:16 .
**allege** 30:21 .
**alleged** 60:14, 60:22, 61:20, 97:12, 107:5 .
**alleges** 66:25 .
**allow** 4:15, 11:6, 32:11, 38:20, 41:14, 44:7, 71:15, 99:6, 101:6 .
**allowed** 34:5, 39:25, 42:18, 60:23, 99:12, 109:14 .
**allowing** 23:1, 27:10, 32:12, 37:24 .
**alluded** 22:12 .
**almost** 75:16 .
**alone** 70:17 .
**already** 12:3, 84:14, 102:11, 114:10 .
**alter** 74:13 .
**altered** 18:24 .
**alternates** 8:24 .
**Alternatively** 57:13 .
**although** 75:15 .
**amendment** 48:20, 56:5 .
**America** 72:22, 72:25, 73:22, 74:9, 74:10, 74:12, 74:22,

75:4, 75:20, 79:13, 80:22 .
**analysis** 19:5, 36:3, 77:20, 88:20, 90:12, 90:22, 92:12, 96:24, 98:19, 98:20, 100:25, 102:9, 103:8, 106:1, 110:12, 110:25 .
**analyze** 22:22 .
**analyzed** 35:8 .
**analyzing** 96:20 .
**and/or** 76:22, 88:24, 89:14, 90:19, 90:21, 91:12, 93:21, 95:11, 95:15, 97:8 .
**ANDREW** 2:17 .
**Andy** 3:6 .
**animus** 7:25, 8:5 .
**answer** 6:7, 6:15, 37:13 .
**anticipate** 14:9, 115:9 .
**anticipating** 107:21 .
**anyway** 17:4, 111:19, 111:24 .
**apart** 52:25, 110:3 .
**Apologies** 15:2 .
**apologize** 61:7, 80:16, 82:7, 82:13, 95:22 .
**Appeal** 10:24, 29:25, 101:22 .
**appear** 16:17, 92:10 .
**appearances** 3:5 .
**appears** 73:12, 109:8 .
**appellate** 69:22 .
**appended** 79:15 .
**applications** 20:24, 23:25 .
**applied** 98:18, 105:19, 107:21 .
**applies** 55:17 .
**apply** 68:4, 69:12, 70:8, 106:15, 107:12 .
**applying** 92:2 .
**appointed** 112:16 .
**appreciate** 113:18 .
**approach** 21:2, 66:8, 84:19, 84:22, 85:19 .
**appropriate** 7:24, 8:9, 27:21, 32:4, 37:21, 42:4, 50:18 .
**approximately** 20:23, 23:24 .
**Arch** 2:25, 4:2 .
**area** 46:5, 57:6, 105:6, 105:15, 105:22, 106:12, 107:18, 109:12, 111:21 .
**areas** 99:7 .
**arguably** 29:22 .
**argue** 5:21, 14:15, 20:11, 21:6, 30:24, 34:17, 34:18, 34:24,

57:24, 67:15, 68:22, 70:11, 85:19, 86:23, 87:10, 88:11, 92:25, 95:5, 95:24, 102:4 .
**argued** 55:1, 55:4, 55:12 .
**argues** 51:1 .
**argument** 5:22, 18:7, 20:4, 22:16, 27:9, 30:18, 48:20, 52:21, 54:18, 54:23, 56:21, 58:21, 63:14, 65:18, 66:6, 79:12, 93:10, 96:17, 99:5, 101:24, 101:25, 109:20, 112:3 .
**arguments** 38:12, 47:9, 109:24 .
**arises** 102:17 .
**armed** 108:22 .
**around** 30:15, 42:10, 44:1, 109:22 .
**arranged** 85:15 .
**arrangement** 15:14, 45:15, 46:11, 48:25, 52:2, 57:20, 58:9, 59:14 .
**arrived** 78:11 .
**art** 28:20, 33:5, 47:22, 52:22, 54:6, 81:18, 82:2, 82:10, 83:9, 84:6, 90:8, 94:18, 103:9, 105:7, 105:19, 106:3, 106:7, 106:14, 107:21 .
**Article** 60:18, 77:18, 78:6 .
**Arts** 74:3 .
**aside** 42:13, 101:7 .
**aside"--it** 100:7 .
**aspect** 100:19 .
**aspects** 106:6, 108:17, 109:4 .
**assert** 103:24 .
**asserted** 10:8, 49:6, 83:1 .
**asserting** 10:11, 25:20, 34:14 .
**assessment** 36:21, 37:4 .
**assist** 98:16 .
**associated** 61:11 .
**association** 60:25, 62:16 .
**assume** 87:13, 114:9 .
**assumption** 64:16 .
**assured** 7:8 .
**attack** 35:25 .
**attempt** 85:16, 89:18 .
**attempts** 6:25, 39:20 .
**attended** 61:11, 61:20 .
**attention** 68:5 .
**attorney** 28:14, 54:18, 54:23, 107:23, 107:24 .

## Concordance

**attorneys** 36:3, 37:8 .
**Audio** 66:12, 66:13, 69:1, 69:2, 70:14, 70:17, 70:18, 71:6 .
**August** 9:7, 9:10 .
**authorities** 68:5 .
**authority** 55:15 .
**authorized** 27:23, 71:1, 71:2, 71:5 .
**available** 9:14 .
**avoid** 43:9 .
**aware** 4:12, 4:16, 14:11, 63:15, 98:24 .
**away** 4:18 .
**axial** 46:20 .
.
.

**< B >** .
**baby** 72:23 .
**back** 15:24, 16:10, 24:3, 27:3, 28:14, 44:22, 50:5, 62:3, 81:7, 86:24, 87:11, 97:4, 102:14, 105:3, 112:15, 113:9 .
**backdoor** 85:17 .
**background** 27:14, 76:2, 89:17, 105:11, 107:6, 108:20 .
**Bally** 68:8 .
**band** 50:2 .
**bar** 36:6 .
**bare** 37:5 .
**base** 77:6, 78:12, 80:1 .
**base--in** 77:1 .
**based** 5:16, 6:25, 28:11, 34:19, 35:4, 35:19, 39:13, 60:7, 64:16, 65:12, 66:15, 70:17, 71:17, 72:2, 82:22, 83:2, 86:15, 93:11, 102:8, 103:8, 106:11, 108:15 .
**bases** 98:21 .
**basically** 8:13, 9:20, 28:15, 29:3, 30:21, 39:23, 41:5, 41:11, 47:14, 47:16, 50:22, 51:23, 53:8, 83:13, 103:7 .
**basis** 8:19, 10:18, 16:23, 36:4, 39:21, 41:24, 44:13, 71:19, 72:3, 73:5, 110:3 .
**Bates** 80:21 .
**batteries** 18:25, 20:19, 20:21, 23:12, 40:13, 62:6, 64:3, 72:23, 73:19, 74:16, 74:20, 75:23, 76:7, 78:9, 79:19,

106:12 .
**battery** 39:20, 39:22, 40:2, 40:8, 40:10, 40:24, 47:11, 47:21, 47:22, 47:23, 48:14, 53:25, 54:2, 54:24, 62:8, 79:11, 81:23, 100:10, 100:12, 100:16, 100:18, 100:24, 106:13, 109:9 .
**bead** 89:8, 89:16, 96:25 .
**beaded-over** 103:10 .
**beading** 46:12, 52:5, 52:10, 55:3, 82:23, 83:3 .
**beads** 90:21, 91:14, 91:22, 95:11, 97:9 .
**became** 30:8, 30:19, 31:9, 39:25 .
**become** 40:14 .
**becomes** 9:3, 110:15, 110:17 .
**behalf** 6:13, 17:11, 66:12, 68:25, 87:23 .
**behind** 102:24 .
**Beijing** 80:6 .
**Bejin** 28:13, 104:9, 104:10, 106:22 .
**belief** 29:16, 31:2, 67:3, 67:12, 68:15, 68:17, 69:7, 69:25, 70:12, 70:14, 70:24 .
**belies** 79:16 .
**believes** 50:25 .
**below** 28:11, 51:22 .
**best** 69:17, 113:15 .
**better** 37:25 .
**beyond** 9:22, 31:3, 90:14, 111:21 .
**biases** 7:20 .
**Big** 60:20, 60:21, 75:16, 108:2 .
**binding** 68:18, 68:22, 70:1, 70:4, 70:6 .
**bit** 36:23, 50:19 .
**Blount** 104:23 .
**blue** 47:8 .
**Board** 29:25, 101:22 .
**Bob** 3:13, 18:13 .
**bolster** 99:6 .
**bottom** 8:14, 9:20, 50:21, 51:14, 53:14, 63:4, 63:13, 80:21, 90:1, 110:12 .
**Boulevard** 2:34 .
**brand** 62:12, 76:23 .
**brands** 75:22, 78:20 .

**break** 86:23, 114:16 .
**Brenner** 81:22, 82:15, 83:11, 83:18 .
**Brief** 27:4, 44:23, 51:5, 51:6, 88:18, 89:24 .
**briefed** 88:15 .
**briefed--we** 36:25 .
**briefing** 51:4, 96:9, 99:10 .
**briefly** 50:15, 96:18 .
**Briley** 99:16 .
**bring** 33:2, 68:4, 75:23 .
**brought** 12:1, 63:8 .
**Brown** 2:19, 3:23, 28:11, 28:16, 29:7, 51:24, 54:7, 100:23, 106:2, 108:2, 108:4 .
**Bucket** 75:15, 75:16, 75:19, 76:14, 76:25, 81:16, 81:17, 82:4, 82:9, 83:4, 85:24, 86:19, 87:21, 87:25, 88:1, 88:5 .
**buckets** 65:25, 75:16, 101:9, 101:10 .
**building** 39:13 .
**business** 20:18, 22:14, 76:11, 79:5, 99:2, 99:14, 100:2, 101:25, 102:22, 103:3, 103:15, 106:15, 106:16, 107:1, 107:7, 109:10 .
**button** 39:21, 45:16, 45:22, 46:19, 52:3, 63:2, 63:6, 63:9, 76:7, 76:11, 78:10, 79:11, 79:19, 83:24, 84:7, 84:8, 84:13, 84:15, 85:10, 91:23 .
**buyer** 77:24 .
.
.

**< C >** .
**calculation** 78:10 .
**calendar** 114:1 .
**call** 14:8, 40:17, 77:13, 103:13, 104:5, 106:21, 111:8, 114:9 .
**called** 60:20, 73:23, 81:16, 90:9, 107:3 .
**capacities** 107:9, 107:11, 107:16 .
**capacity** 18:3 .
**capture** 25:7 .
**career** 61:9 .
**carries** 93:16 .
**carry** 38:15 .
**carrying** 40:5 .

**Concordance**

cartoon-type 86:1 .
case--and 96:22 .
case--in 70:13 .
case-specific 42:12 .
cases 4:19, 4:20, 16:22, 39:6, 68:16, 99:11, 99:16, 102:15, 115:22 .
casing 46:5, 47:11, 53:25, 54:2, 54:24, 57:6 .
cast 29:19, 32:2, 37:6 .
category 76:22 .
CAUSE 1:5, 8:17, 19:9, 85:19 .
caused 100:10 .
cease 48:1 .
cell 23:12, 25:16, 25:23, 39:21, 45:16, 45:22, 46:2, 46:19, 52:6, 52:9, 54:8, 54:9, 57:4, 63:2, 76:7, 79:11, 79:19, 83:25, 84:7, 84:14, 84:15, 85:11, 88:19, 90:22, 91:1, 91:23 .
cells 19:4, 23:17, 24:9, 24:13, 24:20, 25:4, 25:6, 46:19, 52:3, 63:6, 63:9, 76:11, 78:11, 84:8 .
cells--and 20:25 .
cells--for 20:23 .
certain 8:5, 20:16, 35:3, 35:24, 58:13, 77:22, 87:7, 87:8, 88:14, 97:24, 107:13 .
Certainly 7:1, 7:7, 7:23, 8:4, 15:11, 16:9, 17:16, 22:19, 22:23, 24:20, 29:20, 30:24, 55:18, 58:8, 63:19, 64:8, 64:12, 69:5, 94:16, 105:18, 108:21, 108:22, 109:7, 109:18 .
CERTIFY 117:1, 117:4 .
challenge 73:16, 104:25 .
challenged 28:9 .
challenges 8:17 .
challenging 109:17 .
chambers 4:23, 15:20, 15:25, 16:3 .
chance 6:3, 28:7, 32:22, 66:18, 82:19, 96:12 .
change 50:6, 101:5 .
changed 50:5 .
changes 15:5 .
channels 63:18, 64:11 .

characterization 31:14, 39:9 .
characterize 42:21, 42:23, 43:2 .
characterizing 41:23, 42:6, 43:18 .
charged 32:9 .
check 102:24 .
Chicago 2:3, 2:6, 2:27, 115:3 .
China 62:10, 62:11, 74:9, 74:10, 74:13, 74:22, 75:1, 75:3, 75:6, 75:8, 75:20, 75:22, 76:2, 76:3, 76:6, 77:14, 77:15, 78:3, 78:7, 78:9, 78:18, 79:1, 79:13, 79:16, 79:17, 80:19, 80:20, 80:24 .
China. 78:1 .
Chinese 6:16, 7:10, 7:11, 7:21, 8:1, 8:3, 28:12, 28:17, 60:14, 75:22, 77:22, 100:25 .
choice 38:11 .
choose 63:20 .
chosen 9:3 .
CI 74:5 .
CI. 74:7 .
Circuit 39:6, 48:19, 68:9, 102:18 .
circumstances 8:9, 19:20, 34:1, 110:11 .
circumstantial 61:20, 64:12 .
circumvent 40:15, 41:9 .
cite 34:3, 68:8, 69:19, 74:2 .
cited 55:15, 74:2 .
cites 99:11 .
citing 56:22, 70:5, 102:21 .
civil 8:25 .
CKP 74:3, 74:6 .
claimed 59:14, 59:15, 97:13 .
claiming 20:15, 84:21 .
claims 30:5, 31:24, 43:12, 48:13, 49:6, 52:21, 58:14, 82:23, 83:1, 83:2, 83:3, 93:16, 105:12, 105:19, 105:21 .
clarification 7:16, 11:18, 55:24, 72:3, 82:20 .
clarified 39:11 .
clarify 48:11 .
class 62:11, 76:22 .
clear 11:21, 26:15, 39:6, 68:11, 89:2, 90:13, 92:12, 101:4, 107:19 .
clearance 105:15, 105:17 .

clearing 107:16 .
clearly 45:20, 57:1, 59:11, 92:1 .
Clendening 9:9, 9:16 .
clerk 15:18 .
client 8:10, 34:13, 36:8, 36:11 .
clients 85:7 .
close 22:15, 28:2, 59:9, 92:22 .
closed 27:22, 45:16, 46:2, 46:3, 52:10, 57:4, 57:5 .
closes 52:2 .
closest 52:5 .
closing 6:4, 52:6, 54:9 .
closings 5:19, 6:3 .
closure 40:8, 40:17, 54:11, 55:2, 55:11 .
CO. 1:11 .
coated 93:19 .
coin 19:4, 20:23, 20:24, 23:12, 23:17, 24:9, 24:13, 24:20, 25:4, 25:6, 25:16, 25:22, 25:23 .
collector 94:14 .
collectors 93:17 .
combination 85:12, 107:24 .
combine 108:10 .
comes 22:7, 39:3, 39:19, 52:5, 60:16 .
coming 4:24, 7:24, 67:19 .
comments 79:22 .
commercial 63:18, 64:10, 64:11 .
committee 101:5 .
companies 7:21, 80:11, 105:16 .
Company 7:10, 7:11, 66:13, 70:18, 73:23, 80:8, 80:9, 104:1, 105:16 .
comparing 92:8 .
competence 98:22, 101:14, 102:13, 102:25, 105:1, 109:12, 110:13, 111:21 .
competency 30:25, 35:25, 36:21, 37:1 .
competent 33:14, 35:2, 35:7, 35:20, 103:5 .
compiled 77:5 .
complains 58:11 .
complaint 66:11, 69:1, 69:9 .
completely 40:10, 78:2 .
completeness 99:1 .
COMPLY 117:5 .

## Concordance

**component** 85:12, 94:14 .
**components** 85:13 .
**components.** 93:22 .
**comprising** 58:10 .
**compromise** 24:24, 109:5 .
**compute** 77:6 .
**conceivably** 12:21 .
**concept** 18:19, 23:2, 97:13, 98:11, 98:12, 99:15 .
**concern** 16:21, 23:3, 23:11, 23:12, 23:13, 39:4, 42:24, 43:23 .
**concerned** 6:24, 8:5 .
**concerning** 18:25 .
**concerns** 109:8, 115:3 .
**concession** 68:7 .
**conclude** 31:6, 41:2, 41:13, 42:11, 47:10, 94:12, 105:21 .
**concluded** 27:10, 28:19 .
**concludes** 41:8, 90:23 .
**concluding** 91:1, 91:3 .
**conclusion** 35:8, 37:22, 43:11, 94:8, 95:2, 95:4, 95:5 .
**conclusions** 99:4, 99:22, 99:25, 100:16, 101:2, 101:6, 101:7, 105:8, 106:10 .
**conclusory** 19:2 .
**condition** 47:11, 47:13, 47:15, 47:17, 47:18, 49:13, 54:1, 54:3, 57:17, 57:18, 57:19, 58:5, 58:6, 58:8, 59:12 .
**conduct** 33:21 .
**conducted** 77:19 .
**conductor** 96:3, 108:12 .
**Confectionary** 74:3 .
**confer** 15:12, 15:15, 16:7, 17:3, 86:3, 86:25 .
**CONFERENCE** 1:22, 3:2, 64:7, 117:6 .
**conferred** 48:7, 112:12 .
**confers** 73:3 .
**confidential** 9:25, 27:20, 72:14, 72:16 .
**confine** 97:20 .
**confirmed** 14:16 .
**confirms** 77:18 .
**confuse** 82:2 .
**confusion** 20:2, 29:24, 61:1 .
**connect** 94:13, 95:14 .
**connected** 93:11, 93:20 .

**Connecticut** 74:5 .
**connecting** 95:17, 95:18 .
**connection.** 45:9, 47:24, 54:25 .
**connections** 88:24, 89:14, 90:19, 90:20, 91:12, 93:6, 93:21, 95:15, 97:7, 97:8 .
**connections.** 95:15 .
**consent** 9:2 .
**consequences** 109:2 .
**consider** 5:10, 11:1, 15:5, 38:4, 38:14, 50:16, 67:11, 105:7 .
**consideration** 30:6, 34:6 .
**considered** 30:4, 33:6, 41:5, 56:6, 57:15 .
**considering** 37:18 .
**considers** 76:5 .
**consistent** 45:17, 49:12, 58:4, 59:15, 106:9 .
**consistently** 48:17, 48:23, 57:3, 57:9 .
**constitute** 51:1, 70:1 .
**construction** 10:14, 10:16, 10:17, 45:3, 45:12, 50:14, 50:17, 51:4, 51:6, 51:9, 51:18, 51:23, 54:9, 55:6, 55:19, 58:22, 59:23, 59:25, 88:23, 89:21, 89:24, 92:4, 93:8, 93:9, 96:11 .
**constructions** 89:22 .
**construe** 53:3, 53:7, 57:16, 57:21, 57:22, 58:23, 59:1, 59:9, 89:19, 89:25, 90:3 .
**construed** 10:17, 58:1, 59:1, 59:4, 96:22 .
**construing** 59:3, 59:8, 92:11 .
**consult** 9:19 .
**consultant** 107:9 .
**contain** 94:25 .
**contains** 16:10 .
**contemplating** 27:4 .
**contend** 88:22, 93:25, 96:11, 96:12 .
**contended** 55:10 .
**contending** 54:13 .
**contends** 62:4, 85:8, 94:24 .
**contention** 61:16, 73:3, 73:4 .
**contentions** 50:5, 50:8 .
**contents** 101:17 .
**context** 34:9, 36:23, 41:15, 50:11, 52:20, 53:17, 70:8,

98:25 .
**continue** 12:7, 27:8, 29:20, 29:21, 35:4 .
**continued** 101:22 .
**continues** 66:25 .
**continuing** 25:9 .
**contract** 62:9, 70:20, 73:8, 73:13, 75:22, 76:22, 77:14, 77:19, 77:21, 77:24, 78:18, 80:10 .
**contracts** 78:15 .
**contradict** 70:3 .
**contradicts** 93:9 .
**contrary** 53:25, 54:5, 71:20, 106:24, 108:4 .
**contributed** 20:17, 22:13, 22:18, 22:20 .
**controls** 49:21 .
**convoluted** 13:12 .
**cooperation** 77:21 .
**coordinating** 115:23 .
**copies** 10:11, 10:12, 43:22, 66:4 .
**copy** 16:1, 41:11 .
**copycat** 21:7, 43:2 .
**copying** 17:20, 38:17, 38:20, 38:23, 39:1, 39:4, 39:7, 41:3, 41:14, 41:24, 42:1, 42:3, 42:6, 42:10, 42:19, 42:21, 42:24, 43:1, 43:10, 43:16, 44:1, 44:7, 44:14 .
**core** 101:13, 102:13 .
**Corinth** 69:20 .
**corners** 35:20 .
**corporate** 12:18, 19:13, 74:7, 74:12, 76:5, 79:18 .
**CORRECT** 17:12, 20:6, 33:15, 35:19, 35:23, 60:5, 67:24, 75:2, 97:19, 106:18, 117:2 .
**correctly** 107:21 .
**correctness** 102:14, 102:16, 110:14, 110:20, 110:22, 111:23 .
**correspondence** 82:25 .
**cost** 21:2 .
**counsel--in** 34:19 .
**couple** 14:15, 14:18, 33:3, 36:18, 53:3, 55:24, 75:16, 82:5, 93:16 .
**course** 5:18, 32:21, 43:20, 110:7,

**Concordance**

110:15, 113:11 .
**court--or** 29:4 .
**courtroom** 27:22, 28:1 .
**cover** 19:3, 20:4, 21:13, 21:17, 22:1, 25:6, 43:12, 103:10 .
**covered** 24:24, 44:5 .
**covering** 20:22, 24:9, 24:11, 24:20 .
**covers** 19:24 .
**crafted** 42:2 .
**create** 23:4, 29:25, 39:20 .
**created** 40:1, 96:2 .
**creates** 18:15, 54:24 .
**creating** 80:24 .
**credentials** 99:6, 109:18, 110:10 .
**crimp** 49:25, 50:2 .
**crimped** 54:8 .
**crimping** 45:15, 45:20, 45:22, 48:24, 52:2, 56:25, 57:2, 57:20, 58:9, 59:14 .
**critiques** 98:20, 100:7, 100:8, 101:13, 102:8, 102:12, 104:15, 109:21, 109:23 .
**critiquing** 95:24 .
**cross** 7:12, 101:15, 102:5, 111:5, 111:10, 111:11, 111:17 .
**crosses** 92:1 .
**CRR** 1:43, 2:39, 117:11 .
**crux** 67:12 .
**CULBERTSON** 2:32, 2:37, 3:22, 3:23, 4:2, 4:6, 4:9, 4:10, 4:11, 7:4, 7:5, 7:6, 11:17, 11:21, 41:19, 41:21, 42:16, 42:20, 43:19, 44:15, 44:17, 44:18, 60:11, 60:13, 61:23, 61:24, 112:25 .
**cup** 45:7, 45:13, 46:2, 46:4, 46:5, 46:6, 46:19, 46:23, 47:3, 47:6, 49:21, 51:21, 52:25, 53:12, 57:4, 57:5, 57:7, 57:8 .
**current** 6:10, 69:8, 93:17, 94:13 .
**currently** 4:19 .
**CURTIN** 2:29, 4:6, 4:7, 35:16, 41:20, 92:19, 94:2, 94:5, 94:11, 94:22, 95:1, 96:15, 96:16, 96:19, 97:25, 103:12, 103:14, 103:17, 103:23, 104:7, 104:10, 104:14,

104:17, 104:18, 109:16, 111:4, 111:9, 111:15, 111:25 .
**customer** 62:12, 63:7, 78:8 .
**customers** 20:19, 67:2, 67:4 .
**cut** 32:17, 32:18 .
.
.
**< D >** .
**damages** 20:20, 74:1, 76:24, 76:25, 78:12, 80:1, 80:3 .
**Data** 60:20, 60:21, 77:9 .
**date** 15:11, 30:14, 30:21 .
**dated** 30:12, 48:4 .
**dates** 30:7, 115:16 .
**Daubert** 26:8, 35:17, 51:13, 65:14, 65:18 .
**day** 10:1, 16:19, 16:20, 16:24, 17:1, 17:3, 17:14, 33:14, 113:3, 113:5, 113:6, 113:13, 113:16 .
**DC** 2:19, 2:21 .
**DCO** 9:7 .
**deadline** 9:6 .
**deal** 36:10 .
**dealing** 105:11 .
**deals** 22:11, 32:7 .
**December** 51:2 .
**decide** 16:11, 36:8, 37:21, 53:8 .
**decided** 5:6, 110:17 .
**decides** 102:1 .
**decision** 4:22, 5:2, 12:8, 27:8, 27:11, 29:2, 30:10, 30:11, 31:4, 31:14, 31:17, 31:19, 31:21, 32:3, 33:24, 36:9, 47:14, 49:12, 53:6, 53:23, 54:21, 65:1, 88:6, 102:18, 114:18, 115:21 .
**decision-maker** 102:22, 103:4, 103:5, 103:15 .
**decision-makers** 99:14 .
**decisions** 25:14, 29:17, 31:8, 31:10, 31:11, 32:1, 32:3, 32:6, 34:8, 37:3, 37:6, 69:22, 88:5, 100:9, 101:21, 102:19, 106:20, 106:24, 107:12 .
**decisions.** 100:13 .
**declaratory** 66:11, 67:13 .
**deemed** 7:12, 51:15, 69:5, 69:9, 72:15 .
**Defendants** 1:14, 2:19, 5:1,

13:16, 15:4, 15:9, 18:20, 32:8, 71:10, 81:18, 82:9, 92:10, 109:1 .
**Defense** 5:3, 5:6, 23:7, 27:16, 33:7, 34:11, 34:12, 34:17, 34:23, 36:7, 36:12, 36:13, 37:12, 37:22, 81:19, 81:20, 81:25, 98:5, 103:24, 110:16 .
**deficiencies** 100:7, 105:5, 105:10, 106:2 .
**deficient** 106:5, 106:10 .
**definition** 93:5 .
**degree** 111:1 .
**delays** 16:25 .
**deliberate** 8:25, 68:10 .
**deliberations** 11:7 .
**delivered** 10:4, 16:3 .
**demand** 39:23, 40:13 .
**demonstrating** 41:15 .
**demonstrative** 15:8, 16:1, 16:2 .
**demonstratives** 14:22 .
**denial** 27:11, 30:12, 30:13, 34:8 .
**denials** 25:14, 31:4, 101:20 .
**denials--"the** 100:9 .
**denied** 29:8, 29:14, 57:10 .
**deny** 92:25 .
**denying** 53:6 .
**depose** 64:20 .
**deposed** 104:6, 104:8, 104:10, 111:10 .
**deposition** 12:18, 13:7, 16:17, 17:2, 19:4, 48:5, 90:7, 90:8, 91:2, 91:7, 94:6, 104:4, 106:6, 113:6, 113:21, 114:4, 114:10 .
**deposition--i** 98:13 .
**deposition--or** 90:11 .
**depositions** 12:15, 13:10, 13:17, 13:19, 13:22, 16:23, 51:12, 104:16, 113:2, 113:13, 113:16 .
**Deputy-in-charge** 9:9 .
**derive** 108:13 .
**derives** 108:15 .
**describe** 46:2, 54:14, 57:4 .
**described** 23:1, 44:8, 46:18, 54:11, 113:11 .
**describes** 54:9, 83:12 .
**describing** 49:5 .
**design** 39:19, 40:7, 40:12, 40:18, 40:19, 40:24, 41:11, 43:8 .

**Concordance**

**designations** 16:18 .
**designed** 40:8, 40:16, 41:10, 60:15 .
**designs** 42:22, 43:14 .
**destroyed** 9:24 .
**destroying** 64:7 .
**detail** 36:23, 41:7, 106:19 .
**detailed** 9:19 .
**details** 9:16, 11:14, 15:7, 23:9 .
**determination** 114:1 .
**determinations** 30:8 .
**determine** 7:19, 114:13, 115:5 .
**determined** 42:4, 103:6 .
**determining** 79:10, 107:20 .
**develop** 7:22, 64:24, 101:12, 101:15 .
**developed** 42:14, 43:4 .
**developing** 39:13 .
**Development** 43:7, 43:14, 55:16 .
**differences** 42:22 .
**different** 48:8, 58:17, 73:7, 73:13, 77:4, 77:14, 93:23, 97:9 .
**differing** 43:25 .
**difficult** 13:11, 13:13, 64:16 .
**dire** 6:2, 6:7, 6:15, 7:19, 7:22, 8:15 .
**direct** 22:5, 94:19, 95:16, 97:1, 97:2 .
**directed** 19:23 .
**direction** 46:20, 49:3, 56:10 .
**directly** 93:11, 93:20, 94:13, 95:18, 96:1, 105:5, 105:9, 106:21 .
**disagree** 33:10, 96:25 .
**disagreed** 33:9, 33:16, 37:4 .
**disagreements** 98:20, 112:13 .
**disavow** 46:11, 48:21, 57:1 .
**disavowal** 51:2, 55:18, 55:19, 56:16 .
**disavowals** 55:17 .
**disavowed** 45:20, 48:21, 56:6 .
**disclaimed** 56:22, 59:13 .
**disclaimer** 51:2, 55:5, 55:16, 56:15 .
**disclaims** 56:23 .
**disclosed** 21:22 .
**discovery** 12:25, 13:2, 13:9, 13:10, 13:19, 62:20, 76:14 .

**discuss** 12:2, 23:1, 35:16 .
**discussed** 14:23, 60:22, 77:3, 91:15, 101:20, 102:12, 105:7, 106:7 .
**discusses** 90:16 .
**discussion** 34:7, 72:15, 81:10, 81:17, 82:1, 86:16 .
**disingenuous** 8:4 .
**dismissed** 66:14, 67:17 .
**disparage** 85:25 .
**disparagement** 6:25 .
**displayed** 85:8 .
**dispute** 14:2, 16:1, 16:23, 17:1, 18:20, 67:9, 93:2, 93:4, 94:19 .
**disputes** 14:21, 15:22, 15:25, 16:11, 16:17, 112:16 .
**disputes--that** 98:14 .
**disseminate** 9:22 .
**disseminated** 62:17 .
**distinguish** 45:22, 52:21 .
**distinguished** 56:25, 110:23 .
**District** 1:1, 1:2, 50:20, 66:12, 67:14, 67:16, 67:17, 68:13, 68:16, 69:21, 69:24, 74:4, 99:16 .
**DIVISION** 1:3 .
**docket** 3:4, 4:20, 4:24, 115:23 .
**Doctor** 35:17, 36:24, 41:5, 87:9, 95:24, 97:24, 98:2, 98:12, 99:4, 99:24, 100:15, 101:10, 101:25, 102:8, 102:12, 104:11, 105:4, 109:17, 109:24, 110:9, 110:23, 111:21 .
**Document** 17:24, 56:4, 64:15, 67:18, 67:20, 71:16, 72:4, 73:20, 76:9, 80:20 .
**documents** 39:12, 40:12, 41:8, 43:1, 43:7, 43:21, 43:22, 72:8, 72:10, 73:6, 73:10, 76:13, 76:14, 76:25, 77:9, 80:19, 81:4, 83:9, 84:6, 84:14, 84:16, 84:18 .
**doing** 8:3, 42:17, 92:6, 92:13, 96:4, 105:2 .
**done** 4:17, 4:18, 5:11, 8:14, 9:11, 19:5, 33:13, 73:13, 91:18, 94:16, 100:18 .
**Dongguan** 80:8 .

**door** 22:17, 22:19, 84:20, 85:19 .
**doubt** 29:19, 32:2, 37:7, 42:1 .
**down** 16:11, 25:9, 26:1, 29:18, 40:9, 60:15, 60:25, 63:25, 71:16, 110:6 .
**drastic** 39:22 .
**draw** 102:6, 112:10 .
**drawing** 82:16, 82:17, 85:25, 86:1 .
**drawn** 43:11 .
**drop** 10:2 .
**dropped** 10:9, 34:12, 37:11, 88:17, 88:18 .
**drumming** 76:10 .
**DTX** 83:11, 86:12 .
**due** 40:21, 115:18 .
**duplicate** 71:25 .
**During** 4:16, 5:19, 7:22, 11:6, 13:1, 13:9, 49:24, 50:13, 50:16, 51:8, 58:21, 73:3, 90:6, 91:2, 91:6 .
.
.
**< E >** .
**E.** 1:44, 2:14, 2:40 .
**ear** 40:3 .
**earbuds** 62:10 .
**earlier** 83:13, 86:9, 86:16, 98:25, 101:20, 102:15 .
**earliest** 30:22 .
**early** 16:7, 39:9, 50:8, 102:19 .
**earphones** 39:25 .
**easier** 28:24 .
**Eastern** 1:2, 68:13, 69:24 .
**economic** 26:9 .
**edge** 46:5, 57:7 .
**editing** 16:22 .
**effect** 5:14, 43:19, 55:5, 70:2, 84:18, 110:8, 110:9 .
**efficient** 40:2 .
**effort** 39:8, 41:9, 114:24 .
**efforts** 40:7, 76:19 .
**ego** 74:13 .
**eight** 8:22, 8:25, 9:1, 9:3 .
**either** 5:20, 6:6, 9:23, 14:8, 27:11, 28:24, 44:9, 86:12, 113:7, 116:1 .
**elected** 50:14 .
**electrode** 93:19 .
**Electronics** 80:8 .

Concordance

**element** 93:15 .
**elements** 20:17, 22:13 .
**elicit** 85:7 .
**eliminate** 101:3 .
**email** 15:18, 26:15, 65:24, 90:1 .
**embedded** 58:13 .
**embodiment** 89:6, 94:17 .
**embodiments** 49:7, 52:17, 92:9, 92:14 .
**employees** 12:19 .
**encountered** 11:18 .
**encouragement** 76:21 .
**End** 15:15, 16:10, 21:1, 33:14, 42:10, 55:15, 62:5, 62:6, 62:14, 63:18, 64:3, 88:4, 112:19, 112:20, 116:9 .
**ending** 64:11, 74:16 .
**Energizer** 105:16 .
**Energy** 1:11, 3:3, 3:23, 66:13 .
**engaged** 99:24 .
**engaging** 96:10 .
**engineer** 99:17, 99:21 .
**engineering** 40:25 .
**English** 77:15 .
**enough** 10:5 .
**ensures** 46:23 .
**enter** 85:1 .
**entire** 40:1, 60:24, 95:8 .
**entirely** 85:17 .
**entirety** 96:14 .
**entities** 79:18 .
**entitled** 17:24, 84:12, 111:22 .
**entity** 29:25 .
**entrant** 40:14 .
**equal** 48:1 .
**Equipment** 68:11 .
**equitable** 34:7 .
**especially** 7:24 .
**essentially** 18:22, 19:11, 46:24, 49:4, 49:10, 55:9, 101:10 .
**established** 68:10, 80:6 .
**estoppel** 55:25 .
**et** 1:12 .
**evaluate** 11:7, 37:15 .
**evaluated** 110:13 .
**evaluating** 33:11, 103:1 .
**Evanston** 69:20 .
**Eve--excuse** 61:6 .
**evening** 15:19, 113:21 .
**event** 64:20, 114:19 .

**events** 50:20, 50:21, 50:22, 106:18 .
**eventually** 33:9, 33:16, 40:19 .
**Eveready** 105:16 .
**everybody** 26:15 .
**everyone** 101:9 .
**everything** 32:19, 37:25, 38:12, 94:5, 106:9 .
**everywhere** 76:8 .
**evidentiary** 21:9 .
**exact** 30:14, 43:4, 50:1 .
**exactly** 6:24, 25:25, 67:6, 92:6, 92:12, 102:21 .
**examination** 101:15, 111:5 .
**examine** 102:5, 111:10, 111:11 .
**examining** 111:17 .
**example** 7:21, 20:23, 27:17, 46:16, 53:5, 72:13, 77:16, 90:12, 90:16, 91:8, 102:4, 106:16 .
**examples** 52:12, 52:14, 90:14, 90:17, 105:23 .
**except** 88:17 .
**excerpt** 90:1 .
**excerpts** 91:11, 114:11 .
**exchange** 15:8, 26:15, 112:19 .
**exclude** 7:1, 19:16, 19:23, 20:3, 25:1, 36:24, 57:20, 60:14, 64:19, 87:7, 87:8, 88:13, 88:16, 92:23, 97:24, 98:1 .
**excluded** 19:10, 21:11, 61:22, 98:8, 99:17, 99:21 .
**excluding** 45:14, 52:1, 73:5 .
**exclusive** 49:1, 49:2, 52:8, 55:11 .
**Exclusively** 45:13, 46:15, 46:20, 48:14, 49:3, 51:25, 52:12, 52:13, 52:17, 58:2 .
**excuse** 29:4, 90:11 .
**exemplary** 51:19 .
**exerting** 46:4, 57:6 .
**Exhibits** 15:8, 65:19, 65:23, 66:4, 66:5, 75:17, 76:4, 77:5, 82:5, 85:9, 86:21, 88:2, 88:5, 112:11 .
**existed** 107:17 .
**expanded** 39:10 .
**expect** 4:24, 6:2, 21:8, 104:2, 104:15, 111:12 .
**expected** 102:23, 102:24 .

**expecting** 15:23 .
**expediency** 87:24 .
**experience** 6:8, 100:17, 106:11, 107:8, 107:18 .
**expert** 18:22, 20:15, 20:20, 22:21, 22:23, 24:15, 36:24, 41:5, 48:3, 48:6, 51:12, 56:14, 59:16, 59:17, 76:24, 89:1, 89:3, 89:19, 90:11, 92:2, 92:5, 96:10, 96:20, 99:3, 99:12, 102:23, 105:4, 110:23, 111:14 .
**expertise** 98:15, 105:7, 105:22, 110:10 .
**experts** 26:9, 99:15, 101:6 .
**explain** 46:15, 49:9, 57:2, 71:9 .
**explained** 47:5, 48:25, 56:1, 56:3, 56:5, 56:12, 56:18, 57:9, 58:16, 59:5, 59:18 .
**explaining** 24:16, 49:11 .
**explains** 106:5 .
**explanation** 46:1, 49:13, 57:11, 57:15, 58:4, 58:18, 59:1 .
**explanations** 47:9 .
**explicitly** 54:14 .
**express** 100:16, 109:14 .
**expresses** 99:4, 100:3 .
**expressing** 108:19 .
**expressly** 54:11, 59:2 .
**extending** 95:8 .
**extensive** 10:20, 26:15 .
**extent** 10:23, 21:16, 21:18, 27:1, 33:4, 33:8, 33:22, 34:8, 50:25 .
**external** 47:6 .
**extremely** 40:2 .
.
.
**< F >** .
**F.3d** 68:8 .
**F.supp.3d** 68:12 .
**face** 104:22, 110:14 .
**face--thoroughness** 103:7 .
**fact** 21:15, 21:25, 30:2, 31:6, 36:1, 37:10, 37:15, 43:11, 50:12, 72:18, 76:17, 98:16, 102:5, 108:5, 110:17, 111:11, 111:12, 111:17, 115:6 .
**Factor** 20:25, 22:3, 22:4, 22:9, 22:11, 22:15, 22:17, 22:22 .

**Concordance**

factors 21:4, 22:22 .
facts 67:9 .
factual 7:1, 101:14, 111:23 .
failed 29:4, 73:4 .
fair 34:6, 83:16, 83:25, 85:6, 94:11 .
fairly 10:19, 15:4, 35:23 .
faith 15:10, 31:2 .
faithfully 105:19 .
fall 23:15, 88:6 .
far 24:14, 79:10, 86:5 .
fashion 72:7 .
feature 22:1 .
features 20:18, 22:14 .
FEDERAL 8:25, 39:6, 48:19, 98:8, 102:18, 117:12 .
feel 59:18 .
FEES 117:4 .
FERGUSON 2:14 .
few 17:13, 49:17, 79:22 .
Fifth 68:9 .
figure 47:4, 48:9, 113:14 .
figured 58:23 .
figures 42:23 .
Filbin 2:9, 3:16, 3:17, 75:13, 76:2, 76:16, 76:20, 77:2, 77:10, 77:18, 78:7, 78:16, 78:23, 79:4, 79:14, 79:20, 79:21, 80:1, 80:14, 86:19 .
file 5:7, 15:12, 51:6, 112:20 .
filed 20:22, 24:12, 26:25, 29:6, 29:12, 46:8, 48:23, 50:5, 51:5, 51:11, 51:12, 59:16, 66:11, 112:13 .
files 39:19 .
film 47:8 .
final 12:8, 25:14, 27:8, 27:11, 29:2, 30:8, 30:9, 31:3, 32:3, 55:14, 64:4, 112:9, 114:18 .
Finally 103:11 .
find 4:17, 7:3, 44:13, 48:7, 74:12, 80:16, 80:17 .
finder 31:6, 37:15 .
finding 29:8, 31:18, 71:19, 108:9, 108:14 .
finds 105:10, 106:2 .
fine 5:23, 14:2, 26:12, 26:14, 84:24, 101:24 .
firm 4:2, 28:5, 28:6, 100:25, 104:8, 106:22, 106:23 .

fitting 47:20 .
fix 9:13 .
flat 101:2 .
FLOCK 2:13 .
flow 105:9 .
flying 115:1 .
focus 102:16 .
focused 13:9, 13:14 .
focusing 98:19 .
foiler 93:18 .
follow 13:13 .
following 90:11, 98:9, 112:20 .
force 47:20, 49:4, 57:8 .
force-fit 46:3, 47:6, 52:9, 52:13, 55:10, 57:1, 57:4, 57:5 .
force-fit. 45:23 .
force. 46:7, 46:25 .
FOREGOING 117:1 .
foreign 6:15 .
form 91:2, 93:18 .
formal 68:7 .
formality 27:24 .
formally 5:8 .
FORMAT 77:12, 101:18, 117:5 .
formed 31:1, 90:24 .
forth 13:23, 14:23, 15:1, 35:25, 69:15, 71:11, 80:3, 80:4, 107:10 .
forward 36:9 .
forward--'the 51:21 .
found 8:4, 29:3, 40:11, 40:17, 55:1, 55:4, 55:13, 70:10, 79:8, 79:9 .
foundational 63:13 .
four 8:18, 8:20, 35:20, 75:17 .
frame 39:23 .
Frankly 13:13, 32:6, 37:10 .
free 104:25 .
friction 47:5 .
Friday 4:15, 113:22, 114:1, 114:17, 115:2, 115:6, 115:13, 115:16 .
front 109:25 .
full 53:10, 68:6 .
fully 36:20, 63:15, 64:2, 91:22 .
furnished 114:12 .
.
.
< G >.
gaining 39:22 .

game 83:25 .
gap 21:10 .
Gary 2:23, 3:23, 103:17 .
gasket 84:9 .
gather 112:15, 113:9 .
gathering 115:3 .
gave 56:7, 58:17, 67:13, 68:5 .
general 74:8 .
generally 24:13 .
generically 91:15 .
Geoff 3:22, 41:21, 92:19, 95:7, 97:25, 100:20, 102:10, 103:11, 109:22, 110:5 .
GEOFFREY 2:37 .
Georgia-pacific 20:14, 20:25, 21:4, 21:18, 22:3, 22:4, 22:22 .
German 6:16 .
Germany 115:2 .
gets 110:21 .
getting 23:19 .
Gilstrap 4:13, 4:14, 4:23, 6:4, 6:10, 6:24, 8:17, 9:18, 15:20, 16:10 .
gist 108:6 .
give 9:16, 32:22, 42:8, 66:18, 74:1, 82:19, 92:22 .
given 61:4, 83:21, 99:25 .
gives 10:5, 24:21 .
glad 26:3 .
global 77:6 .
GMBH 1:5 .
Golden 104:23 .
gotten 62:23, 107:15 .
GP 22:15 .
grant 24:25, 44:6, 65:6 .
granted 31:16, 31:18 .
granting 31:20, 34:3 .
graphic 90:1, 91:19 .
grappling 37:10 .
Great 11:23, 19:9 .
ground 13:22, 33:7 .
grounds 73:21 .
Group 72:8, 75:10 .
guess 15:6, 42:16, 65:25, 66:1, 85:5, 86:7, 113:15, 113:23, 113:24 .
guessing 113:17 .
.
.

Concordance

**< H >.**
**H.** 2:8 .
**half** 47:12, 53:25, 54:2, 113:5 .
**hand** 66:4 .
**hand-in-glove** 76:6 .
**handed** 110:1 .
**happened** 50:16, 51:2, 67:16 .
**happy** 5:21, 6:7, 6:10, 11:15, 17:23, 18:9, 65:17 .
**hardest** 32:6 .
**HARTMANN** 2:8, 3:7, 3:8, 5:23, 5:25, 12:13, 12:21, 13:1, 13:6, 13:8, 13:15, 14:4, 14:11, 87:15, 112:6, 113:15, 114:3, 114:8, 114:21, 115:1, 115:10 .
**hat** 40:9, 40:17 .
**he'll** 15:20 .
**head** 96:3, 114:24 .
**head-and-shoulders** 11:4 .
**heads** 17:16, 68:6 .
**hear** 5:22, 17:1, 17:9, 19:12, 20:7, 24:3, 32:22, 60:23, 65:17, 66:1, 66:17, 68:1, 82:18, 88:11, 109:13 .
**heard** 65:2, 94:7 .
**hearing** 116:5 .
**hearing.** 116:9 .
**hearsay** 60:18, 61:5, 63:21 .
**heart** 67:9 .
**Heatherly** 99:16, 99:21 .
**heightened** 23:10 .
**Heli** 80:8 .
**helpful** 9:8, 15:1, 66:7 .
**HEREBY** 77:18, 117:1 .
**high** 19:16, 19:17, 28:7 .
**highlighted** 28:11, 50:22, 91:20, 93:13, 93:23, 96:20 .
**highly** 40:2 .
**Higuchi** 25:16, 25:23, 28:12, 28:18, 29:7, 81:20, 82:14 .
**hiring** 77:22 .
**hold** 46:6, 57:7, 108:1 .
**holds** 52:2, 76:3 .
**HONORABLE** 1:24 .
**hope** 12:7, 16:9 .
**hopefully** 85:18 .
**horizontal** 56:10 .
**Horn** 35:17, 41:5, 87:9, 95:24, 97:24, 98:2, 98:12, 99:4, 99:24, 100:15, 101:10,

101:25, 102:8, 102:12, 104:12, 105:4, 109:17, 109:25, 110:9, 110:23, 111:21 .
**Horn--but** 36:24 .
**horrors** 61:8 .
**hour** 15:23, 112:16 .
**hours** 5:17, 5:24 .
**house** 45:7, 45:8, 45:12, 45:13, 46:2, 46:4, 46:6, 57:5, 57:7 .
**housing** 40:22, 46:6, 51:21, 57:8, 89:9, 89:16, 90:21, 91:14, 91:22, 93:22, 94:10, 94:13, 94:14, 95:14, 95:19, 97:1, 97:10 .
**housing"--clearly** 95:12 .
**housing--"which** 95:13 .
**housings** 84:8, 84:9, 84:11 .
**HOUSTON** 1:44, 2:40 .
**humans** 40:4 .
**hypothetical**                    .
.
.
**< I >.**
**idea** 15:21, 62:4, 83:15, 83:17, 83:23, 83:24, 84:1, 84:2, 84:11, 84:13, 84:21, 85:8 .
**identified** 78:8 .
**identifies** 63:1 .
**identify** 12:1, 89:21 .
**identifying** 10:13 .
**Illinois** 2:6, 2:27, 66:12, 67:14, 67:16, 67:17 .
**image** 96:1 .
**imagine** 15:3 .
**immediate** 95:3 .
**imminently** 105:4, 109:9 .
**impact** 63:23 .
**impaneled** 113:5 .
**impeachment** 84:18, 85:1 .
**implausible** 62:19 .
**importance** 63:23 .
**important** 27:14, 63:23, 92:22, 95:21 .
**importing** 91:5, 91:24, 92:13 .
**imports** 92:3 .
**imposing** 91:13 .
**impression** 23:4, 24:21 .
**improper** 43:17, 85:17, 88:23, 92:4, 99:24 .

**improperly** 84:21 .
**improvements** 20:19, 22:14 .
**impute** 70:22 .
**imputed** 70:15 .
**inadequate** 13:19 .
**inadmissible** 60:18, 98:7 .
**inappropriate** 8:6, 99:5 .
**inclined** 64:19 .
**include** 5:18, 25:3, 58:8, 78:12, 81:20, 83:3, 115:17, 115:18 .
**includes** 15:15, 28:8, 93:18 .
**including** 52:17, 56:3, 67:1, 68:16, 75:21, 78:19, 101:4, 108:11 .
**income** 21:2 .
**inconsistent** 45:4, 49:18, 49:23, 58:24 .
**Incorporated--s-h-u-r-e** 73:23 .
**incorporating** 67:3 .
**incorrect** 61:7 .

**independent** 108:16 .
**independently** 22:21 .
**indicate** 64:5, 65:2 .
**indicated** 5:9, 12:17, 19:4, 21:5, 89:22, 96:20 .
**indicates** 18:17, 90:18, 106:25 .
**indicating** 90:2 .
**indicators** 21:2 .
**indiscriminately** 62:18 .
**individual** 85:12 .
**induce** 75:21 .
**inducement** 75:20 .
**inducing** 67:7, 78:3 .
**indulgence** 87:11 .
**industry** 40:1, 60:14, 60:22, 60:24, 61:13, 62:8, 62:15, 62:17, 107:9 .
**industry-wide** 64:6 .
**inferentially** 62:22 .
**information** 9:19, 9:25, 10:2, 15:24, 16:8, 67:2, 67:12, 68:15, 68:17, 68:25, 69:7, 69:25, 70:12, 70:14, 70:17, 70:23, 71:11, 72:14, 74:18, 77:4 .
**informed** 67:10, 77:23 .

**Concordance**

**infringe** 18:16, 20:12, 40:21, 77:25, 96:5 .
**infringed** 19:19, 100:5, 110:19 .
**infringing** 23:5, 29:16, 31:2 .
**inherency** 54:13, 54:17 .
**inherently** 49:25, 54:15 .
**initial** 31:6, 60:15, 88:15, 95:2 .
**initially** 40:16, 41:10, 89:17, 89:21 .
**initiated** 63:3 .
**innovations** 19:22 .
**innovator** 19:14, 19:21, 21:6, 21:16, 25:3 .
**inquiries** 71:12 .
**inserted** 40:3 .
**instances** 90:7 .
**institute** 31:17, 53:8, 53:24 .
**institution** 27:12, 29:8, 29:9, 29:14, 30:12, 30:13, 30:17, 31:4, 31:16, 31:19, 32:1, 34:3, 34:8, 53:6, 57:10, 101:20 .
**instructed** 8:8 .
**instruction** 37:17 .
**insulator** 88:21 .
**intellectual** 19:15, 20:21, 77:25, 78:17 .
**intend** 7:22, 19:18, 20:11, 30:24, 43:15, 66:20, 85:7, 103:13, 113:3 .
**intended** 10:21, 19:2, 101:5 .
**intended--excuse** 61:12 .
**intending** 7:1, 18:23, 27:15, 67:15 .
**intends** 14:8, 61:6 .
**intent** 10:15, 11:6, 16:25, 43:9 .
**intention** 63:15, 103:24 .
**intentional** 41:2 .
**inter** 26:25, 27:2 .
**interest** 87:24 .
**interested** 74:18 .
**interim** 27:7, 27:9, 31:21, 32:3 .
**internal** 47:6, 79:7 .
**interrupt** 66:16, 86:20 .
**intrinsic** 93:12 .
**introduce** 18:23, 32:8, 33:4, 33:5, 33:8, 34:5, 35:9, 37:23, 72:1, 81:18, 104:25 .
**introduced** 27:2 .
**introducing** 97:13 .
**introduction** 72:12 .

**invalid** 33:23, 34:20, 35:3, 36:2, 100:5 .
**invalidated** 28:9 .
**invalidity** 5:3, 28:10, 33:7, 34:12, 34:13, 34:14, 34:17, 34:18, 34:22, 34:24, 35:6, 36:11, 36:12, 37:11, 38:22, 38:24, 81:19, 81:25, 85:17, 106:4 .
**invented** 85:11, 85:12 .
**invention** 83:13, 83:16, 83:22 .
**inventor** 83:18 .
**inventors** 83:14 .
**Investors** 69:20 .
**invitation** 62:16, 62:19, 63:1, 64:6 .
**invited** 63:24 .
**involve** 107:11 .
**involved** 73:25, 77:20, 78:7, 80:24, 110:12 .
**involving** 68:24 .
**iphone** 40:5 .
**ipods** 40:4 .
**IPR** 25:14, 28:19, 28:21, 28:22, 29:1, 29:2, 29:3, 29:5, 29:6, 29:15, 29:17, 31:20, 45:4, 45:17, 45:20, 46:17, 50:17, 50:21, 52:15, 58:24, 88:5, 100:8, 106:20, 106:24 .
**Iprs** 27:9, 29:12, 33:4, 33:8, 34:6, 49:20, 49:24, 51:20, 52:14, 61:19, 102:1 .
**irradiation** 90:25, 97:14 .
**irrelevant** 33:17, 36:2, 61:15, 72:11, 73:1, 73:10, 74:25, 75:5, 80:15 .
**is--'held** 56:18 .
**issuance** 30:22 .
**issued** 28:5, 28:13, 33:21, 33:23, 106:25 .
**issues** 5:16, 12:5, 13:14, 14:7, 14:17, 15:6, 15:10, 16:5, 17:7, 19:18, 32:20, 33:20, 35:23, 65:17, 73:9, 87:7, 88:16, 88:17, 102:7, 103:19, 104:15, 114:13 .
**it--nor** 80:14 .
**item** 63:11, 86:8 .
**items** 14:18, 81:23, 82:1, 82:9, 106:6 .
**itself** 21:14, 35:10, 35:20, 51:18,

63:1, 77:21, 82:4, 91:25 .
.
.
**< J >** .
**Jason** 104:8 .
**job** 107:16 .
**joint** 112:15, 112:21 .
**Judge** 1:25, 4:13, 4:14, 4:22, 6:3, 6:10, 6:24, 8:17, 9:18, 15:20, 16:10 .
**judged** 98:25 .
**judging** 98:22, 103:4 .
**judgment** 51:13, 66:11, 67:13 .
**JUDICIAL** 67:11, 68:3, 68:7, 68:10, 68:18, 68:22, 69:4, 69:5, 69:7, 69:9, 69:13, 69:16, 70:1, 70:2, 70:24, 71:19, 102:3, 117:6 .
**jurisdiction** 67:13 .
**juror** 115:14 .
**jurors** 8:22, 9:25, 10:22, 11:10 .
**justified** 99:3 .
**Juzkow** 48:6, 87:8, 88:14, 88:16, 88:20, 88:23, 89:1, 89:3, 90:6, 91:16, 92:7, 92:13, 92:22, 93:1, 93:4, 93:10, 93:25, 94:12, 95:23, 96:23 .
.
.
**< K >** .
**keep** 9:25, 27:6 .
**keeping** 12:5 .
**kept** 8:2 .
**key** 54:4, 93:24, 102:19 .
**kind** 27:7, 39:17, 51:1, 83:20, 84:17 .
**Kline** 19:4, 20:20, 23:22, 24:6, 24:7, 24:19 .
**knowledge** 61:13, 61:17, 62:5, 62:24, 64:13, 64:21, 66:24, 67:6, 70:21, 70:22, 74:15, 98:16, 106:12 .
**knowledgeable** 64:3, 64:9 .
**known** 63:3, 81:23 .
**knows** 107:14 .
**Kobayashi** 54:7 .
**Kosonic** 78:8, 78:9, 78:13 .
.
.
**< L >** .

**Concordance**

**LA** 68:8 .
**lacking** 98:15, 108:11 .
**Lake** 2:25, 4:2 .
**language** 7:3, 45:25, 46:7, 46:21, 46:25, 49:1, 49:20, 49:21, 51:20, 52:18, 58:4, 58:13, 89:12, 91:4, 91:25, 92:3, 94:20 .
**largest** 63:7 .
**Lasalle** 2:26 .
**laser** 89:8, 89:15, 89:23, 90:25, 91:4, 91:14, 91:19, 94:1, 94:9, 94:25, 96:6, 96:7, 97:14 .
**lasers** 94:16 .
**last** 11:3, 12:16, 14:24, 17:21, 25:17, 65:24, 67:10, 86:7, 97:23, 103:11 .
**late** 25:17, 84:6 .
**later** 9:10, 15:18, 15:21, 36:23, 48:6, 56:2, 60:17, 86:7, 106:23 .
**latter** 52:4, 52:11 .
**law** 4:2, 15:18, 18:17, 28:5, 28:6, 35:15, 35:18, 36:5, 42:3, 68:3, 69:14, 70:5, 70:7, 100:25, 104:8, 104:23, 106:22, 106:23, 107:20 .
**lawsuit** 30:18, 30:23, 63:7 .
**lawyer** 98:14, 99:2, 111:13 .
**lawyers** 106:7 .
**laying** 41:6, 84:17 .
**layperson** 102:23 .
**lead** 3:3, 71:12, 76:10, 114:22 .
**Leading** 108:25 .
**learn** 4:21 .
**least** 27:21, 31:24, 62:22, 64:12, 64:19, 96:13, 107:2, 107:18, 114:16 .
**leave** 17:19, 25:13, 42:7, 42:17, 84:22 .
**leaves** 83:4 .
**leaving** 26:6 .
**left** 86:21, 91:11, 91:15 .
**Legal** 68:4, 98:10, 98:12, 98:14, 99:4, 99:7, 99:15, 99:21, 99:25, 100:16, 100:19, 101:2, 101:6, 101:7, 102:13, 102:25, 105:6, 108:17, 108:22, 108:23, 109:2, 110:10 .
**legitimate** 6:18 .

**lend** 110:9 .
**less** 19:1, 23:13, 110:18 .
**letter** 35:10, 111:18 .
**letters** 101:18, 111:24 .
**level** 19:16, 19:17 .
**Lexus** 69:21, 74:4 .
**LEYDIG** 2:3 .
**liable** 74:5, 74:9 .
**license** 42:9 .
**light** 51:24, 93:11, 100:13 .
**likelihood** 28:7, 31:23, 33:24, 114:17 .
**likely** 28:9, 31:18, 98:24 .
**likes** 110:24 .
**Limine** 6:21, 14:16, 17:8, 17:9, 17:19, 17:22, 18:2, 18:6, 18:8, 18:12, 19:23, 25:10, 41:23, 42:2, 42:14, 43:5, 44:6, 44:20, 44:25, 51:11, 65:7, 86:10 .
**Limine.** 17:25 .
**limit** 109:3 .
**limitation** 89:7, 90:23, 91:13, 91:23, 93:13, 93:23, 95:8, 95:25 .
**limitations** 91:5, 92:3 .
**Limited** 12:22, 66:13, 89:23, 111:16 .
**limiting** 91:7 .
**Lin** 76:4 .
**line** 7:12, 8:14, 9:20, 27:4, 51:14, 92:1, 101:19, 110:12 .
**linear** 88:24, 89:14, 90:19, 91:12, 93:7, 93:21, 95:15, 97:8 .
**link** 22:5 .
**linked** 72:10 .
**links** 78:19 .
**list** 17:18, 21:24, 25:9, 35:12, 86:8, 86:9, 104:5, 112:9, 112:10 .
**listed** 82:12, 104:5 .
**listen** 40:4, 109:20 .
**listening** 109:20 .
**lists** 82:4, 112:19 .
**litigation** 45:5, 45:10, 49:19, 50:1, 66:21, 67:9 .
**little** 36:23, 40:9, 50:19, 75:16, 86:21 .
**live** 24:14, 24:23, 60:10, 97:17, 104:5 .
**LLP** 2:19, 2:25, 2:33 .

**local** 6:8, 114:23 .
**logistical** 115:3 .
**long** 13:21, 26:11, 86:22 .
**longer** 25:19, 38:24, 45:10, 47:12, 47:17, 54:2, 58:7, 88:19 .
**Look** 10:22, 18:21, 22:22, 35:23, 38:15, 40:23, 90:12, 91:10, 93:15, 94:21, 94:23, 96:8, 101:7, 103:3, 105:23, 108:7, 111:19, 113:25 .
**looked** 80:16 .
**looking** 5:16, 17:24, 33:8, 41:7, 76:9, 90:25, 103:7, 105:18, 107:19, 107:22 .
**looks** 104:22, 106:23 .
**lot** 4:15 .
**Louisiana** 68:13 .
**love** 24:13 .
**low** 31:21, 36:6 .
**lower** 21:1 .
**LTD** 1:11 .
**Lunch** 86:24, 87:11, 87:18 .
.

**< M >** .
**M.** 2:39 .
**MAGISTRATE** 1:25 .
**main** 15:13 .
**maintain** 98:7, 100:14 .
**maintained** 43:12, 77:12 .
**maintaining** 32:16, 34:11, 36:11 .
**management** 14:20, 15:10, 15:13, 17:7 .
**manner** 14:23, 14:25, 46:24, 77:11, 78:25 .
**manufacture** 46:19 .
**manufacturer** 62:9, 63:8, 80:10, 100:10, 100:12, 100:16, 100:18, 100:22, 100:24 .
**manufacturers** 62:9, 63:3, 63:14, 70:20, 73:8, 73:14, 75:22, 76:22, 77:15, 78:18 .
**manufacturing** 20:17, 22:13, 107:13 .
**Marc** 48:6, 88:14 .
**March** 30:15, 50:6 .
**marketplace** 40:14 .
**MARSHALL** 1:3, 1:12, 1:45,

## Concordance

2:41 .
**Martinez** 68:8 .
**matched** 47:7 .
**material** 27:20 .
**material.** 93:19 .
**MATTER** 17:23, 60:16, 88:15, 108:16, 111:1, 117:3 .
**matters** 37:23 .
**Mayer** 2:3, 2:19, 3:23 .
**Mcroberts** 1:43, 2:39, 117:9, 117:11 .
**me--if** 61:12 .
**me--in** 90:11 .
**me--the** 29:4 .
**me--varta** 61:6 .
**mean** 31:18, 34:25, 48:16, 48:22, 56:12, 58:1, 58:3, 58:17, 80:23, 90:20, 93:23, 94:18, 102:1, 109:18, 110:15, 111:1, 115:13 .
**meaning** 27:6, 52:9, 56:2, 56:8, 56:13, 56:15, 56:17, 56:18, 57:14, 57:16, 57:17, 70:6, 89:5, 89:20, 90:5, 90:15, 92:2, 93:11 .
**means** 17:2, 48:10, 53:19, 55:25, 56:5, 59:18, 95:13 .
**meant** 52:24, 56:1 .
**mechanism** 40:8, 40:17, 45:14, 52:1, 54:10, 55:2, 55:11 .
**meet** 15:12, 15:15, 16:4, 16:6, 17:3, 73:3, 91:3 .
**meeting** 60:14, 60:22, 60:24, 61:11, 61:21, 62:16, 62:17, 62:22, 63:12, 63:15, 63:24, 64:21 .
**members** 7:20, 63:13 .
**mention** 16:16, 32:1, 45:10, 89:15 .
**mentioned** 46:23, 82:5, 98:24, 99:13, 103:20, 115:22 .
**merely** 92:2 .
**merits** 35:6, 35:13, 35:22, 50:15, 55:9, 62:2 .
**mesh** 93:18 .
**met** 29:9, 48:6, 54:18, 90:24, 95:25, 112:12 .
**metal** 93:18, 97:2 .
**methods** 54:11, 98:18 .
**Metzdorff** 20:14, 77:2, 78:8,

78:10, 79:6 .
**Metzdorff--whether** 22:12 .
**MICHAEL** 2:8 .
**Microbattery** 1:5, 3:3, 17:11 .
**mid-2015** 39:22 .
**middle** 40:18, 108:8 .
**Miehlich** 62:16, 62:21, 64:4 .
**Miehlich--and** 61:7 .
**Mike** 3:7 .
**MIL** 7:3, 7:9, 8:11, 25:1, 25:13, 25:15, 26:20, 38:15, 38:17, 38:19, 39:3, 43:9, 44:6, 45:3, 59:24, 60:3, 60:6, 60:7, 60:10, 60:13, 65:10, 65:11, 66:15, 74:2, 81:10, 86:16, 88:7, 92:5, 93:10, 102:3 .
**Mils** 8:7 .
**mind** 23:5, 32:7, 110:6 .
**mindful** 42:2 .
**minds** 19:10, 20:2, 26:3 .
**minimum** 29:17, 34:5, 37:5 .
**minute** 86:20 .
**minutes** 6:1, 6:2, 8:15 .
**mischaracterizing** 93:2 .
**misimpression** 18:16, 19:9 .
**missed** 80:14 .
**mistaken** 86:2 .
**misunderstanding** 19:9 .
**modification** 27:5, 107:25 .
**modified** 108:3, 108:5 .
**modify** 17:19, 25:13, 26:19, 38:19, 41:22, 108:10 .
**moment** 12:16, 38:15, 50:10, 77:3 .
**Monday** 112:18, 113:24 .
**monitors** 72:23 .
**moot** 33:7 .
**morning** 3:1, 3:6, 3:8, 3:9, 3:11, 3:12, 3:14, 3:15, 3:17, 3:18, 3:22, 3:25, 4:1, 4:4, 4:5, 4:7, 4:8, 15:21, 44:21 .
**mostly** 74:18 .
**Motions** 5:15, 6:21, 14:15, 14:16, 17:7, 17:8, 17:25, 25:10, 26:8, 44:20, 44:25, 51:13, 65:15, 86:22, 87:10, 88:10, 112:2 .
**motivation** 108:10 .
**movant** 88:11 .
**move** 44:25, 115:16 .

**moved** 41:10, 115:16 .
**moves** 98:1 .
**moving** 4:14 .
**Ms** 9:9, 9:16 .
**multiple** 71:9, 71:10, 90:7 .
**music** 40:4 .
**mutually** 52:8, 55:11 .
**mypower** 63:9 .
**myself** 97:20 .
. .
< N > .
**N.** 2:26 .
**NA** 76:5 .
**name** 11:5 .
**named** 83:18 .
**namely** 77:14 .
**narrow** 90:14 .
**national** 60:24 .
**nationality** 6:25, 7:9, 8:10 .
**nationals** 6:16 .
**naturally** 110:3 .
**nature** 20:2, 40:21, 101:19, 103:8 .
**near** 46:5, 57:7 .
**necessarily** 22:5, 31:24, 105:17 .
**necessary** 5:8, 21:16 .
**need** 6:9, 9:8, 10:25, 16:18, 25:18, 26:12, 28:1, 32:19, 33:4, 35:22, 40:13, 40:15, 53:3, 53:7, 62:2, 68:10, 71:9, 82:1, 86:14, 99:14, 112:8, 112:14, 113:7, 113:9, 114:14, 114:22, 115:25 .
**needed** 107:1 .
**needs** 15:17, 16:10, 17:1, 72:19 .
**negotiation** 4:21, 22:7, 22:10 .
**neither** 61:18 .
**new** 50:12, 93:7 .
**Next** 38:9, 40:6, 41:4, 63:10, 65:15, 71:24, 72:8, 86:8, 86:19, 88:13, 93:14, 95:7, 95:9, 99:9, 99:23, 100:20, 102:10 .
**nexus** 24:10 .
**night** 25:17, 65:25, 67:10, 86:7 .
**nobody** 27:23, 28:1 .
**non-final** 32:9 .

**Concordance**

**non-hearsay** 71:17 .
**non-infringement** 92:8, 93:5, 93:10, 95:4 .
**non-party** 70:13 .
**non-patented** 20:17, 22:13 .
**non-public** 39:12 .
**None** 5:22, 14:13, 52:4, 112:4, 112:6 .
**nonsensical** 79:9 .
**noon** 10:4 .
**nor** 61:19, 80:7 .
**North** 2:5, 72:22, 72:24, 73:22, 74:9, 74:10, 74:12, 74:21, 75:4, 79:13, 80:22 .
**Northern** 66:12, 67:14, 67:16, 67:17 .
**Nos.** 25:11 .
**note** 8:7, 25:1, 27:14, 27:25, 28:2, 31:25, 37:9, 72:6, 72:17, 79:15, 95:21, 96:21 .
**notebook** 10:7, 10:12, 10:21, 11:14 .
**notebooks** 10:3, 10:4, 11:2, 11:3, 115:18 .
**noted** 109:17 .
**notes** 11:8, 20:20, 101:5, 106:24 .
**Nothing** 8:5, 96:5, 116:5 .
**notice** 12:3, 15:17, 102:3, 104:4, 112:15, 112:21, 115:7 .
**noticed** 10:19 .
**notices** 5:2 .
**notified** 5:7 .
**notify** 112:14, 114:6, 115:25 .
**notion** 79:16 .
**November** 28:6 .
**Number** 7:5, 23:16, 26:24, 31:16, 34:15, 59:13, 66:15, 77:1, 77:7, 78:10, 80:21, 83:1, 99:24 .
**numbers** 23:20, 82:12 .
**numerous** 20:22, 24:8, 24:9, 24:12 .
**numerously** 46:15 .
**nutshell** 41:12 .
**NW** 2:20 .
.
.
**< O >** .
**object** 73:10, 73:20, 109:1 .

**objecting** 94:8 .
**objection** 61:2, 61:5, 66:10, 71:14, 71:18, 72:5, 72:6, 72:9, 81:11, 84:19, 86:13, 86:14, 105:9 .
**objections** 14:8, 14:22, 15:16, 65:23, 66:15, 81:4, 81:6, 81:13, 87:20, 87:25, 112:21, 113:7, 113:9, 114:5, 114:7 .
**obtained** 100:13, 104:4 .
**obtaining** 42:7 .
**obvious** 108:18 .
**Obviously** 6:3, 8:24, 10:8, 10:9, 12:22, 21:25, 23:3, 64:14, 64:23, 93:8 .
**obviousness** 29:18, 107:20, 108:9, 108:14 .
**occasion** 85:6 .
**occur** 79:2 .
**occurred** 61:12 .
**occurring** 67:8 .
**occurs** 37:14 .
**odds** 106:21 .
**ODM** 62:10, 67:2 .
**Odms** 70:19 .
**OEM** 62:10 .
**Oems** 70:19 .
**offer** 23:15, 67:1, 72:21, 72:24, 73:2, 73:22, 73:25, 74:21, 74:23, 75:7, 80:25, 100:2, 101:6, 111:22, 112:2, 112:11, 113:3 .
**offered** 55:6, 74:20, 113:8 .
**offering** 74:15, 75:3, 75:4 .
**offerings** 79:10 .
**offers** 54:23, 76:18, 98:2, 100:7, 101:12, 101:17 .
**offhand** 30:14 .
**Office** 27:12, 28:23, 29:3, 29:4, 29:8, 29:14, 30:3, 30:4, 30:5, 30:6, 31:8, 32:1, 33:6, 33:9, 37:2, 37:3, 37:6, 49:20, 49:24, 53:24, 54:5, 54:21, 55:1, 76:3, 76:6, 100:9, 108:4 .
**OFFICIAL** 2:39, 56:4, 117:12 .
**often** 83:23 .
**Okay** 7:7, 18:1, 18:11, 26:2, 35:13, 66:19, 82:11, 82:13, 87:6, 95:1, 102:11, 115:10, 115:19 .

**omnibus** 26:7 .
**once** 31:7, 37:5, 104:24 .
**ones** 32:13 .
**ongoing** 27:6, 30:23, 37:24 .
**opened** 22:17, 22:19, 84:20, 85:20 .
**opening** 42:9, 43:3, 51:5 .
**openings** 5:19, 6:2, 44:11 .
**opine** 99:12, 109:19 .
**opined** 20:15, 22:24 .
**opines** 20:25, 28:7, 98:5 .
**opining** 99:8, 108:6, 109:1, 109:10 .
**opinions--one** 27:18 .
**oppose** 70:7 .
**Opposed** 10:22, 17:25, 23:2, 79:7 .
**opposes** 41:22 .
**opposite** 50:2 .
**opposition** 50:10, 99:10 .
**oral** 112:3 .
**orally** 86:23 .
**order** 4:23, 6:20, 8:7, 9:2, 9:18, 10:16, 10:19, 11:12, 11:24, 14:19, 14:21, 15:6, 27:23, 34:16, 42:5, 59:24, 74:5, 74:15, 94:13, 95:17, 96:5, 103:24 .
**ordering** 17:15 .
**ordinary** 6:5, 57:14, 57:16, 70:4, 89:5, 89:20, 90:5, 90:15, 92:2, 94:18, 113:11 .
**organization** 60:20 .
**organized** 60:24 .
**original** 89:22 .
**originally** 40:7, 88:15 .
**originated** 84:21, 85:7 .
**Ortho** 102:18 .
**others** 19:15, 75:21, 78:16 .
**otherwise** 61:20, 74:25 .
**ought** 18:25, 19:10 .
**outcome** 29:15 .
**output** 96:3, 108:12 .
**outset** 82:6 .
**outside** 79:7, 109:12 .
**overall** 26:9 .
**overlapping** 40:10, 40:20, 40:22 .
**overrule** 71:18, 81:6 .
**overseas** 67:2 .

Concordance

**own** 18:7, 18:15, 18:17, 19:7, 19:15, 19:22, 19:24, 20:12, 20:21, 21:8, 22:8, 23:6, 23:12, 39:20, 43:20, 43:21, 102:8 .
**owns** 19:14, 25:3 .

.

.

**< P > .**
**p.m.** 15:18 .
**Page** 11:9, 14:21, 17:15, 46:10, 46:14, 47:2, 47:19, 53:22, 59:17, 74:4, 79:14 .
**pages** 11:4 .
**paid** 111:13 .
**paper** 38:22 .
**papers** 5:9 .
**paragraph** 14:24, 15:1, 66:22, 67:23, 71:16, 90:13, 90:16, 90:18, 90:22, 90:25, 91:21, 95:5, 97:11, 97:14, 99:25, 100:6, 108:7, 108:8 .
**paragraphs** 23:22, 41:7, 88:25, 92:24, 94:23, 94:24, 97:6, 98:6 .
**paraphrase** 22:15 .
**Part** 7:18, 9:24, 26:7, 26:9, 41:3, 49:14, 52:16, 59:10, 63:2, 70:13, 70:23, 76:20, 78:11, 83:15, 91:16, 91:17, 91:20, 91:21, 93:12, 95:23, 97:17, 97:18, 97:21, 98:4, 110:25 .
**partes** 26:25, 27:2 .
**partial** 22:23 .
**partially** 12:13 .
**participants** 62:18 .
**participated** 64:22, 65:3 .
**participating** 64:10 .
**particular** 11:11, 12:19, 19:24, 23:2, 23:10, 29:2, 47:11, 47:15, 47:17, 47:18, 49:13, 53:19, 54:1, 57:17, 58:5, 58:6, 58:8, 58:12, 58:14, 72:18, 73:8, 79:6, 84:1, 85:16, 89:12, 98:12, 98:14, 103:9 .
**particularly** 66:22, 76:8, 76:12 .
**parties** 8:8, 8:15, 9:7, 11:1, 14:1, 14:9, 15:7, 17:3, 26:8, 38:12, 39:4, 43:25, 60:8, 68:24, 71:10, 77:14, 78:7, 86:23, 89:4, 92:6 .

**Partners** 68:12 .
**Partnership** 66:13, 66:14, 69:1, 69:2, 70:18, 71:6 .
**Partnership--that** 70:15 .
**parts** 54:1, 54:2, 88:14 .
**party** 7:9, 7:13, 7:24, 22:7, 22:12, 34:14, 41:23, 42:5, 42:6, 59:20, 69:14, 71:1, 78:1, 79:1 .
**pass** 89:8, 90:21, 91:22, 95:11, 95:12, 95:18, 96:25 .
**passing** 89:16, 91:14, 97:10 .
**past** 16:22, 17:14 .
**patentee** 104:25 .
**patents-in-suit** 28:8, 45:9 .
**paths** 47:12 .
**Patton** 2:32 .
**Paul** 2:9, 3:16, 75:13 .
**Pause** 87:3 .
**pay** 19:1 .
**PAYNE** 1:24 .
**PC** 2:13 .
**people** 76:22 .
**per** 5:17, 6:1, 8:18, 34:17 .
**percent** 62:13 .
**peremptories** 8:21 .
**peremptory** 8:18 .
**perfectly** 101:24 .
**perhaps** 37:16, 105:23, 114:9 .
**period** 30:15 .
**permit** 34:7, 92:25 .
**permitted** 25:5, 38:25 .
**person** 71:1, 90:8, 94:18, 99:2, 100:2, 106:14, 106:15, 106:17, 107:1, 107:3, 107:7, 109:11 .
**perspective** 103:3 .
**Peter** 2:29, 4:6 .
**petition** 31:20, 46:17 .
**petitioner** 31:23, 33:25 .
**petitioner"--eve--** 54:22 .
**petitions** 32:12, 54:17 .
**Ph** 99:6 .
**Pharma** 55:16 .
**Pharmaceuticals** 102:18 .
**photograph** 63:12 .
**phrase** 57:25 .
**pick** 10:1 .
**picks** 110:3 .
**picture** 11:5, 11:9, 47:8 .

**piece** 103:9 .
**pieces** 57:18, 57:19, 58:7, 97:2 .
**pierce** 74:6, 74:12 .
**place** 29:20, 29:21, 44:21, 51:4 .
**plain** 57:14, 57:15, 89:5, 89:19, 90:4, 90:15, 92:2 .
**plainly** 108:11 .
**Plaintiffs** 2:3, 83:23, 84:20 .
**plan** 114:19, 114:23 .
**play** 18:8 .
**PLAZA** 2:4 .
**pleading** 69:25, 74:11 .
**pleadings** 69:15, 70:9 .
**Please** 3:1, 18:21, 41:19, 44:24, 45:6, 45:19, 46:10, 46:14, 47:2, 47:19, 87:19, 92:19, 93:14, 95:7, 95:9, 97:25, 99:9, 99:23, 110:6 .
**pleasure** 65:20 .
**pled** 67:12 .
**point** 5:22, 7:16, 12:12, 30:18, 31:15, 37:9, 50:4, 52:23, 55:14, 73:4, 75:19, 79:14, 83:21, 102:11, 102:21, 103:1, 111:3, 111:5, 113:12 .
**points** 36:19, 49:17, 66:17 .
**Pontchartrain** 68:12 .
**popularity** 39:22 .
**popularized** 39:25 .
**portfolio** 18:24, 19:24, 21:7, 23:12, 40:12, 61:14, 63:16, 64:8 .
**portion** 54:21, 72:15, 93:23, 96:19, 98:1 .
**portions** 52:15, 113:8 .
**POSITA** 90:18 .
**positions** 49:23, 99:7, 110:11 .
**positive** 103:19 .
**possession** 43:24 .
**possibility** 114:20 .
**possible** 46:18 .
**possibly** 12:14, 81:16 .
**post-complaint** 30:23 .
**post-trial** 10:24 .
**potential** 7:20, 72:23 .
**practice** 6:5, 6:7, 15:20, 42:13 .
**practices** 6:10 .
**practicing** 23:6, 24:21 .
**pre-admit** 84:23 .
**pre-admitted** 112:11 .

**Concordance**

**precise** 6:15, 7:3, 89:2 .
**preclude** 18:7, 27:8 .
**precludes** 92:6 .
**precluding** 41:23 .
**preclusion** 42:5 .
**predicate** 84:17 .
**prefer** 87:9 .
**preferably** 52:19, 91:18 .
**preference** 38:3, 38:11, 87:12 .
**preferenced** 79:9 .
**preferred** 46:24, 52:12, 52:14, 89:5, 90:17, 92:9, 92:13 .
**prejudice** 61:2, 110:21 .
**prejudices** 7:20 .
**prejudicial** 20:2, 43:3, 43:19, 44:3, 64:15, 70:16, 70:22, 71:13, 72:12, 110:7, 110:8 .
**preliminary** 45:21, 45:24, 46:8, 46:17, 46:22, 47:1, 48:22, 49:17, 50:24, 56:4, 56:7 .
**prepared** 12:2, 114:12 .
**preparing** 114:11 .
**PRESCRIBED** 117:5 .
**present** 19:18, 42:19, 42:21, 44:10, 47:13, 57:16, 57:18, 58:7, 59:12, 67:15, 78:20, 83:22, 95:8, 102:7, 103:16, 103:21, 114:22 .
**present.** 54:3 .
**presentation** 95:22, 97:4 .
**presentations** 113:18 .
**presented** 14:23, 16:18, 16:19, 16:21, 29:19, 51:15, 54:6, 54:19, 58:21, 95:24 .
**presenting** 5:20 .
**presently** 14:11 .
**presents** 83:14, 102:8 .
**press** 60:19 .
**pressure** 46:5, 57:6 .
**presumably** 88:6, 110:23, 111:11 .
**PRETRIAL** 1:22, 3:2, 10:19, 11:24, 14:19, 14:21, 15:6, 34:16, 42:18 .
**pretty** 22:15, 51:20 .
**prevail** 31:23, 33:25 .
**prevent** 43:16 .
**previous** 100:11 .
**previously** 81:8, 106:25 .
**price** 74:18, 74:25, 75:2, 79:5,

79:10, 79:15 .
**prices** 79:6 .
**primarily** 99:1, 110:13 .
**primary** 28:16 .
**principles** 98:18 .
**prior** 28:20, 33:5, 47:22, 52:22, 54:6, 81:18, 82:2, 82:9, 83:9, 84:6, 93:9, 103:9, 105:7, 105:19, 106:3, 106:6, 107:21 .
**privilege** 104:24 .
**probably** 9:10, 44:20, 113:16 .
**probative** 19:7, 78:2 .
**problem** 7:13, 9:12, 18:14, 19:1, 54:16, 112:23, 115:9 .
**problematic** 20:1, 32:14, 37:14 .
**problems** 8:2, 14:9, 16:22, 30:25, 40:11 .
**procedure** 42:13 .
**proceed** 3:20, 4:9, 9:4, 113:13 .
**proceeded** 35:3, 52:19 .
**proceeding** 45:5, 45:18, 50:20, 56:2, 56:3, 56:21, 58:19, 58:24, 58:25, 70:24 .
**PROCEEDINGS** 27:2, 27:6, 27:7, 27:10, 28:19, 28:21, 28:22, 29:15, 32:19, 37:24, 50:17, 50:21, 63:2, 117:3 .
**proceedings.** 87:3 .
**process** 7:19, 7:22, 9:23, 15:16, 15:17, 16:7, 28:10, 40:23, 50:14, 54:24, 90:10, 107:14, 114:11 .
**processes** 20:18, 22:13, 107:13 .
**produce** 72:2 .
**produced** 47:4, 62:20, 76:14, 77:4, 77:11, 80:19, 80:20, 80:21, 84:6, 100:1 .
**product** 20:16, 22:18, 35:4, 36:9, 39:9, 39:11, 39:13, 40:16, 41:1, 41:9, 43:8, 43:13, 43:14, 92:8 .
**production** 18:3 .
**prohibits** 50:2 .
**project** 77:21 .
**promise** 9:24, 113:20 .
**promote** 76:7, 79:18 .
**promptly** 115:25 .
**pronunciation--testify** 61:8 .
**proper** 7:23, 10:6, 102:16 .

**properly** 25:6 .
**property** 19:15, 20:22, 77:25, 78:17 .
**proposal** 90:4 .
**propose** 19:18, 67:21, 108:3 .
**proposed** 15:4, 17:14, 27:5, 45:12, 50:17, 51:18, 55:19, 89:22 .
**proposing** 35:9 .
**proposition** 54:23, 74:8 .
**proprietary** 20:21 .
**protected** 72:19 .
**protective** 27:23 .
**proven** 110:19 .
**provide** 9:9, 9:20, 46:1, 54:17, 58:19 .
**provided** 12:3, 15:25, 16:8, 17:4, 20:19, 21:24, 78:13, 90:2, 93:17, 100:25 .
**provides** 8:19, 101:11 .
**provision** 15:15 .
**prudent** 9:11 .
**PRUDENTIAL** 2:4 .
**PTAB** 30:8, 32:7, 33:16, 33:23, 37:23, 47:9, 47:14, 47:20, 48:13, 49:11, 49:12, 52:23, 53:2, 53:9, 53:22, 55:13, 56:3, 56:11, 56:20, 57:10, 57:14, 58:4, 58:19, 58:25, 59:2, 59:5, 59:7, 59:17, 101:19 .
**PTX** 66:2, 66:10, 66:11, 72:5, 72:8, 72:9, 72:13, 72:21, 73:5, 73:7, 73:14, 73:18, 73:22, 75:25, 76:9, 76:17, 76:18, 77:3, 77:8, 77:10, 77:16, 78:23, 79:15, 79:25, 80:5, 81:6, 81:7, 81:11 .
**pull** 20:10 .
**purchaser** 73:19 .
**purchases** 78:9 .
**purchasing** 70:19 .
**purpose** 7:19, 33:11, 35:21, 64:7, 67:18 .
**purposes** 10:24, 50:23, 92:7 .
**pursue** 109:6 .
**pursuing** 107:4 .
**put** 18:13, 25:18, 26:12, 32:4, 42:11, 42:24, 42:25, 43:23, 44:11, 45:12, 51:18, 73:13, 83:19, 83:24, 84:10, 89:10,

Concordance

89:11, 94:22 .
**putting** 44:12 .
**pyramid** 63:13 .
**Pytlik** 81:21, 82:15 .
.
.
**< Q > .**
**qualifications** 109:19 .
**qualified** 100:15, 105:4, 109:9 .
**qualify** 68:18, 69:14, 70:6 .
**question** 5:1, 6:19, 19:8, 35:23, 38:8, 64:2, 75:18, 98:10, 100:10, 102:17, 105:17, 106:21, 107:3, 112:18, 113:12, 114:21 .
**questionnaire** 9:8, 9:14 .
**questionnaires** 9:6, 115:14, 115:17 .
**questions** 6:6, 6:9, 6:14, 9:17, 9:20, 11:15, 17:6, 37:19, 44:15, 81:1, 92:15, 106:17 .
**quick** 36:18, 62:3, 97:5 .
**quickly** 29:11, 39:18, 62:25, 102:11 .
**quite** 17:13 .
**quotation** 79:5 .
**quote** 45:21, 46:1, 46:23, 59:8, 59:9, 79:15 .
**quoted** 59:17, 79:7 .
**quotes** 86:1 .
.
.
**< R > .**
**radial** 46:4, 57:6 .
**radii** 47:6 .
**raise** 33:19, 33:20, 51:7 .
**raised** 8:8, 37:9, 50:13, 51:8, 51:10, 81:4, 114:14 .
**RAMEY** 2:13 .
**rate** 21:1 .
**rather** 48:9, 65:16, 93:10 .
**reach** 14:2, 35:24, 109:4 .
**reached** 49:12, 60:8 .
**reacted** 106:16 .
**reaction** 95:3 .
**read** 22:4, 51:24, 92:22, 94:3, 106:13 .
**reading** 10:23, 16:16, 89:5, 89:7 .
**reads** 45:21 .

**ready** 3:19, 4:9, 87:20 .
**real** 11:10, 105:9 .
**really** 31:14, 36:2, 39:5, 45:2, 45:3, 55:25, 80:15, 93:2, 97:5, 98:9, 101:11, 109:1, 110:16 .
**reason** 9:1, 13:8, 13:10, 28:19, 42:12, 43:4, 54:5, 61:3, 75:5, 108:10 .
**reasonable** 13:21, 18:23, 19:1, 26:3, 29:22, 31:7, 31:22, 33:24, 36:8, 98:11, 99:12, 99:19, 100:12, 100:18, 106:15, 106:16, 106:25, 107:6, 109:10 .
**reasonableness** 37:15, 98:10, 99:15, 99:18, 100:11, 105:8 .
**reasonably** 98:3, 100:3, 100:22, 100:24, 103:2, 103:6 .
**reasons** 20:13, 21:4, 69:6, 98:9 .
**rebuttal** 48:3, 83:16, 89:1 .
**received** 64:16, 98:4 .
**recent** 5:2, 50:6 .
**recently** 4:14, 39:10, 59:20 .
**recess** 44:21, 44:22, 87:17 .
**recess.** 44:23, 87:18 .
**recognize** 96:10 .
**recollection** 11:11 .
**recommend** 96:13 .
**reconsidering** 64:25 .
**RECORD** 3:2, 3:5, 25:19, 26:13, 27:22, 79:5, 100:14, 117:2 .
**records** 79:8 .
**red** 27:4, 53:15 .
**redact** 71:16 .
**redesigned** 25:22 .
**reducing** 82:25 .
**refer** 25:22, 30:1, 39:1, 41:15, 44:13, 66:5, 66:20, 76:10, 77:15, 78:16 .
**reference** 5:2, 6:15, 6:18, 7:8, 7:12, 17:20, 18:12, 18:14, 25:14, 27:10, 28:11, 54:7, 54:9, 81:20, 106:2, 107:23 .
**referenced** 70:20 .
**references** 7:2, 8:9, 28:16, 28:20, 29:10, 29:13, 30:2, 30:4, 30:6, 54:12, 54:14, 54:19, 55:2, 106:3, 106:7, 106:13, 107:25, 108:10 .
**referred** 80:14 .

**referring** 25:23, 29:24 .
**refers** 14:21, 109:15 .
**reflected** 89:25 .
**reflects--would** 96:23 .
**refusing** 59:9 .
**regard** 6:8, 6:18, 29:11, 95:20 .
**regarding** 15:13, 18:3, 18:12, 45:25, 46:12, 72:22, 88:7 .
**regular** 63:18, 68:20 .
**reiterate** 55:9 .
**relate** 24:17 .
**related** 14:20, 45:3, 73:6, 88:18, 88:20 .
**relates** 21:18, 81:17, 82:9 .
**relating** 20:24, 23:17, 24:13, 24:24, 25:4, 28:21, 81:23, 82:23, 90:23 .
**relationship** 21:19 .
**relatively** 36:6 .
**release** 60:19 .
**relevance** 42:3, 73:16, 73:19, 73:20, 76:1, 78:5, 78:15, 81:3, 83:8, 83:10, 84:4, 84:5 .
**reliance** 29:20, 29:22, 31:7, 31:8, 35:4, 39:16, 43:13, 98:6, 98:11, 99:12, 100:23, 101:22, 102:6, 103:22, 103:25 .
**relied** 98:3, 100:3, 100:22, 103:2, 106:4 .
**relief** 72:18 .
**relieve** 44:4 .
**rely** 27:15, 36:8, 52:14, 56:13, 76:24, 100:4, 100:24, 103:6, 109:11 .
**relying** 22:17, 29:7, 36:12, 37:11, 54:13, 78:6, 90:13, 91:16, 99:3, 100:11, 110:1 .
**remainder** 9:5 .
**remaining** 8:23, 87:6 .
**remains** 88:22 .
**remember** 22:10 .
**remind** 22:9 .
**removed** 68:23 .
**rendered** 34:20, 35:2, 36:3, 37:7, 106:22 .
**rendering** 106:8 .
**renders** 108:17 .
**repeat** 82:11 .
**repeated** 7:10 .
**repeating** 80:22 .

**Concordance**

**replicate** 39:8 .
**replicating** 39:11 .
**report** 23:22, 24:6, 48:4, 59:16, 88:25, 89:1, 89:3, 90:12, 92:23, 94:15, 94:20, 95:23, 96:9, 96:13, 96:14, 96:23, 98:2, 104:12, 107:10 .
**REPORTER** 2:39, 117:12 .
**reports** 51:12 .
**representation** 78:25, 82:22, 83:2 .
**representative** 12:19, 19:13, 76:5, 78:14, 104:1 .
**representatives** 13:17 .
**represented** 91:19 .
**reproduced** 47:4 .
**request** 13:21, 17:18, 21:24, 25:13, 26:19, 38:19, 41:14, 41:22, 72:15, 72:17, 89:25, 90:3 .
**requested** 28:2 .
**require** 10:3, 22:5, 48:14, 68:7 .
**required** 44:9, 98:16, 114:23 .
**requirement.** 108:12 .
**requirements** 108:14, 108:22, 108:23, 109:2 .
**requires** 11:15, 23:1, 31:22, 35:5, 39:7, 39:14, 94:9, 108:9 .
**requiring** 97:14 .
**reservation** 34:16 .
**reserve** 12:14, 34:18, 64:19, 84:25 .
**reshaping** 113:18 .
**resistance** 90:9, 91:1 .
**resistive** 90:10 .
**resolution** 25:19, 25:21, 86:10 .
**resolve** 16:4, 109:7, 112:16, 114:7 .
**resolved** 14:10, 15:16, 15:22, 16:23, 18:3, 25:16, 50:11, 71:24, 81:10, 112:14, 113:10, 114:5 .
**resolves** 86:10 .
**respect** 18:20, 27:5, 27:9, 30:20, 31:23, 38:21, 101:1, 107:4, 107:17, 108:12 .
**respects** 19:15 .
**respond** 32:23, 66:18, 82:19 .
**response** 20:7, 20:20, 22:23,

45:21, 45:24, 46:17, 50:24, 56:4, 56:7, 58:20, 68:1, 82:18, 92:10 .
**responses** 46:8, 46:22, 47:1, 48:22, 52:15 .
**responsibility** 85:24 .
**responsible** 107:16 .
**rest** 101:8 .
**result** 20:25, 50:25 .
**resulted** 49:25, 54:15 .
**results** 16:24 .
**resume** 87:20 .
**retail** 99:19 .
**returned** 9:23 .
**review** 27:2, 96:13 .
**reviewing** 8:6, 100:1 .
**reviews** 26:25 .
**revisit** 64:24 .
**right-hand** 39:21, 40:19 .
**rights** 77:25 .
**Rimon** 28:5, 28:6, 28:10, 100:21, 104:8, 106:22 .
**ripe** 65:1 .
**rise** 67:13, 74:1, 88:6 .
**risk** 61:1 .
**risks** 20:18, 22:14 .
**RMR** 1:43, 2:39, 117:11 .
**ROBERT** 2:10 .
**rocket** 39:24 .
**routinely** 11:12, 19:12 .
**ROY** 1:24 .
**royalty** 18:23, 19:1, 21:1 .
**Rule** 69:11, 92:21, 98:8, 101:3, 101:4, 101:5, 102:2, 102:15, 114:23 .
**rules** 13:23 .
**ruling** 64:19, 64:24, 85:2 .

.

.

**< S >** .
**S.** 1:24 .
**S/shawn** 117:9 .
**safest** 114:8 .
**safety-type** 99:20 .
**sale** 67:1, 72:21, 72:24, 73:2, 73:25, 74:23, 75:7, 80:25 .
**sales** 71:25, 72:1, 72:2, 72:3, 74:5, 74:9, 76:3, 76:6, 77:4, 77:6, 78:12 .
**Samsung** 61:18, 63:8 .

**satellite** 66:21 .
**satisfaction** 12:11 .
**satisfied** 108:24 .
**sausage** 15:3 .
**saw** 5:2, 42:23, 95:2 .
**saying** 12:18, 22:3, 22:17, 22:20, 24:7, 24:8, 24:10, 33:24, 35:1, 36:10, 47:16, 48:19, 49:2, 56:24, 57:3, 59:11, 70:5, 71:20, 74:24, 76:18, 92:21, 105:24 .
**says** 14:22, 23:24, 46:18, 49:21, 52:7, 68:16, 70:7, 70:25, 83:13, 94:15, 95:6, 95:12, 96:1, 96:5, 101:21, 103:9, 104:24 .
**scheduled** 115:7 .
**schematically** 91:18 .
**scope** 51:2, 56:22 .
**screen** 23:23 .
**se** 34:17 .
**seal** 84:12 .
**seal.** 47:8 .
**search** 77:20 .
**seated** 3:1, 44:24, 87:19 .
**second** 28:13, 28:17, 29:6, 30:11, 38:2, 54:7, 56:7, 79:1, 80:5, 86:3, 87:1, 91:21 .
**Section** 11:3, 14:25, 88:18, 88:20, 93:18, 93:20, 95:13, 96:13, 98:6, 101:8, 104:12, 109:15 .
**sections** 92:23 .
**seek** 4:17, 64:23, 72:18, 81:18, 84:22 .
**seeking** 19:16, 19:22, 20:3, 31:10, 37:23, 67:14, 67:22, 71:3, 93:7 .
**seeks** 60:13, 92:23 .
**seems** 5:16, 6:18, 32:14, 33:17, 70:5, 80:15, 109:11 .
**seen** 34:11, 43:6, 61:9, 64:6, 82:24 .
**seize** 47:23 .
**selected** 113:4, 115:13 .
**selection** 4:13, 5:19, 9:15, 9:22, 10:6, 114:17, 114:24, 115:7, 115:15 .
**selections** 4:15 .
**sell** 25:23, 35:4, 62:9, 67:1, 67:3,

**Concordance**

67:4, 76:7, 76:11, 76:19, 79:19, 80:10 .
**seller** 77:18, 77:19, 77:23, 77:24 .
**sells** 62:12 .
**sense** 16:12, 16:13, 48:4, 57:14 .
**sensitive** 6:17, 29:24 .
**sent** 62:18, 65:24 .
**sentence** 53:14, 53:15, 97:11 .
**sentences** 49:5 .
**separate** 59:22, 79:17 .
**separating** 10:13 .
**September** 4:13, 9:15, 28:15, 113:23, 113:25, 114:2, 114:18 .
**sequence** 17:13 .
**series** 77:12 .
**serious** 29:19, 37:6, 37:7 .
**seriously** 100:10 .
**serve** 82:2 .
**served** 50:8 .
**set** 4:12, 10:3, 11:4, 13:14, 14:23, 14:25, 15:11, 42:13, 80:3, 80:4, 107:10 .
**sets** 36:5 .
**settled** 61:19, 69:2 .
**settlement** 4:21 .
**several** 28:7, 48:25, 75:17, 77:4, 77:12, 88:16, 107:15, 115:22 .
**shall** 13:11, 14:22 .
**Shallow** 68:11 .
**shape** 10:6 .
**SHAWN** 1:43, 2:39, 117:11 .
**shawn_mcroberts@txed.uscourts.gov** 1:47 .
**sheet** 76:10 .
**shell** 40:3 .
**Shen** 2:30, 4:3 .
**ship** 39:24 .
**Shire** 55:15 .
**short** 16:2 .
**shot** 11:4 .
**shouldn't** 31:11, 42:18, 69:5, 109:13 .
**show** 12:16, 12:23, 13:2, 13:3, 13:4, 21:17, 24:5, 33:5, 42:25, 43:22, 46:21, 46:25, 47:8, 48:12, 61:13, 61:16, 63:16, 64:1, 67:18, 74:15, 75:6, 76:19, 76:25, 83:17, 84:6,

84:15, 105:21, 114:11 .
**showed** 47:3, 54:8 .
**showing** 10:16, 13:5, 39:20 .
**shown** 30:10, 39:20, 40:18, 44:10, 53:14, 54:11, 81:3, 81:8, 90:13, 104:23 .
**shows** 21:15, 42:22, 62:24, 90:1 .
**Shure** 73:23 .
**side** 5:17, 5:20, 5:21, 6:1, 6:6, 8:4, 8:18, 8:19, 8:21, 14:8, 14:19, 16:2, 16:8, 20:14, 39:21, 40:19, 56:10, 66:18, 85:18, 112:9, 112:10, 112:11, 114:5, 116:1 .
**side-by-side** 10:17 .
**sides** 6:8, 8:10, 9:2, 26:12, 34:7, 40:10, 40:20, 40:22 .
**sideshow** 33:17 .
**significant** 15:5, 20:18, 22:14, 40:11, 42:22 .
**signing** 77:19 .
**similar** 53:23, 78:17, 78:25, 84:5 .
**Similarly** 28:15, 46:9, 46:11, 73:18 .
**Simmons** 102:20 .
**simplified** 50:19 .
**simply** 10:16, 21:6, 24:7, 24:12, 31:22, 51:14, 67:18, 70:4, 74:9, 80:2, 80:22, 96:21 .
**simultaneous** 8:19 .
**single-sided** 10:12 .
**sitting** 109:25 .
**situation** 36:15 .
**six** 9:1, 46:14 .
**sizable** 18:24, 21:7 .
**skill** 90:8, 94:18 .
**skilled** 106:14 .
**slow** 16:11 .
**small** 40:2, 40:17 .
**Smith** 102:19 .
**sold** 62:11, 66:24, 72:24, 77:1, 77:7, 84:14 .
**somehow** 99:17 .
**someone** 64:21, 84:1 .
**sometimes** 16:24 .
**somewhat** 37:14 .
**somewhere** 84:2 .
**soon** 4:24, 4:25, 69:2, 115:21 .

**sooner** 115:14 .
**sorry** 94:23, 110:5 .
**sorry--9** 83:7 .
**sort** 27:3, 27:4, 27:12 .
**sources** 101:12 .
**specialized** 98:15 .
**specific** 21:23, 23:19, 37:13, 39:8, 49:1, 61:10, 61:17, 106:1, 106:6 .
**specifically** 32:1, 51:3, 63:17, 88:25, 89:6, 90:25, 97:6 .
**specification** 49:7, 52:4, 52:5, 52:7, 52:11, 52:12, 89:6, 90:14, 90:17, 91:6, 91:8, 91:10, 91:17, 92:9, 94:17 .
**specifications** 20:16 .
**spectrum** 23:14 .
**split** 32:10 .
**sponsoring** 61:5, 80:24 .
**spot** 88:23, 90:10, 91:3, 93:6, 95:14, 96:2, 96:25, 97:12 .
**spot-like** 91:12 .
**spot-welded** 89:14, 90:19, 93:21, 97:7 .
**spots** 90:21, 90:23, 95:11, 97:10, 97:13 .
**spring-load** 45:15, 46:11, 48:25, 57:20, 58:9, 59:14 .
**spring-loaded** 52:1, 54:10 .
**ST.** 2:14, 2:26 .
**stage** 64:25 .
**stamp** 96:2 .
**stand** 4:25, 37:13, 42:9, 71:13, 109:25 .
**standard** 8:14, 26:20, 29:9, 31:21, 42:13, 80:23, 98:22, 110:20 .
**standing** 6:20, 7:3, 9:18, 39:3, 41:22, 42:5, 44:6, 66:15 .
**standpoint** 105:18, 105:20, 106:14, 107:22, 108:1 .
**stands** 74:8 .
**start** 15:24, 17:8, 17:23, 42:9, 44:1, 45:6, 48:4, 65:25, 75:25, 89:10, 92:20 .
**starting** 16:4 .
**starts** 95:8, 110:21 .
**state** 3:5, 71:13 .
**stated** 24:7, 69:24, 70:23 .
**statement** 16:2, 53:21, 53:23,

Concordance

54:6, 56:22, 67:23, 68:23,
69:13, 69:25, 70:11, 70:16,
70:23, 71:1, 71:2, 71:3, 71:5 .
**statements** 33:10, 50:23, 51:1,
68:17, 69:6, 69:15, 70:8,
111:23 .
**statements--the** 100:21 .
**STATES** 1:1, 1:25, 62:7, 62:14,
64:12, 66:25, 67:5, 67:8,
67:20, 74:16, 75:23, 76:8,
76:12, 76:21, 78:1, 78:4,
78:11, 78:21, 79:2, 80:12,
80:15, 108:8, 117:7 .
**States--in** 78:19 .
**static** 57:8 .
**static-friction** 46:7, 46:25, 49:4,
56:10 .
**status** 12:6 .
**stay** 53:20 .
**stayed** 50:7, 86:7 .
**stealing** 44:2 .
**step** 62:3, 99:19 .
**stereo** 39:25 .
**STETSON** 2:5 .
**STINSON** 2:17, 3:6, 3:7, 3:10,
3:13, 3:16, 3:19, 3:21, 11:17,
11:19, 65:24, 66:8, 66:9,
112:22, 114:24, 115:8, 116:3 .
**stipulation** 10:25, 17:5 .
**stipulations** 10:20, 10:23, 10:24,
14:20, 15:12, 16:16 .
**stopped** 41:8 .
**store** 99:19 .
**story** 83:22 .
**straight** 51:20 .
**STREET** 1:44, 2:20, 2:40 .
**strike** 88:13, 88:16 .
**strikes** 8:18, 8:20, 64:15 .
**stronger** 65:2 .
**subject** 7:25, 30:2, 51:19, 71:2,
81:17, 89:4, 89:19 .
**subjective** 29:16 .
**submit** 9:12, 19:6, 24:14, 38:25,
40:25, 41:12, 55:17, 62:18,
62:22, 62:23, 105:1, 106:11,
106:20 .
**submitted** 28:21, 30:3, 38:22,
89:24 .
**subsequent** 106:18 .
**Subsequently** 29:6 .

**subsidiary** 74:1, 74:6, 74:10 .
**substitute** 43:10 .
**suffer** 110:21 .
**sufficient** 5:17, 5:21, 31:1,
40:25, 41:13, 47:5 .
**sufficiently** 75:7, 80:11 .
**suggest** 15:7, 34:21, 63:10 .
**suggesting** 30:1, 32:11, 32:18 .
**suggestion** 42:15, 104:21 .
**suit** 29:2 .
**SUITE** 2:5, 2:14, 2:26 .
**summarized** 27:13, 52:16,
89:20 .
**summarizing** 41:6 .
**summary** 51:13, 52:16, 52:20,
71:25, 72:1, 72:2, 77:5 .
**Sunrise** 60:20, 60:21 .
**superiority** 20:15 .
**supplemental** 45:2, 59:22,
59:25 .
**supplied** 70:14, 77:23 .
**supply** 78:20 .
**support** 21:1, 52:10, 55:5, 55:19,
91:24, 96:24, 110:10 .
**supports** 64:24 .
**supposed** 107:24 .
**Surely** 111:3, 111:4 .
**surrounding** 34:9 .
**survived** 30:5 .
**suspected** 102:22 .
**sustain** 84:19, 86:14 .
**sustained** 81:12, 86:13 .
**switch** 24:5, 48:5, 62:1 .
.
.
**< T >** .
**table** 10:16, 22:8, 38:23 .
**tabs** 10:13 .
**talked** 25:10, 40:14, 52:16,
60:16, 83:12, 86:9, 106:3,
108:25 .
**talks** 91:17, 91:22, 94:16, 96:4,
97:11, 100:8, 101:19, 106:8,
106:19 .
**tangential** 102:12 .
**tangentially** 101:13 .
**target** 62:21 .
**targeting** 63:5, 63:17 .
**task** 100:1 .
**teach** 107:23 .

**teaches** 107:23 .
**teaching** 47:21 .
**technically** 106:10 .
**technologies** 106:13 .
**technology** 22:8, 109:9, 109:14,
109:19 .
**tells** 91:6 .
**tend** 64:1 .
**term--'held** 53:10 .
**terms** 12:6, 13:22, 15:10, 16:6,
19:1, 20:1, 32:14, 33:3, 36:1,
44:1, 44:5, 69:15, 80:23, 86:2,
94:19, 103:18 .
**territory** 44:2 .
**test** 34:1 .
**testify** 25:5, 103:22 .
**testifying** 25:2, 102:6 .
**testimony** 11:8, 11:11, 13:13,
18:7, 18:23, 19:2, 19:6, 19:12,
19:16, 19:21, 20:4, 23:14,
23:21, 24:16, 27:9, 43:20,
76:4, 83:14, 83:20, 85:7, 89:3,
90:6, 93:1, 93:8, 99:17,
101:17, 102:2, 103:25, 109:3 .
**Texarkana** 2:33, 2:35 .
**Texas** 1:2, 1:12, 1:45, 2:15, 2:34,
2:41, 69:24 .
**text** 51:23, 51:24, 52:4, 52:11,
53:16 .
**the'869** 28:23 .
**them--contents** 101:18 .
**theme** 75:19 .
**themes** 75:17 .
**themselves** 30:25 .
**theories** 29:18 .
**theory** 32:2, 80:3, 80:4 .
**they've** 39:10, 42:10, 44:8,
44:10, 80:4, 80:11 .
**thickness** 47:7 .
**think--and** 36:22 .
**third** 54:9, 77:25, 80:7 .
**Thomas** 104:9 .
**thorough** 33:13 .
**Thoroughness** 99:1, 102:16 .
**though** 34:22, 54:14, 91:24 .
**threat** 19:9 .
**three** 4:19, 45:9, 46:8, 46:21,
47:1, 57:11, 58:14, 69:19,
73:7, 73:13, 86:21, 100:21,
101:10 .

**Concordance**

**three-ring** 10:12 .
**throughout** 49:19, 108:11 .
**throwing** 42:9, 44:1 .
**Thursday** 9:15, 10:1, 10:4, 83:2, 115:2, 115:14, 115:16 .
**Tidwell** 2:32 .
**tie** 21:8, 73:8, 80:14 .
**tied** 74:25, 75:7, 80:12 .
**till** 59:16 .
**timeline** 50:19 .
**timely** 16:23, 51:15 .
**timing** 5:3 .
**Tingting** 80:6 .
**to--are** 24:17 .
**to--maybe** 80:14 .
**Today** 3:23, 83:13, 86:9, 101:9, 101:21, 113:20, 116:6 .
**took** 39:24, 45:4, 45:17, 48:3, 48:23, 49:23, 49:24, 99:18 .
**top** 45:8, 45:13, 46:2, 46:4, 46:20, 46:24, 47:3, 47:7, 49:21, 50:20, 51:21, 52:25, 53:12, 57:4, 57:5 .
**total** 77:6 .
**totality** 19:20, 34:1, 110:11 .
**totals** 78:12 .
**towards** 21:1, 51:18 .
**training** 108:20 .
**TRANSCRIPT** 117:2, 117:4 .
**translation** 77:16 .
**translators** 13:12 .
**travel** 12:5, 103:19 .
**tremendous** 61:1 .
**trespassing** 44:1 .
**Trial** 4:16, 8:23, 10:11, 12:1, 12:8, 12:9, 12:14, 14:10, 16:11, 17:7, 29:25, 34:14, 36:11, 38:20, 48:8, 53:8, 62:4, 82:1, 101:21, 103:18, 114:7 .
**trials** 4:23, 8:25 .
**tried** 62:3 .
**trier** 98:16, 110:17 .
**true** 39:24, 42:17, 50:7, 64:1, 69:13, 103:14 .
**truth** 63:22 .
**trying** 7:2, 11:7, 57:24, 66:23, 80:8 .
**turn** 17:7, 50:10, 78:20, 90:6 .
**turning** 51:17 .
**twice** 59:12 .

**TWO** 2:4, 9:4, 17:14, 20:1, 20:13, 21:3, 27:17, 28:4, 28:16, 28:21, 40:20, 45:24, 49:14, 50:21, 52:8, 57:18, 57:19, 58:7, 58:15, 59:13, 78:15, 79:17, 81:23, 84:5, 84:7, 84:9, 84:11, 97:2, 99:16, 104:7 .
**TWS** 62:6, 63:2, 64:11 .
**TX** 2:35 .
**tying** 61:10, 74:22 .
**TYLER** 2:15 .
**type** 40:8, 50:2, 78:17, 78:25, 79:9, 90:9, 90:24, 103:8 .
**types** 91:13 .
**typical** 79:5 .
**typically** 17:2, 62:11, 113:5 .
.
.
**< U >** .
**ultimate** 101:3 .
**ultimately** 35:19, 63:18, 105:21 .
**Ultralife** 88:19 .
**unable** 13:20, 13:24 .
**unambiguous** 55:17, 55:18 .
**unavailable** 9:4 .
**unaware** 74:22 .
**unclear** 60:19, 61:4, 82:8 .
**uncoated** 93:18, 93:20, 95:13 .
**undercutting** 29:18 .
**underline** 53:15 .
**underlined** 89:12 .
**underlying** 67:4, 106:9 .
**understand** 6:17, 10:15, 11:24, 35:18, 36:14, 57:24, 60:4, 61:15, 62:3, 72:21, 73:6, 85:1, 88:8, 90:8, 90:18, 92:21, 96:11, 97:17, 108:21, 111:19 .
**understanding** 7:18, 9:21, 27:15, 44:12, 106:12, 108:8, 108:13, 108:15, 108:17 .
**Understood** 7:14, 8:12, 65:5, 85:21 .
**undertaking** 96:24 .
**undue** 61:1 .
**unduly** 44:3, 110:8 .
**unequivocal** 68:11, 68:14 .
**unexpectedly** 9:3 .
**unintelligible** 59:19 .
**unique** 20:18, 22:14 .
**UNITED** 1:1, 1:25, 62:6, 62:14,

64:11, 66:25, 67:4, 67:8, 67:19, 74:16, 75:23, 76:8, 76:12, 76:21, 78:1, 78:4, 78:11, 78:19, 78:21, 79:2, 80:12, 80:15, 117:7 .
**units** 77:1, 77:7 .
**Unless** 17:6, 37:19, 47:23, 65:1, 81:1, 92:15 .
**unnamed** 83:18 .
**unnecessary** 71:12 .
**unpatentability** 100:12 .
**unreasonable** 31:9, 98:6, 100:4, 100:23, 101:23 .
**unreasonableness** 31:5 .
**unreliable** 98:18 .
**unresolved** 15:25 .
**until** 16:24, 51:6, 59:20, 64:20, 87:17, 96:12 .
**unusual** 36:15 .
**up-to-date** 12:6 .
**updated** 107:2 .
**upheld** 29:4 .
**upside** 40:9 .
**USA** 76:3 .
**users** 76:23 .
**uses** 28:15, 77:2, 77:5, 79:6 .
**using** 42:5, 98:18 .
**USPTO** 28:10 .
.
.
**< V >** .
**v.** 55:16, 68:11, 69:20, 74:3 .
**valid** 23:7, 29:17, 107:12, 110:18, 110:19 .
**validity** 37:12, 83:21, 101:1, 113:19 .
**value** 104:22 .
**variety** 39:6 .
**various** 49:6, 52:17, 98:21, 107:9 .
**vast** 107:8 .
**veil** 74:7, 74:12 .
**verdict** 9:2, 9:5 .
**version** 28:12 .
**versus** 3:3, 52:6, 68:8, 102:18 .
**video** 114:11 .
**view** 33:15, 37:22 .
**view--and** 36:25 .
**views** 43:25 .
**violate** 7:9, 92:5 .

Concordance

**violates** 93:9 .
**violation** 8:11 .
**virtue** 40:1 .
**voir** 6:1, 6:6, 6:15, 7:19, 7:22, 8:14 .
**VOIT** 2:3 .
**vs** 1:9 .
.
.
**< W > .**
**waived** 104:24 .
**waiver** 50:12, 50:23, 50:25, 51:16, 89:18 .
**wall** 94:10 .
**WANG** 2:30, 4:3, 4:4, 45:1, 48:12, 48:16, 49:8, 49:15, 49:16, 55:22, 55:23, 56:17, 56:24, 58:3, 58:12, 58:23, 59:4, 59:11, 60:1 .
**wanted** 5:1, 14:18, 15:13, 16:15, 27:1, 50:4 .
**wanting** 23:3, 75:5 .
**wants** 5:21, 14:19, 15:24, 51:24, 116:1 .
**war** 63:4 .
**warranty** 79:15, 80:23 .
**wars** 63:6 .
**WASHINGTON** 2:21 .
**Water** 68:11 .
**Watson** 55:16 .
**Wednesday** 115:16 .
**week** 4:16, 12:7, 112:19, 112:20, 114:6 .
**weight** 81:5, 110:9 .
**welcome** 17:16, 49:16 .
**weld** 89:7, 89:8, 89:16, 89:23, 90:20, 90:21, 90:23, 91:13, 91:14, 91:22, 93:5, 94:1, 94:9, 94:12, 95:10, 95:11, 95:17, 96:2, 96:7, 96:25, 97:9, 97:10, 97:13 .
**welded** 88:24, 89:14, 90:20, 91:12, 93:21, 95:15, 97:2, 97:8, 97:12 .
**welding** 89:8, 89:16, 90:9, 90:10, 91:2, 91:3, 91:4, 93:6, 93:7, 96:3 .
**well-known** 90:10 .
**well-reasoned** 33:13, 35:24 .
**well-set** 69:15 .

**Wes** 3:10, 6:12, 17:10, 87:22 .
**WESLEY** 2:11 .
**Whatever** 5:7, 15:14, 16:6, 47:20, 55:25, 56:3, 56:5 .
**whereas** 13:13, 32:12, 70:3 .
**wherein** 93:17 .
**wherever** 7:13 .
**whether--and** 22:11 .
**whichever** 88:10 .
**whom** 71:1 .
**willful** 18:19, 27:16, 30:19, 30:21, 30:22, 32:10, 32:16, 34:21, 36:13, 37:12, 38:21, 39:2, 41:16, 110:16 .
**willfully** 19:19 .
**willfulness** 32:14, 32:20, 33:18, 33:20, 34:2, 37:22, 41:25, 42:1, 42:3, 61:16, 98:5 .
**willing** 13:19, 13:24, 109:6 .
**wireless** 39:24 .
**withdraw** 5:3, 5:6, 72:4, 83:4 .
**withdrawing** 82:23, 87:25, 90:3 .
**withdrawn** 18:4, 25:12, 33:6, 34:22, 60:4, 60:7, 65:12, 69:2, 72:7, 81:19, 82:1, 82:8, 82:21, 82:22, 86:12, 86:14, 86:15 .
**withdrew** 26:8, 86:6, 89:25 .
**within** 12:7, 105:6, 105:22 .
**Without** 9:2, 23:19, 37:24, 42:6, 53:24, 54:4, 91:12, 113:13 .
**witness** 11:5, 11:6, 12:15, 18:22, 61:5, 102:5, 103:21, 104:5, 109:25, 111:11, 111:12, 111:17 .
**witnesses** 5:17, 11:9, 11:11, 12:1, 12:5, 12:22, 13:20, 13:24, 14:7, 21:8, 21:19, 25:2, 64:20, 101:16, 103:18, 114:10, 115:1 .
**WITTMAN** 3:14, 26:21, 26:24, 28:3, 30:9, 30:20, 31:13, 31:19, 32:24, 36:18, 37:20, 38:2, 38:6, 49:17, 53:1, 53:12, 53:21, 55:8, 55:21, 88:12, 92:17, 92:18, 96:17, 96:18, 97:16, 97:19, 97:22 .
**Wittmann** 2:10, 3:13 .
**word** 43:1, 43:16, 56:1, 57:12, 115:21 .
**words** 8:1, 34:12, 34:19, 39:14,

44:10, 52:19, 70:13, 77:1, 78:20, 79:8, 113:4 .
**work** 13:20, 13:24, 14:1, 15:7, 15:14, 39:13, 39:14, 39:15, 40:18, 41:10, 105:15, 108:16 .
**workable** 104:22 .
**workbench** 40:25 .
**worked** 15:10, 105:16 .
**working** 12:4, 12:11, 76:6, 79:18 .
**works** 32:14, 62:8 .
**world** 79:7 .
**worldwide** 62:13 .
**worth** 102:20 .
**writing** 26:11 .
**written** 8:19, 11:13, 26:1, 27:11, 29:2, 30:9, 31:3, 31:4, 59:23, 60:18, 60:19, 88:9 .
.
.
**< X > .**
**Xiaoniao** 80:6 .
**Xu** 104:8 .
.
.
**< Y > .**
**yellow** 50:22 .
**yesterday** 68:5 .
**you-all** 11:18 .
.
.
**< Z > .**
**zinc-air** 81:23, 82:16, 82:17, 84:7, 84:13, 84:15 .